1
2
3
4
5
6
7
8
9

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

10  JAMES GAO,

11              *Plaintiff*,

12        v.

13  PENTIUM ATLAS FUND III, LP,
    PENTIUM INVEST, LLC, RYAN MILLER,
14  KEUMHWAN KWONG (*a/k/a Kevin
    Kwong*), and DAVID YEOW,
15
16              *Defendants*.

Case No.: 2:25-cv-1543

**COMPLAINT WITH JURY DEMAND**

17                    **INTRODUCTION**

18        1.      Plaintiff James Gao, by and through his undersigned counsel, brings this action to

19  remedy Defendants' mishandling of his money invested in Defendants' hedge fund, and

20  Defendants' inducing Plaintiff's investment in the fund based on materially misleading information.

21        2.      Plaintiff invested $800,000 in a hedge fund, Defendant Pentium Atlas Fund III, LP

22  (the "Fund"), in September 2023.

23        3.      The Fund was structured as a limited partnership and managed by its general partner,

24  Defendant Pentium Invest, LLC ("Pentium Invest"), which was responsible for, among other things,

25  selecting and managing the Fund's investments.

26
27  PLAINTIFF'S COMPLAINT WITH JURY
    DEMAND - 1

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

4.      Defendants Ryan Miller, Keumhwan (a/k/a Kevin) Kwong, and David Yeow (collectively, the "Individual Defendants") were the founders and principals of Pentium Invest. Through Pentium Invest, the Individual Defendants acted as the senior executives responsible for, among other things, determining the Fund's investment strategy, selecting and monitoring the Fund's investments, and soliciting investors for the Fund.

5.      Plaintiff invested in the Fund based on a private placement memorandum and investor presentation prepared by Defendants, which provided limited information about the Fund's supposed investment strategy but did not disclose the Fund's specific investments.

6.      These disclosures promoted the Fund's purported multiple-strategy approach to investing and the Fund's supposed diversification of its investments.  The disclosures also assured that the Fund would use minimal, if any, leverage when making investments.

7.      For example, these materials said that the Fund would "employ[] a multi-strategy approach to investing, with the objectives of diversification, effective risk management, and potential enhanced returns," and that Pentium Invest and the Individual Defendants would construct for the Fund a "[r]esilient portfolio layered with multiple uncorrelated strategies."  The private placement memorandum repeatedly said that the Fund "d[id] not generally expect to utilize leverage as a part of the Partnership's investment program."

8.      Throughout the entire duration of Plaintiff's investment in the Fund, he never received any information from Defendants suggesting that the Fund was using meaningful leverage or incurring any liabilities as part of its investment strategy, such as margin obligations to the Fund's broker.

9.      In July 2024, Plaintiff, still unaware of the misleading nature of the Fund's description of its investment strategy, asked to withdraw his investment in the Fund.  Plaintiff's request was based on his need for more liquid assets—not because he had any reason to believe that anything was amiss with the Fund.

10. Plaintiff, the Fund, and Pentium Invest agreed that the Fund would withdraw, and distribute to Plaintiff, half of his investment on July 31, 2024, and the remainder of his investment on August 31, 2024.

11. The Fund and Pentium Invest assured Plaintiff that his first withdrawal, of approximately $450,000, had been processed on July 31, 2024, and that he would receive his money soon.

12. Unbeknownst to Plaintiff, however, as of July 31, 2024, the Fund had accumulated substantial short positions, in almost exclusively a single type of option. As a result, the Fund had only about $10.5 million in assets yet nearly $45 million in liabilities. This proved catastrophic for Plaintiff, and all of the Fund's other investors, during a spike in market volatility that began in early August.

13. As a result of that spike in volatility, the Fund's position became extremely precarious. On or about August 5, 2024, the Fund's broker informed Defendants that they needed immediately to contribute additional assets to the Fund's brokerage account, in order to satisfy the Fund's margin requirements, or else the broker would begin liquidating the Fund's positions. That liquidation would entail using the Fund's comparatively small amount of liquid assets (e.g., cash or U.S. Treasuries) to close out the Fund's substantial short positions in options, in order to eliminate the liability associated with those positions.

14. Despite receiving this warning, Defendants did not contribute assets to the Fund's account sufficient to satisfy the Fund's margin requirements. Even more egregiously, Defendants left the approximately $450,000 of money related to Plaintiff's withdrawal in the Fund's brokerage account, rather than segregating it in a separate account, thereby leaving it within the broker's control as collateral for the Fund's margin requirements.

15. Due to Defendants' failure to meet their margin requirements, the Fund's broker liquidated the Fund's entire account and used all of its assets to close out the liabilities associated

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 3

1    with the Fund's short option positions.  In fact, the Fund's liabilities were so large that the Fund

2    ended up owing its broker nearly $360,000 after the liquidation.

3        16.    Plaintiff and the Fund's other investors lost their entire investments.  For Plaintiff,

4    this included the approximately $450,000 that he had already withdrawn and that the Fund should

5    not have continued to leave at risk.

6        17.    Only after the liquidation did Plaintiff learn, through information compelled by a

7    statutory books and records request, that the Fund had maintained such large liabilities relative to

8    its assets.  In other words, the Fund had used exactly the type of leverage that Defendants had

9    assured Plaintiff the Fund would not use.  The records revealed for the first time not only that the

10   Fund had incurred large liabilities, but that the liabilities were incurred by pursuing a single

11   investment strategy: taking short positions in put options tied to the S&P index.  Concentrating

12   almost the entire portfolio in a single type of position contradicted the Fund's assurances that it was

13   pursuing multiple, uncorrelated strategies.

14       18.    Plaintiff did not expect, and could not reasonably have known based on Defendants'

15   misleading disclosures, that he might lose his entire investment not because the Fund's investments

16   had declined in value, but because the investments were seized to satisfy the Fund's substantial

17   undisclosed liabilities.  Defendants' repeated statements that the Fund would use minimal leverage

18   and that it would pursue multiple investment strategies gave Plaintiff (and every other reasonable

19   investor) no reason to believe that outcome was even a possibility.

20       19.    As explained in greater detail in this complaint, Defendants' misleading statements

21   about the Fund's investment strategy violate the federal securities laws and Washington's securities

22   laws.  Additionally, Defendants' mishandling of the money related to Plaintiff's withdrawal of his

23   investment amounts to a breach of their fiduciary duty of loyalty to Plaintiff under Delaware law

24   and the terms of the Fund's governing documents.

25

26

27   PLAINTIFF'S COMPLAINT WITH JURY
     DEMAND - 4

1

## **THE PARTIES**

2       20.    Plaintiff James Gao is an individual who resides in, and is a citizen of, Washington.

3  Plaintiff invested in, and became a limited partner of, the Fund.

4       21.    Defendant Pentium Atlas Fund III, LP, is a limited partnership organized under the

5  laws of Delaware with its principal place of business in Nevada.  The Fund was initially organized

6  pursuant to a Limited Partnership Agreement dated August 1, 2023, which was amended pursuant

7  to a First Amended and Restated Limited Partnership Agreement dated November 1, 2023 (the "LP

8  Agreement").  A copy of the LP Agreement is attached to this complaint as **Exhibit A**.

9       22.    Defendant Pentium Invest, LLC is a limited liability company organized under the

10  laws of Delaware with its principal place of business in Nevada.  Pentium Invest is the general

11  partner of the Fund.  Ryan Miller, Keumhwan Kwong, and David Yeow are the principals of

12  Pentium Invest, and, upon information and belief, they were Pentium Invest's sole members while

13  Plaintiff was invested in the Fund.

14       23.    Defendant Ryan Miller is an individual who, upon information and belief, is a

15  resident and citizen of Canada.  At all times relevant to Plaintiff's claims, Ryan Miller was a founder

16  and Managing Director of Pentium Invest.

17       24.    Defendant Keumhwan (a/k/a Kevin) Kwong ("Kevin Kwong") is an individual who,

18  upon information and belief, maintains a residence in both Nevada and Washington.  At all times

19  relevant to Plaintiff's claims, Kevin Kwong was a founder and the Chief Investment Officer of

20  Pentium Invest.

21       25.    Defendant David Yeow is an individual who, upon information and belief, is a

22  resident and citizen of California.  At all times relevant to Plaintiff's claims, David Yeow was a

23  founder and the President of Pentium Invest.

24

25

26

27  PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 5

1

## JURISDICTION AND VENUE

2     26.    This Court has jurisdiction over Plaintiff's claims asserted under the Exchange Act,

3   pursuant to 28 U.S.C. § 1331, because those claims arise under the laws of the United States, and

4   pursuant to 15 U.S.C. § 78aa(a), which grants the courts of the United States exclusive jurisdiction

5   to decide claims for violations of the Exchange Act.

6     27.    This Court has supplemental jurisdiction over the remainder of Plaintiff's claims,

7   pursuant to 28 U.S.C. § 1367(a), because they are so related to Plaintiff's claims under the Exchange

8   Act, over which this Court has original jurisdiction, that they form part of the same case or

9   controversy under Article III of the United States Constitution.

10    28.    Venue is proper in this District, pursuant to 15 U.S.C. § 78aa(a), because an act or

11  transaction constituting Defendants' violation of the Exchange Act occurred in this District, and

12  because the Defendants transacted business in this District.  Defendants provided Plaintiff with the

13  misleading private placement memorandum, as part of their solicitation of his investment in the

14  Fund, while Plaintiff was physically present in Kirkland, Washington, where Plaintiff resides.

15  Plaintiff signed his subscription agreement investing in the Fund while he was in Kirkland,

16  Washington, sent the Fund his signed subscription from Kirkland, Washington, and authorized the

17  wire transfer transmitting his investment in the Fund while he was in Kirkland, Washington.

18  Kirkland, Washington is located in King County, which is located within this District.  *See* 28

19  U.S.C. § 128(b).

20    29.    Venue is also proper in this District, pursuant to 28 U.S.C. § 1391(b)(2) because, for

21  the reasons described in Paragraph 28, a substantial part of the events or omissions giving rise to

22  Plaintiff's claims occurred in this District.   In addition to Defendants' soliciting Plaintiff's

23  investment in the Fund while Plaintiff was physically present in Kirkland, Washington, and Plaintiff

24  making his investment in the Fund while he was physically present in Kirkland, Washington,

25

26

27  PLAINTIFF'S COMPLAINT WITH JURY
    DEMAND - 6

Plaintiff also made his request to withdraw his investment in the Fund while he was physically present in Kirkland, Washington.

30.     This Court may exercise personal jurisdiction over all of the Defendants, pursuant to the nationwide grant of jurisdiction provided in the Exchange Act (15 U.S.C. § 78aa(a)), because each Defendant has sufficient contacts with the United States as a whole, and those contacts are related to Plaintiff's claims.  Those contacts include, but are not limited to:

    a.   The Fund and Pentium Invest were each organized under the laws of Delaware and had their principal place of business in Henderson, Nevada.

    b.   Each of the Defendants participated in recruiting investors for the Fund located throughout the United States, including Plaintiff located in Washington.

    c.   Kevin Kwong maintained a residence in Henderson, Nevada, from which he participated in managing Pentium Invest's operations and the Fund's investments.

    d.   David Yeow resides in California and, upon information and belief, was present in California when he participated in managing Pentium Invest's operations and the Fund's investments.

    e.   Ryan Miller identified the Fund's principal place of business in Henderson, Nevada, as his own business address in the Fund's Form D filed with the U.S. Securities and Exchange Commission ("SEC") on August 23, 2023.

    f.   Ryan Miller and David Yeow were presenters at the Fund Launch Live conference in Miami, Florida, which occurred on May 10–12, 2023, a few months before Defendants launched the Fund.[1]  Upon information and belief, one of their purposes of presenting at the conference was to promote their

---

[1] *Fund Launch Live 2023*, FUND LAUNCH (last accessed Aug. 11, 2025), https://buy.fundlaunchlive.com/fll-23 (identifying both Ryan Miller and David Yeow as presenters).

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 7

investment experience, and to develop contacts with potential investors, in connection with their plans to launch the Fund later that year.

g. Ryan Miller hosts the "Making Billions Podcast," which purports to be a "Top 2% Ranked Podcast Globally" and, on information and belief, includes a significant listener base in the United States. The podcast's website identifies Miller's affiliation with "Pentium Capital Partners" and promotes the podcast as providing information related to "strategies and pitfalls of fundraising" for investment funds, "demystify[ing] the world of hedge funds," and "discussing their investment approaches."[2]

h. The Individual Defendants appeared together on Miller's Making Billions Podcast to discuss the Fund, their investment experience, and the supposed virtues of the Fund's investment strategy, despite purporting to disavow any intent to use the podcast appearance to solicit investors for the Fund (because SEC regulations prohibited them from doing so).[3]

## **FACTUAL BACKGROUND**

**A.    Plaintiff's Investment in the Fund**

31.    Pentium Invest and the Individual Defendants formed the Fund in or about August 2023.

32.    Pentium Invest was the general partner of the Fund and, pursuant to the LP Agreement, "ha[d] exclusive management and control of the business of the Partnership," including

---

[2] *Making Billions with Ryan Miller* (last accessed Aug. 11, 2025), https://making-billions.com/.

[3] In the Fund's Form D filed with the SEC, which Ryan Miller personally signed, the Fund said that it was not registering its limited partnership interests as securities, which the U.S. Securities Act of 1933 would otherwise require, because the Fund was relying on the SEC's exemption from registration in Rule 506(b). That regulation prohibited Defendants from soliciting investors in the Fund through "any form of general solicitation or general advertising." 17 C.F.R. § 230.502(c)(1); *see also* 17 C.F.R. § 230.506(b)(1) (incorporating the prohibitions from 17 C.F.R. § 230.502(c)(1) into the Rule 506(b) exemption of registering securities). Kevin Kwong reiterated that the Fund had been relying on that same exemption in the Fund's amended Form D filed on October 16, 2024.

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 8

the authority to "make all decisions affecting the Partnership and the Partnership's assets." Ex. A §§ 5.01, 5.02.

33.     On September 18, 2023, Plaintiff met via videoconference with David Yeow and Kevin Kwong, where they described and promoted the Fund and solicited Plaintiff's investment. The next day, Yeow and Kwong emailed Plaintiff various investment-related documents, including the Fund's Confidential Private Placement Memorandum dated September 2023 (the "PPM"), an investor presentation entitled "Atlas Fund III: Preserve and Grow Wealth" (the "Investor Presentation"), and other transaction documents, including the Fund's Subscription Agreement.

34.     On or about September 26, 2023, Plaintiff entered into a Subscription Agreement with the Fund, which was countersigned by Kevin Kwong, on behalf of the Fund and Pentium Invest.

35.     Pursuant to that Subscription Agreement, Plaintiff invested $800,000 in the Fund and became a limited partner in the Fund.

36.     Pursuant to the LP Agreement, the value of Plaintiff's limited partnership interest in the Fund would increase (or decrease) depending on the performance of the Fund's investments. *See, e.g.*, Ex. A § 3.02.  As noted above, Pentium Invest would control the management of those investments.

37.     Plaintiff's limited partnership interest in the Fund was a security, as that term is defined in 15 U.S.C. § 78c(a)(10) and RCW § 21.20.005(17), because Plaintiff's limited partnership interest was a "participation in a[] profit-sharing agreement" of the Fund's profits, as described in those provisions.

38.     Additionally, Plaintiff's limited partnership interest in the Fund was a security, as that term is defined in 15 U.S.C. § 78c(a)(10) and RCW § 21.20.005(17), because the limited partnership interest was an "investment contract" described in those provisions.  Plaintiff's limited partnership interest in the Fund entailed Plaintiff's investment of money in the Fund, which is a

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    common enterprise.  Plaintiff expected to earn money from the efforts of others, specifically

2    Pentium Invest and the Individual Defendants, along with any non-parties retained by the Fund or

3    Pentium Invest to manage the Fund's investments and other operations.  Plaintiff did not intend to

4    perform work on behalf of the Fund that would help the Fund to generate profits, and Plaintiff never

5    performed any such work on behalf of the Fund.  In fact, pursuant to the LP Agreement, Plaintiff

6    and the other limited partners could "take no part in the management or control of the Partnership's

7    business" and "ha[d] no authority to act for or bind the Partnership."  Ex. A § 5.01.

8         39.     Plaintiff's Subscription Agreement with the Fund identified Plaintiff's limited

9    partnership interest as a security, as that term is defined in 15 U.S.C. § 78c(a)(10) and RCW §

10   21.20.005(17), because it included a legend explaining that Plaintiff's limited partnership interest

11   had not been registered under the Securities Act of 1933 and that Plaintiff could not transfer his

12   limited partnership interest unless either Plaintiff's limited partnership interest was later registered

13   or an exception to the Securities Act's transfer restrictions were to apply.  A similar legend was

14   included in the Private Placement memorandum that Plaintiff received prior to entering into the

15   Subscription Agreement.

16       **B.**     **Defendants' Misleading Statements Regarding the Fund's Investment**

17           **Strategy**

18        40.     Before Plaintiff invested in the Fund by entering into the Subscription Agreement,

19   he reviewed the PPM and Investor Presentation that Kevin Kwong and David Yeow had previously

20   presented to him via videoconference and sent to him by email.  A copy of the PPM is attached to

21   this complaint as **Exhibit B**, and a copy of the Investor Presentation is attached as **Exhibit C**.

22        41.     As explained in greater detail herein, the PPM and Investor Presentation contained

23   materially misleading information about the Fund's investment strategy, particularly its purported

24   diversification of investments and its use of leverage, that induced Plaintiff to invest in the Fund.

25

26

27   PLAINTIFF'S COMPLAINT WITH JURY
     DEMAND - 10

**Corr Cronin LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

42.     Defendants provided Plaintiff with only basic information about the Fund's investment strategy and the types of investments that the Fund would make. The Investor Presentation said that the Fund would invest in "Index Options." Ex. C at 3. The PPM explained that the Fund's "primary focus" would be "index options," and that the Fund would also "explore[] investing excess capital in short-term Treasury bills to optimize fund utilization." Ex. B at 3. Through these investments, the PPM explained that the Fund's strategy would "encompass[], but is not limited to, statistical arbitrage, short- to mid-term options, and mid- to long-term complex options structures, while concurrently implementing portfolio hedging techniques." *Id.*

43.     The PPM said that Pentium Invest "w[ould] only cause a material change to the Partnership's investment strategy with the consent of a majority in interest of Limited Partners." Ex. B at 4.

44.     Plaintiff never received information about the Fund's specific investments at any point during his investment in the Fund. Although Plaintiff received monthly reports related to the Fund's performance, those reports showed only the value of Plaintiff's limited partnership interest as of the beginning and end of each month, without identifying the Fund's specific investments or even the asset classes in which the Fund was invested. Neither those monthly reports, nor any other updates that Plaintiff received about the Fund, indicated that the Fund had incurred any liabilities, such as margin obligations owed to the Fund's broker, or that the Fund was invested almost exclusively in a single type of position.

45.     Through the PPM and Investor Presentation, Defendants made numerous materially misleading statements about the Fund's use of multiple different strategies and diversification of its investments, including but not limited to the following statements:

    a.  The PPM said: "The Partnership was formed for the purpose of employing a multi-strategy approach to investing, with the objectives of diversification, effective risk management, and potential enhanced returns." Ex. B at 1, 3.

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 11

b.   The Investor Presentation said that one of the Fund's objectives was "Capital Preservation," which it would achieve through a "[r]esilient portfolio layered with multiple uncorrelated strategies." Ex. C at 8.

c.   The Investor Presentation said that the Fund would be "focused on risk mitigation & **diversification**." Ex. C at 8 (emphasis in original).

d.   The Investor Presentation said that the Fund would achieve "[d]iversification" by "[a]void[ing] dependence and over-leveraging one specific strategy." Ex. C at 9.

46.   Through the PPM and Investor Presentation, Defendants made numerous materially misleading statements about the Fund's use of leverage in its investment strategy, including but not limited to the following statements:

a.   Although the PPM acknowledged that the Fund might, under some circumstances, use leverage when making its investments, the PPM repeatedly said that "the GP [i.e., Pentium Invest] does not generally expect to utilize leverage as a part of the Partnership's investment program." Ex. B at 4, 12, 17.

b.   The Investor Presentation said that the Fund would "maintain[] substantial **liquidity** and avoid overleveraging." Ex. C at 8.

47.   Similarly, the PPM said that "[t]he Partnership *may* engage in short selling as part of its general investment strategy," which implied that the Fund would not rely exclusively or predominantly on short-selling to further its investment strategy. Ex. B at 18. Short-selling inherently entails the use of leverage.[4]

---

[4] In the context of investing, leverage refers to purchasing an investment using borrowed funds or assets. *See, e.g.*, Black's Law Dictionary (12 ed. 2024) (defining "leverage" as "[t]he use of credit or borrowed funds (such as buying on margin) to improve one's speculative ability and to increase an investment's rate of return"); Adam Hayes, *What Is Financial Leverage and Why Is it Important?*, INVESTOPEDIA (last updated June 2, 2025), https://www.investopedia.com/terms/l/leverage.asp ("Leverage refers to using debt or borrowed funds to amplify returns from an investment or project."). Taking a short position in an option, without also holding the product

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

48.     Upon information and belief, the PPM and Investor Presentation were prepared or approved by Pentium Invest, which was the only partner authorized to perform any actions on behalf of the Fund.

49.     Upon information and belief, the Individual Defendants also participated in the preparation of, and approved, the PPM and Investor Presentation.  Both the PPM and Investor Presentation identify each of the Individual Defendants by name, and the PPM identified them as Pentium Invest's "principals."  And both documents had been presented and emailed to Plaintiff by David Yeow and Kevin Kwong.

**C.    The Liquidation of the Fund and the Loss of Plaintiff's Investment**

50.     On or about August 6, 2024, the Fund lost all of its assets, not because the Fund's investments had lost their value, but because the Fund's broker liquidated all of them to satisfy the Fund's substantial margin requirements, which had never previously been disclosed to Plaintiff.

51.     Pentium Invest and the Fund informed the Fund's investors, including Plaintiff, of this development, in a letter dated August 14, 2024.

52.     In that letter, Pentium Invest and the Fund attributed the liquidation to a "pullback" in "[t]he S&P 500 Index" that they said occurred on "August 1st and 2nd," 2024, which supposedly led to a "spike in market volatility" on August 5, 2024.

53.     In the same letter, Pentium Invest and the Fund admitted that the Fund did not have sufficient long positions in options to hedge against the Fund's substantial short positions, or to serve as sufficient collateral for the Fund's margin requirements to its broker caused by the short positions.

---

underlying the option, involves using leverage.  *See* CHARLES SCHWAB, *Characteristics and Risks of Standardized Options*, at 66 (June 2024), https://www.theocc.com/getmedia/a151a9ae-d784-4a15-bdeb-23a029f50b70/riskstoc.pdf ("Since *the leverage inherent in an option* can cause the impact of price changes in the underlying interest to be magnified in the price of the option, a writer of an option that is uncovered and unhedged may have a significantly greater risk than a short seller of the underlying interest." (emphasis added)).

PLAINTIFF'S COMPLAINT WITH JURY DEMAND - 13

54.     According to Pentium Invest and the Fund, the Fund's broker contacted Pentium Invest and the Fund on or about August 5, 2024, to advise that "an immediate capital injection was necessary to maintain the Portfolio's positions."

55.     In other words, Pentium Invest needed to contribute substantial cash (or other assets) into the Fund's brokerage account to remain compliant with the Fund's margin requirements, or else the Fund's broker would liquidate and close out the Fund's positions, including its short option positions.

56.     According to Pentium Invest and the Fund, the Fund's broker gave them "an extension of a day to seek stabilization and recovery."  But when the Fund failed to remedy its compliance with its margin requirements, "all positions were ultimately liquidated by Charles Schwab on the morning of August 6th, 2024."

57.     As a result of the broker's liquidation, the Fund "lost all Portfolio assets," and ended up owing to its broker $358,271.

58.     The Fund later advised Plaintiff and other investors, through the Fund's outside auditing firm, that Pentium Invest would be paying the Fund's outstanding debt to the broker, but that investors would receive nothing.

59.     The Fund's and Pentium Invest's letter to investors dated August 14, 2024, did not adequately explain what the Fund had invested in or how the Fund's investment choices resulted in the liquidation of the Fund's entire portfolio on August 6, 2024.  To obtain that information, Plaintiff made a statutory books and records request from the Fund, as authorized by the LP Agreement.

60.     That books and records request revealed that, as of July 31, 2024, the Fund had approximately $10.5 million in assets, which were primarily held through cash and fixed income products—presumably U.S. Treasuries, according to the strategy described in the PPM.  The Fund also had nearly $45 million in liabilities, which directly contradicted Defendants' assurances in the

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

PPM and Investor Presentation that the Fund would not use meaningful leverage as part of its strategy.  Although the Fund did not provide Plaintiff with a complete disclosure of its assets, the Fund's limited disclosures, together with Defendants' letter to investors dated August 14, 2024, show that the Fund's liabilities were attributable almost exclusively to short positions in a single type of put option (SPX put options, which are options tied to the Standard & Poor's 500 Index).

D.    **The Liquidation Revealed the Falsity of Defendants' Statements About the Fund's Strategy**

61.    The liquidation of the Fund's entire portfolio on August 6, 2024, coupled with the investor update on August 14, 2024, and the Fund's later response to Plaintiff's books and records request, revealed that Defendants' statements in the PPM and Investor Presentation were materially misleading.

62.    Defendants' statements described above, in Paragraph 46, about the Fund's use of leverage, including that the Fund "d[id] not generally expect to utilize leverage as a part of the Partnership's investment program," were materially misleading because the Fund actually employed substantial leverage.  As described above, as of July 31, 2024, shortly before the Fund's entire portfolio was liquidated, the Fund had only about $10.5 million in assets yet had nearly $45 million in liabilities associated with unhedged short positions in options.

63.    Defendants' statements described above, in Paragraph 45, about the Fund's diversification of investments and multi-strategy approach, were materially misleading because the Fund's near-exclusive strategy was to write index options—thereby taking a short position in the options—and to hold the vast majority of the premiums received for writing those options in cash and U.S. Treasuries.  Only a small majority of the Fund's assets—2% as of July 31, 2024—were invested in long positions in options for hedging purposes.

64.    Defendants' statement described above, in Paragraph 47, stating that it was merely *possible* that the Fund would engage in short selling, was materially misleading because, in fact,

**Corr Cronin LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

the Fund predominantly invested in short positions in options.  As of July 31, 2024, the Fund had approximately $45 million in liabilities attributable to short positions in options relative to only about $213,000 of assets attributable to long positions in options.

65.    Defendants' statements about the Fund's limited use of leverage, its diversified, multi-strategy approach, and its limited use of short-selling must have been materially misleading at the time they were made—i.e., when Defendants sent the PPM and Investor Presentation to Plaintiff in September 2023—and not merely inaccurate when the fund was liquidated in August 2024.  As described above, the PPM said that Pentium Invest "w[ould] only cause a material change to the Partnership's investment strategy with the consent of a majority in interest of Limited Partners."  Ex. B at 4.  The LP Agreement contained a nearly identical restriction.  Ex. A § 5.02. Neither Pentium Invest, nor any of the other Defendants, ever disclosed to Plaintiff, or obtained his consent to, a change in the Fund's investment strategy.  Therefore, the strategy that Defendants were pursuing on behalf of the Fund, and the Fund's portfolio of investments, were substantially the same at the time of Plaintiff's investment as they were at the time the Fund was liquidated.[5]

66.    Each of the Defendants knew that the statements described above in Paragraphs 45–47 were materially misleading at the time they were made or, alternatively, made those statements with reckless disregard for their truth.  More specifically:

    a.    The Fund would have known the positions in which it was invested and the investment strategy the Fund was pursuing;

    b.    Pentium Invest, as the general partner of the Fund and the only person authorized by the LP Agreement to act on the Fund's behalf, would have known the positions in which the Fund was invested and the investment strategy the Fund was pursuing;

---

[5] Of course, if Defendants elected to change the Fund's investment strategy without the consent of the majority in interest of the Fund's limited partners, that would constitute an independent breach of the LP Agreement.

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1      c.   Kevin Kwong was Pentium Invest's Chief Investment Officer and was
2           personally involved in developing the Fund's strategy and selecting its
3           investments.   During Kwong's appearance on Ryan Miller's "Making
4           Billions Podcast," he promoted his personal involvement in managing the
5           Fund by discussing, among other things, the "[g]eneral guidelines" he used
6           to determine the Fund's "risk management protocol."   Kwong was also
7           responsible for conveying information about the Fund's strategy and
8           performance to investors, as shown by his signing the Fund's 2023 year-end
9           update and the letter to investors dated August 14, 2024.  The PPM touted
10          his more than 15 years of investment experience, and he currently works for
11          CNA Insurance.   Accordingly, Kevin Kwong was an experienced investor
12          who, at the time Defendants made their materially misleading statements,
13          would have understood basic financial concepts, such as leverage,
14          diversification, and short-selling, and would have understood that
15          Defendants' statements on those topics were materially misleading.

16      d.   David Yeow was Pentium Invest's "investment strategist," according to the
17          PPM, and its "President," according to the Investor Presentation.  He was
18          personally involved in developing the Fund's strategy and selecting its
19          investments.  During Yeow's appearance on Ryan Miller's "Making Billions
20          Podcast," he promoted his personal involvement in managing the Fund by
21          discussing, among other things, the "deep research" he performed to
22          determine the Fund's trading strategy.   Yeow was also responsible for
23          conveying information about the Fund's strategy and performance to
24          investors, as shown by his signing the Fund's 2023 year-end update and the
25          letter to investors dated August 14, 2024.  The PPM touted his more than 15

26

27     PLAINTIFF'S COMPLAINT WITH JURY
       DEMAND - 17

1    years of investment experience, and he currently holds himself out as the

2    Chief Operating Officer of a technology company called Sensate.

3    Accordingly, David Yeow was an experienced investor who, at the time

4    Defendants made their materially misleading statements, would have

5    understood basic financial concepts, such as leverage, diversification, and

6    short-selling, and would have understood that Defendants' statements on

7    those topics were materially misleading.

8        e.    Ryan Miller was Pentium Invest's "Managing Director" according to the

9        PPM.    Upon information and belief, he was personally involved in

10       developing the Fund's strategy and selecting its investments.    The PPM

11       touted Miller's prior experience as a "Chief Financial Officer," his

12       experience "manag[ing]" a "$250M Technology Portfolio," and his

13       experience "mentor[ing] over 200 emerging fund managers to start and scale

14       their investment funds, totaling around $4B in funds raised to date."  Ex. B

15       at 6.  Throughout the life of the Fund, Miller hosted the "Making Billions

16       Podcast," which promotes itself as providing information related to

17       "strategies and pitfalls of fundraising" for investment funds, "demystify[ing]

18       the world of hedge funds," and "discussing their investment approaches."[6]

19       Accordingly, Ryan Miller was an experienced investor who, at the time

20       Defendants made their materially misleading statements, would have

21       understood basic financial concepts, such as leverage, diversification, and

22       short-selling, and would have understood that Defendants' statements on

23       those topics were materially misleading.

---

[6] *Making Billions with Ryan Miller* (last accessed Aug. 11, 2025), https://making-billions.com/.

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 18

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

f.   The Individual Defendants were the principals of Pentium Invest and, upon information and belief, its sole employees and the only people responsible for managing the investments of the Fund.  Furthermore, Pentium Invest did not manage any other investment funds.  Therefore, determining the Fund's investment strategy and selecting its investments were a core aspect of Pentium Invest's operations, such that each of the Individual Defendants would have been aware of the Fund's investment strategy, the assets in which it was invested, and the Fund's use of leverage and short positions.

E.   **Defendants' Mishandling of Plaintiff's Withdrawal Request**

67.   On July 1, 2024, prior to the liquidation of the Fund described above, Plaintiff requested to withdraw his entire investment in the Fund.  Plaintiff made the request by email to Kevin Kwong and David Yeow.

68.   At the time Plaintiff asked to withdraw his investment, he was not aware, and could not reasonably have been aware, of the Fund's substantial leverage or its overexposure to short positions in a single type of option.  Plaintiff was not dissatisfied with the Fund's past performance or concerned about its future performance.  Plaintiff simply wanted to have the money he had invested in the Fund to be accessible in cash or more liquid investments.

69.   The LP Agreement permitted limited partners to withdraw some or all of their investment in the Fund on 60 days' notice, but the LP Agreement expressly authorized Pentium Invest to "waive[]" that notice period.  Ex. A § 4.01(a).

70.   Kevin Kwong agreed, on behalf of the Fund and Pentium Invest, to permit Plaintiff to withdraw half of his investment in the Fund as of the end of July 2024, and the remainder of Plaintiff's investment as of the end of August 2024.

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 19

71.     In furtherance of that agreement, Plaintiff signed the Fund's standard Form of Request for Withdrawal, requesting to withdraw 50% of his investment in the Fund as of July 31, 2024.  The Fund marked that request as "Accepted" on the withdrawal form.

72.     As of July 31, 2024, 50% of Plaintiff's investment in the Fund amounted to $447,218.52.   Therefore, the amount of the withdrawal to which Plaintiff was entitled was $447,218.52.

73.     Kevin Kwong informed Plaintiff, by email on July 31, 2024, that Plaintiff's withdrawal had taken place and that the withdrawn funds would soon be wired to Plaintiff.

74.     Pursuant to the LP Agreement, Plaintiff had a right to receive his withdrawn funds within 30 days of the withdrawal date.  Ex. A § 4.01(b).

75.     During the period between the withdrawal of 50% of Plaintiff's investment, and the Fund's anticipated distribution of those withdrawal proceeds to Plaintiff, the Fund kept those proceeds in its brokerage account with Charles Schwab.

76.     Since the Fund kept the money associated with Plaintiff's withdrawal in the Fund's brokerage account, that money, which Plaintiff had a contractual right to receive, continued to serve as collateral for the Fund's various investments in its brokerage account.  Therefore, the money associated with Plaintiff's withdrawal was subject to the risk of being used to liquidate or close out the Fund's other investments if the Fund were to fail to comply with Charles Schwab's margin requirements.

77.     Due to the Fund's failure to segregate the money associated with Plaintiff's withdrawal, Charles Schwab used that money, along with all of the Fund's other assets, to liquidate the Fund's open positions on or about August 6, 2024, as described in more detail above.

78.     Before the Fund's broker liquidated all of the Fund's positions, on or about August 5, 2024, the broker notified the Fund and Pentium Invest that the Fund was out of compliance with

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 20

its margin requirements, and that the Fund needed to provide additional collateral, or else the broker would begin liquidating the Fund's positions to satisfy the margin requirements.

79.    Despite receiving this notice, the Fund and Pentium Invest kept the $447,218.52 of funds for Plaintiff's withdrawal in the Fund's brokerage account where they remained at risk of imminently being used by the Fund's broker to close out the Fund's substantial short positions in index options.

80.    As described above, Pentium Invest ultimately contributed its own money to the Fund to pay the nearly $360,000 deficiency that the Fund owed to its broker after the liquidation. Had Defendants not permitted the $447,218.52 necessary for Plaintiff's withdrawal to remain in the Fund's brokerage account, the deficiency that the Fund and Pentium Invest owed to broker after the liquidation would have been even larger.  Accordingly, the Fund and Pentium Invest benefited from keeping Plaintiff's withdrawal funds in the Fund's brokerage account.

81.    The Individual Defendants likewise benefited because, as the principals of Pentium Invest (and, on information and belief, Pentium Invest's only members), they effectively used Plaintiff's withdrawal funds to maximize their ownership interest in Pentium Invest.

82.    The Individual Defendants further benefited from keeping the money associated with Plaintiff's withdrawal in the Fund's brokerage account because the Individual Defendants had pledged their own personal assets in other investment accounts, separate from any investments they had made in the Fund, as collateral for the Fund's margin obligations.  Therefore, by causing the Fund to use the money associated with Plaintiff's withdrawal as collateral during the liquidation process, the Individual Defendants reduced the amount of their personal assets that might be spent by the Fund's broker during the liquidation.

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 21

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**CLAIMS FOR RELIEF**

**Count I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against All Defendants)**

83.     Plaintiff repeats and realleges every allegation in Paragraphs 1–82 as if fully set forth herein.

84.     This cause of action is based on Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

85.     Plaintiff's limited partnership interest in the Fund was a security, as that term is defined in 15 U.S.C. § 78c(a)(10), because Plaintiff's limited partnership interest was a "participation in a[] profit-sharing agreement" of the Fund's profits, as described in that provision.

86.     Additionally, Plaintiff's limited partnership interest in the Fund was a security, as that term is defined in 15 U.S.C. § 78c(a)(10), because the limited partnership interest was an "investment contract" described in that provision.  Plaintiff's limited partnership interest in the Fund entailed Plaintiff's investment of money in the Fund, which is a common enterprise.  Plaintiff expected to earn money from the efforts of others, specifically Pentium Invest and the Individual Defendants, along with any non-parties retained by the Fund or Pentium Invest to manage the Fund's investments and other operations.  Plaintiff did not intend to perform work on behalf of the Fund that would help the Fund to generate profits, Plaintiff never performed any such work on behalf of the Fund, and the LP Agreement prohibited Plaintiff from performing any such work on behalf of the Fund.

87.     Defendants obtained Plaintiff's investment in the Fund using methods of interstate commerce, including by operating as a hedge fund based in Nevada and soliciting Plaintiff's investment through electronic mail while he resided in Washington, and obtaining Plaintiff's

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 22

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  investment through a wire transfer that, upon information and belief, would have been deposited in
2  the Fund's account after being transmitted through methods of interstate commerce.

3      88.    In connection with obtaining Plaintiff's investment in the Fund, Defendants
4  employed a manipulative or deceptive device, specifically misleading statements of material facts
5  in the PPM and the Investor Presentation.

6      89.    When soliciting Plaintiff's investment in the Fund, Defendants made materially
7  misleading statements about material facts related to the Fund's operations, as described above,
8  including in Paragraphs 45–47.  Most significantly, Defendants delivered to Plaintiff the PPM and
9  Investor Presentation, which contained materially misleading statements about the Fund's use of
10 leverage, use of multiple investment strategies, diversification of investments, and limited use of
11 short positions.

12     90.    These statements were materially misleading because, as described above, including
13 in Paragraphs 50–65: (i) the Fund used substantial leverage when investing, and shortly before it
14 was liquidated, had only about $10.5 million in assets yet had nearly $45 million in liabilities, (ii)
15 the Fund employed a single strategy of selling options and reinvesting the premiums it received
16 from those sales almost entirely in cash and U.S. Treasuries, (iii) the Fund invested almost
17 exclusively in a short position in the same type of SPX index option, and (iv) the Fund's short
18 positions in options vastly exceeded the Fund's long positions in options (or any other type of long
19 position).

20     91.    As described above, including in Paragraph 66, Defendants knew that these
21 statements in the PPM and Investor Presentation were materially misleading when they were made
22 or, alternatively, were reckless in not knowing that such statements were materially misleading.

23     92.    Plaintiff relied on the supposed truth of the statements in the PPM and Investor
24 Presentation when deciding to invest in the Fund.

25

26

27 PLAINTIFF'S COMPLAINT WITH JURY
   DEMAND - 23

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

93.    Plaintiff's reliance on the information contained in the PPM and Investor Presentation was reasonable because Plaintiff did not know that the statements contained in the PPM and Investor Presentation were materially misleading when he invested in the Fund, nor could Plaintiff have discovered through the exercise of reasonable diligence that those statements were materially misleading.

94.    Immediately prior to the Fund's liquidation, Plaintiff's limited partnership interest in the Fund was worth $894,437.04.

95.    As a result of Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiff has sustained damages, including but not limited to the loss of his entire investment in the Fund, plus interest thereon.

96.    Plaintiff's loss of the value of his investment was caused by Defendants' materially misleading statements in the PPM and Investor Presentation.

97.    Alternatively, Plaintiff is entitled to rescind the Subscription Agreement, through which he purchased his limited partnership interests in the Fund, and to recover the $800,000 of consideration he paid, plus interest thereon.  *See* 15 U.S.C. § 78cc(b).

**Count II**

**Control Person Liability Under Section 20(a) of the Exchange Act**

**(Against Pentium Invest and the Individual Defendants)**

98.    Plaintiff repeats and realleges every allegation in Paragraphs 1–97 as if fully set forth herein.

99.    This cause of action is based on Pentium Invest's and the Individual Defendants' violations of Section 20(a) of the Exchange Act.  *See* 15 U.S.C. § 78t(a).

100.    Pentium Invest is a control person of the Fund.

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 24

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

101.　　The LP Agreement provides that only Pentium Invest, as the Fund's general partner, has the authority to take any action on behalf of the Fund, and it prohibits the Fund's limited partners from taking any action on behalf of the Fund. Ex. A § 5.01.

102.　　Pentium Invest determined the Fund's investment strategy and selected the Fund's investments.

103.　　Each Individual Defendant is a control person of the Fund and Pentium Invest.

104.　　The PPM identified the Individual Defendant as the "principals" of Pentium Invest. Upon information and belief, each Individual Defendant is a member of Pentium Invest and has the ability to control Pentium Invest.

105.　　Through the Individual Defendants' control over Pentium Invest, the Individual Defendants had the ability to control the Fund at all relevant times based on Pentium Invest's status as the Fund's general partner and the authority granted to the general partner under the Fund's LPA. *See* Ex. A § 5.01.

106.　　Ryan Miller was Pentium Invest's Managing Director, and by virtue of that position, had the ability to control Pentium Invest and the Fund.

107.　　David Yeow was Pentium Invest's President and was identified in the PPM as Pentium Invest's "investment strategist." By virtue of those positions, Yeow had the ability to control Pentium Invest and the Fund in all relevant aspects, including by selecting the Fund's investments and determining the Fund's investment strategy.

108.　　Kevin Kwong was Pentium Invest's Chief Investment Officer, and by virtue of that position, had the ability to control Pentium Invest and the Fund in all relevant aspects, including by selecting the Fund's investments and determining the Fund's investment strategy.

109.　　Pentium Invest and the Individual Defendants participated in the dissemination of the materially misleading statements in the PPM and the Investor Presentation. Pentium Invest, as the only person authorized to act on behalf of the Fund, must have authorized the content of the

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 25

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

PPM and Investor Presentation and authorized its distribution to Plaintiff. Each Individual Defendant is identified in the PPM by name in a section that describes their positions with Pentium Invest and their responsibilities related to the Fund, and each Individual Defendant is similarly described in the Investor Presentation. Additionally, Kevin Kwong and David Yeow personally sent Plaintiff the PPM and Investor Presentation by email and personally promoted the Fund to Plaintiff, based on those materials, during a videoconference.

110.    Pentium Invest and the Individual Defendants were culpable participants in the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged above based on their having participated in preparing and disseminating the PPM and Investor Presentation and determining and managing the Fund's investment strategy.

111.    As a control person of the Fund, Pentium Invest is jointly and severally liable with the Fund, and to the same extent as the Fund, for the Fund's violations of Section 10(b) of the Exchange Act and Rule 10b-5.

112.    As control persons of Pentium Invest and the Fund, the Individual Defendants are jointly and severally liable with Pentium Invest and the Fund, and to the same extent as Pentium Invest and the Fund, for the Fund's and Pentium Invest's violations of Section 10(b) of the Exchange Act and Rule 10b-5.

113.    Immediately prior to the Fund's liquidation, Plaintiff's limited partnership interest in the Fund was worth $894,437.04.

114.    As a result of Pentium Invest's and the Individual Defendants' actions, Plaintiff has suffered damages, including but not limited to the loss of his entire investment in the Fund, plus interest thereon.

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 26

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

**Count III**

**Violation of The Securities Act of Washington (RCW § 21.20.010)**

**(Against All Defendants)**

115.    Plaintiff repeats and realleges each and every allegation in Paragraphs 1–82 above as if fully set forth herein, except Plaintiff's allegations in Paragraph 66 that Defendants' statements were knowingly or recklessly false.

116.    This cause of action is based on Defendants' violations of The Securities Act of Washington, specifically RCW § 21.20.010(2).  *See* RCW § 21.20.430(1) (providing a private right of action for violations of RCW § 21.20.010).

117.    This cause of action is not based on any allegations of fraud, or any allegations of knowing or reckless conduct by any of the Defendants.  Rather, this cause of action is based on only materially misleading statements made by Defendants.  Plaintiff expressly disclaims any allegations of scienter, or knowingly or recklessly false statements, in connection with this claim.

118.    Plaintiff's limited partnership interest in the Fund was a security, as that term is defined in RCW § 21.20.005(17), because Plaintiff's limited partnership interest was a "participation in a[] profit-sharing agreement" of the Fund's profits, as described in that provision.

119.    Additionally, Plaintiff's limited partnership interest in the Fund was a security, as that term is defined in RCW § 21.20.005(17), because the limited partnership interest was an "investment contract" described in that provision.  Plaintiff's limited partnership interest in the Fund entailed Plaintiff's investment of money in the Fund, which is a common enterprise.  Plaintiff expected to earn money from the efforts of others, specifically Pentium Invest and the Individual Defendants, along with any non-parties retained by the Fund or Pentium Invest to manage the Fund's investments and other operations.  Plaintiff did not intend to perform work on behalf of the Fund that would help the Fund to generate profits, Plaintiff never performed any such work on

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 27

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

behalf of the Fund, and the LP Agreement prohibited Plaintiff from performing any such work on behalf of the Fund.

120.    In connection with obtaining Plaintiff's investment in the Fund, Defendants made misleading statements of material facts in the PPM and the Investor Presentation, in violation of RCW § 21.20.010(2).

121.    When soliciting Plaintiff's investments in the Fund, Defendants made materially misleading statements about material facts related to the Fund's operations, as described above, including in Paragraphs 45–47. Most significantly, Defendants delivered to Plaintiff the PPM and Investor Presentation, which contained materially misleading statements about the Fund's use of leverage, use of multiple investment strategies, diversification of investments, and limited use of short positions.

122.    These statements were materially misleading because, as described above, including in Paragraphs 50–65: (i) the Fund used substantial leverage when investing, and shortly before it was liquidated, had only about $10.5 million in assets yet had nearly $45 million in liabilities, (ii) the Fund employed a single strategy of selling options and reinvesting the premiums it received from those sales almost entirely in cash and U.S. Treasuries, (iii) the Fund invested almost exclusively in a short position in the same type of SPX index option, and (iv) the Fund's short positions in options vastly exceeded the Fund's long positions in options (or any other type of long position).

123.    Immediately prior to the Fund's liquidation, Plaintiff's limited partnership interest in the Fund was worth $894,437.04.

124.    As a result of Defendants' violations of RCW § 21.20.010(2), Plaintiff has sustained damages, including but not limited to the loss of his entire $894,437.04 investment in the Fund, plus interest thereon and attorneys' fees. *See* RCW § 21.20.430(1).

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

125.    Alternatively, Plaintiff is entitled to rescind his purchase of limited partnership interests in the Fund and to recover the $800,000 of consideration he paid, plus interest thereon and attorneys' fees. *See* RCW § 21.20.430(1). Plaintiff hereby tenders the security to Defendants.

**Count IV**

**Control Person Liability Under The Securities Act of Washington (RCW § 21.20.430(3))**

**(Against Pentium Invest and the Individual Defendants)**

126.    Plaintiff repeats and realleges each and every allegation in Paragraphs 1–82 above as if fully set forth herein, except Plaintiff's allegations in Paragraph 66 that Defendants' statements were knowingly or recklessly false.

127.    This cause of action is based on Pentium Invest's and the Individual Defendants' violations of The Securities Act of Washington, specifically RCW § 21.20.430(3)

128.    Pentium Invest is a control person of the Fund.

129.    The LP Agreement provides that only Pentium Invest, as the Fund's general partner, has the authority to take any action on behalf of the Fund, and it prohibits the Fund's limited partners from taking any action on behalf of the Fund.  Ex. A § 5.01.

130.    Pentium Invest determined the Fund's investment strategy and selected the Fund's investments.

131.    Each Individual Defendant is a control person of the Fund and Pentium Invest.

132.    The PPM identified each Individual Defendant as the "principals" of Pentium Invest. Upon information and belief, each Individual Defendant is a member of Pentium Invest and has the ability to control Pentium Invest.

133.    Through the Individual Defendants' control over Pentium Invest, the Individual Defendants had the ability to control the Fund at all relevant times based on Pentium Invest's status as the Fund's general partner and the authority granted to the general partner under the Fund's LPA. *See* Ex. A § 5.01.

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 29

134.    Ryan Miller was Pentium Invest's Managing Director, and by virtue of that position, had the ability to control Pentium Invest and the Fund.

135.    David Yeow was Pentium Invest's President and was identified in the PPM as Pentium Invest's "investment strategist."  By virtue of those positions, Yeow had the ability to control Pentium Invest and the Fund in all relevant aspects, including by selecting the Fund's investments and determining the Fund's investment strategy.

136.    Kevin Kwong was Pentium Invest's Chief Investment Officer, and by virtue of that position, had the ability to control Pentium Invest and the Fund in all relevant aspects, including by selecting the Fund's investments and determining the Fund's investment strategy.

137.    Pentium Invest and the Individual Defendants participated in the dissemination of the materially misleading statements in the PPM and the Investor Presentation.  Pentium Invest, as the only person authorized to act on behalf of the Fund, must have authorized the content of the PPM and Investor Presentation and authorized its distribution to Plaintiff.   Each Individual Defendant is identified in the PPM by name in a section that describes their positions with Pentium Invest and their responsibilities related to the Fund, and each Individual Defendant is similarly described in the Investor Presentation.  Additionally, Kevin Kwong and David Yeow personally sent Plaintiff the PPM and Investor Presentation by email and personally promoted the Fund to Plaintiff, based on those materials, during a videoconference.

138.    Pentium Invest materially aided the Fund's violations of RCW § 21.20.010 alleged above, and the Individual Defendants materially aided both the Fund's and Pentium Invest's violations of RCW § 21.20.010 alleged above, based on their having participated in preparing and disseminating the PPM and Investor Presentation and determining and managing the Fund's investment strategy.

139.    As a control person of the Fund, Pentium Invest is jointly and severally liable with the Fund, and to the same extent as the Fund, for the Fund's violations of RCW § 21.20.010.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    140.    As control persons of Pentium Invest and the Fund, the Individual Defendants are

2    jointly and severally liable with Pentium Invest and the Fund, and to the same extent as Pentium

3    Invest and the Fund, for the Fund's and Pentium Invest's violations of RCW § 21.20.010.

4    141.    Immediately prior to the Fund's liquidation, Plaintiff's limited partnership interest

5    in the Fund was worth $894,437.04.

6    142.    As a result of Pentium Invest's and the Individual Defendants' actions, Plaintiff has

7    sustained damages, including but not limited to the loss of his entire $894,437.04 investment in the

8    Fund, plus interest thereon and attorneys' fees.  *See* RCW § 21.20.430(1).

9                                **Count V**

10                        **Fraudulent Inducement**

11                        **(Against All Defendants)**

12    143.    Plaintiff repeats and realleges every allegation in Paragraphs 1–82 as if fully set forth

13    herein.

14    144.    Defendants fraudulently induced Plaintiff to invest in the Fund.

15    145.    When soliciting Plaintiff's investments in the Fund, Defendants made materially

16    misleading statements about material facts related to the Fund's operations, as described above,

17    including in Paragraphs 45–47.  Most significantly, Defendants delivered to Plaintiff the PPM and

18    Investor Presentation, which contained materially misleading statements about the Fund's use of

19    leverage, use of multiple investment strategies, diversification of investments, and limited use of

20    short positions.

21    146.    These statements were materially misleading because, as described above, including

22    in Paragraphs 50–65: (i) the Fund used substantial leverage when investing, and shortly before it

23    was liquidated, had only about $10.5 million in assets yet had nearly $45 million in liabilities, (ii)

24    the Fund employed a single strategy of selling options and reinvesting the premiums it received

25    from those sales almost entirely in cash and U.S. Treasuries, (iii) the Fund invested almost

26

27    PLAINTIFF'S COMPLAINT WITH JURY
     DEMAND - 31

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1   exclusively in a short position in the same type of SPX index option, and (iv) the Fund's short

2   positions in options vastly exceeded the Fund's long positions in options (or any other type of long

3   position).

4        147.    As described above, including in Paragraph 66, Defendants knew that these

5   statements in the PPM and Investor Presentation were materially misleading when they were made

6   or, alternatively, were reckless in not knowing that such statements were materially misleading.

7        148.    Plaintiff relied on the supposed truth of the statements in the PPM and Investor

8   Presentation when deciding to invest in the Fund.

9        149.    Plaintiff's reliance on the information contained in the PPM and Investor

10   Presentation was reasonable because Plaintiff did not know that the statements contained in the

11   PPM and Investor Presentation were materially misleading when he invested in the Fund, nor could

12   Plaintiff have discovered through the exercise of reasonable diligence that those statements were

13   materially misleading.

14        150.    Immediately prior to the Fund's liquidation, Plaintiff's limited partnership interest

15   in the Fund was worth $894,437.04.

16        151.    As a result of Defendants' material misrepresentations, Plaintiff has sustained

17   damages, including but not limited to the loss of his entire investment in the Fund, plus interest

18   thereon.

19        152.    Alternatively, Plaintiff is entitled to rescind his purchase of limited partnership

20   interests in the Fund and to recover the $800,000 of consideration he paid, plus interest thereon.

21   **Count VI**

22   **Negligent Misrepresentation**

23   **(Against All Defendants)**

24        153.    Plaintiff repeats and realleges each and every allegation in Paragraphs 1–82 above

25   as if fully set forth herein, except Plaintiff's allegations in Paragraph 66 that Defendants' statements

26

27   PLAINTIFF'S COMPLAINT WITH JURY
      DEMAND - 32

1    were knowingly or recklessly false.

2        154.    Defendants induced Plaintiff to invest in the Fund through materially misleading

3    statements that Defendants negligently made.

4        155.    When soliciting Plaintiff's investments in the Fund, Defendants made materially

5    misleading statements about material facts related to the Fund's operations, as described above,

6    including in Paragraphs 45–47.  Most significantly, Defendants delivered to Plaintiff the PPM and

7    Investor Presentation, which contained materially misleading statements about the Fund's use of

8    leverage, use of multiple investment strategies, diversification of investments, and limited use of

9    short positions.

10       156.    These statements were materially misleading because, as described above, including

11   in Paragraphs 50–65: (i) the Fund used substantial leverage when investing, and shortly before it

12   was liquidated, had only about $10.5 million in assets yet had nearly $45 million in liabilities, (ii)

13   the Fund employed a single strategy of selling options and reinvesting the premiums it received

14   from those sales almost entirely in cash and U.S. Treasuries, (iii) the Fund invested almost

15   exclusively in a short position in the same type of SPX index option, and (iv) the Fund's short

16   positions in options vastly exceeded the Fund's long positions in options (or any other type of long

17   position).

18       157.    When Defendants made the materially misleading statements in the PPM and

19   Investor Presentation, they did not have reasonable grounds for believing that those statements were

20   true.  More specifically:

21           a.    The Fund should have known the positions in which it was invested and the

22                 investment strategy the Fund was pursuing;

23           b.    Pentium Invest, as the general partner of the Fund and the only person

24                 authorized by the LP Agreement to act on the Fund's behalf, should have

25

26

27   PLAINTIFF'S COMPLAINT WITH JURY
     DEMAND - 33

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1  known the positions in which the Fund was invested and the investment

2  strategy the Fund was pursuing;

3  c.  Kevin Kwong was Pentium Invest's Chief Investment Officer and was

4  personally involved in developing the Fund's strategy and selecting its

5  investments.  During Kwong's appearance on Ryan Miller's "Making

6  Billions Podcast," he promoted his personal involvement in managing the

7  Fund by discussing, among other things, the "[g]eneral guidelines" he used

8  to determine the Fund's "risk management protocol."  Kwong was also

9  responsible for conveying information about the Fund's strategy and

10  performance to investors, as shown by his signing the Fund's 2023 year-end

11  update and the letter to investors dated August 14, 2024.  The PPM touted

12  his more than 15 years of investment experience, and he currently works for

13  CNA Insurance.  Accordingly, Kevin Kwong was an experienced investor

14  who, at the time Defendants made their materially misleading statements,

15  should have understood basic financial concepts, such as leverage,

16  diversification, and short-selling, and should have understood that

17  Defendants' statements on those topics were materially misleading.

18  d.  David Yeow was Pentium Invest's "investment strategist," according to the

19  PPM, and its "President," according to the Investor Presentation.  He was

20  personally involved in developing the Fund's strategy and selecting its

21  investments.  During Yeow's appearance on Ryan Miller's "Making Billions

22  Podcast," he promoted his personal involvement in managing the Fund by

23  discussing, among other things, the "deep research" he performed to

24  determine the Fund's trading strategy.  Yeow was also responsible for

25  conveying information about the Fund's strategy and performance to

26

27  PLAINTIFF'S COMPLAINT WITH JURY
   DEMAND - 34

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

investors, as shown by his signing the Fund's 2023 year-end update and the letter to investors dated August 14, 2024.  The PPM touted his more than 15 years of investment experience, and he currently holds himself out as the Chief Operating Officer of a technology company called Sensate.  Accordingly, David Yeow was an experienced investor who, at the time Defendants made their materially misleading statements, should have understood basic financial concepts, such as leverage, diversification, and short-selling, and should have understood that Defendants' statements on those topics were materially misleading.

e. Ryan Miller was Pentium Invest's "Managing Director" according to the PPM.  Upon information and belief, he was personally involved in developing the Fund's strategy and selecting its investments.  The PPM touted Miller's prior experience as a "Chief Financial Officer," his experience "manag[ing]" a "$250M Technology Portfolio," and his experience "mentor[ing] over 200 emerging fund managers to start and scale their investment funds, totaling around $4B in funds raised to date."  Ex. B at 6.  Throughout the life of the Fund, Miller hosted the "Making Billions Podcast," which promotes itself as providing information related to "strategies and pitfalls of fundraising" for investment funds, "demystify[ing] the world of hedge funds," and "discussing their investment approaches."[7]  Accordingly, Ryan Miller was an experienced investor who, at the time Defendants made their materially misleading statements, should have understood basic financial concepts, such as leverage, diversification, and

_____

[7] *Making Billions with Ryan Miller* (last accessed Aug. 11, 2025), https://making-billions.com/.

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 35

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

short-selling, and should have understood that Defendants' statements on those topics were materially misleading.

    f.    The Individual Defendants were the principals of Pentium Invest and, upon information and belief, its sole employees and the only people responsible for managing the investments of the Fund. Furthermore, Pentium Invest did not manage any other investment funds. Therefore, determining the Fund's investment strategy and selecting its investments were a core aspect of Pentium Invest's operations, such that each of the Individual Defendants should have been aware of the Fund's investment strategy, the assets in which it was invested, and the Fund's use of leverage and short positions.

158. Defendants made the materially misleading statements in the PPM and the Investor Presentation intending that Plaintiff rely on those statements when deciding to invest in the Fund.

159. Plaintiff relied on the supposed truth of the statements in the PPM and the Investor Presentation when deciding to invest in the Fund.

160. Plaintiff's reliance on the information contained in the PPM and Investor Presentation was reasonable because Plaintiff did not know that the statements contained in the PPM and Investor Presentation were materially misleading when he invested in the Fund, nor could Plaintiff have discovered through the exercise of reasonable diligence that those statements were materially misleading.

161. Immediately prior to the Fund's liquidation, Plaintiff's limited partnership interest in the Fund was worth $894,437.04.

162. As a result of Defendants' material misrepresentations, Plaintiff has sustained damages, including but not limited to the loss of his entire investment in the Fund, plus interest thereon.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

163.    Alternatively, Plaintiff is entitled to rescind his purchase of limited partnership interests in the Fund and to recover the $800,000 of consideration he paid, plus interest thereon.

## Count VII

## Breach of Fiduciary Duty

## (Against Pentium Invest and the Individual Defendants)

164.    Plaintiff repeats and realleges every allegation in Paragraphs 1–82 as if fully set forth herein.

165.    The Fund was organized under Delaware law, and Delaware law therefore governs its internal affairs, including the fiduciary duties owed to the Fund's limited partners.

166.    Under Delaware law, Pentium Invest, as the Fund's general partner, owed a fiduciary duty of loyalty to the Fund's limited partners.  The LP Agreement confirmed the existence of Pentium Invest's fiduciary duty by stating that "[n]othing in this Agreement may be interpreted to limit or modify the GP's fiduciary duty to the Limited Partners."  Ex. A § 5.08(b).

167.    Under Delaware law, if the general partner of a limited partnership is an entity rather than a natural person, the natural persons who are directors or officers of that entity owe fiduciary duties, including a fiduciary duty of loyalty, directly to the limited partners of the limited partnership. *See, e.g.*, *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991).

168.    Therefore, since the Individual Defendants were members and officers of Pentium Invest, they owed a fiduciary duty of loyalty directly to Plaintiff, in his capacity as a limited partner of the Fund.

169.    The Fund owed Plaintiff $447,218.52 as of July 31, 2024, based on the Fund's and Pentium Invest's agreement to allow Plaintiff to withdraw half of his investment in the Fund.

170.    However, the Fund and Pentium Invest did not immediately pay that money to Plaintiff or transfer it to an account separate from the Fund's other assets.  Instead, Pentium Invest caused the Fund to retain the money necessary for Plaintiff's withdrawal, and to keep it in the

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 37

Fund's brokerage account, where it served as collateral for the Fund's margin requirements and remained at risk of being liquidated by the Fund's broker.

171.     Therefore, beginning on July 31, 2024, and continuing thereafter, Pentium Invest and the Individual Defendants improperly placed their own financial interests ahead of Plaintiff's by improperly retaining Plaintiff's withdrawal funds for their own benefit. By keeping Plaintiff's money related to his withdrawal in the Fund's brokerage account, the Fund could use that money to help comply with its margin requirements. That helped Pentium Invest, and in turn the Individual Defendants in their capacity as its members, to minimize any obligation they would owe to the Fund's broker if the Fund's assets were not sufficient to satisfy its margin requirements.

172.     The Individual Defendants further benefited from keeping the money associated with Plaintiff's withdrawal in the Fund's brokerage account because the Individual Defendants had pledged their own personal assets in other investment accounts, separate from any investments they had made in the Fund, as collateral for the Fund's margin obligations. Therefore, by causing the Fund to use the money associated with Plaintiff's withdrawal as collateral for its margin obligations, the Individual Defendants minimized the amount of their personal assets that might be spent by the Fund's broker during a liquidation of the Fund's account.

173.     On or around August 5, 2024, the Fund and Pentium Invest received notice from the Fund's broker that the Fund was out of compliance with its margin requirements, and that the Fund needed to provide additional collateral, or else the broker would begin liquidating the Fund's positions to satisfy the margin requirements.

174.     Despite receiving this notice, Pentium Invest kept the funds for Plaintiff's withdrawal in the Fund's brokerage account where they remained at risk of imminently being used by the Fund's broker to close out the Fund's substantial short positions in index options.

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

175.    On or about August 6, 2024, the Fund's brokers liquidated all of the Fund's positions, thereby using the funds for Plaintiff's withdrawal, and all other assets held by the Fund, to close out the Fund's short positions.

176.    As a result of Pentium Invest's and the Individual Defendants' breach of their fiduciary duty of loyalty—i.e., using Plaintiff's money for their own purposes and benefit rather than conveying it immediately to him or safeguarding it until paying him—Plaintiff has been damaged in the amount of $447,218.52.

## Count VIII

## Unjust Enrichment

## (Against All Defendants)

177.    Plaintiff repeats and realleges every allegation in Paragraphs 1–82 as if fully set forth herein.

178.    The Fund owed Plaintiff $447,218.52 as of July 31, 2024, based on the Fund's and Pentium Invest's agreement to allow Plaintiff to withdraw half of his investment in the Fund.

179.    However, the Fund did not immediately pay that money to Plaintiff or transfer it to an account separate from the Fund's other assets.  Instead, Defendants caused the Fund to retain the money necessary for Plaintiff's withdrawal, and to keep it in the Fund's brokerage account, where it served as collateral for the Fund's margin requirements and remained at risk of being liquidated by the Fund's broker.

180.    Therefore, beginning on July 31, 2024, and continuing thereafter, Defendants used Plaintiff's withdrawal money, to which he was entitled, for their own benefit.  By keeping Plaintiff's money related to his withdrawal in the Fund's brokerage account, the Fund could use that money to help comply with its margin requirements.  That helped Pentium Invest, and in turn the Individual Defendants in their capacity as its members, to minimize any obligation they would owe to the Fund's broker if the Fund's assets were not sufficient to satisfy its margin requirements.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

181.    The Individual Defendants further benefited from keeping the money associated with Plaintiff's withdrawal in the Fund's brokerage account because the Individual Defendants had pledged their own personal assets in other investment accounts, separate from any investments they had made in the Fund, as collateral for the Fund's margin obligations.  Therefore, by causing the Fund to use the money associated with Plaintiff's withdrawal as collateral for its margin obligations, the Individual Defendants minimized the amount of their personal assets that might be spent by the Fund's broker during a liquidation of the Fund's account.

182.    On or around August 5, 2024, Defendants received notice from the Fund's broker that the Fund was out of compliance with its margin requirements, and that the Fund needed to provide additional collateral, or else the broker would begin liquidating the Fund's positions to satisfy the margin requirements.

183.    Despite receiving this notice, Defendants kept the funds for Plaintiff's withdrawal in the Fund's brokerage account where they remained at risk of imminently being used by the Fund's broker to close out the Fund's substantial short positions in index options.

184.    On or about August 6, 2024, the Fund's brokers liquidated all of the Fund's positions, thereby using the funds for Plaintiff's withdrawal, and all other assets held by the Fund, to close out the Fund's short positions.

185.    After the liquidation of the Fund's assets, the Fund owed its broker a deficiency of nearly $360,000, which Pentium Invest ultimately used some of its own assets to pay.

186.    Had Defendants not permitted the $447,218.52 necessary for Plaintiff's withdrawal to remain in the Fund's brokerage account, the deficiency that the Fund and Pentium Invest owed to broker after the liquidation would have been even larger.  Accordingly, the Fund and Pentium Invest benefitted from keeping Plaintiff's withdrawal funds in the Fund's brokerage account.  The Individual Defendants likewise benefited because, as the principals of Pentium Invest (and, on information and belief, Pentium Invest's only members), they effectively used Plaintiff's

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

withdrawal funds to maximize their ownership interest in Pentium Invest.  The Individual Defendants further benefited by minimizing the amount of their personal assets that might be spent during the liquidation.

187.    Accordingly, keeping the money associated with Plaintiff's withdrawal in the Fund's brokerage account conferred a benefit on each of the Defendants.

188.    Defendants appreciated that this benefit had been conferred on them.  Kevin Kwong expressly acknowledged in an email, on July 31, 2024, on which David Yeow was copied, that Plaintiff's money had been withdrawn and that it would be paid to Plaintiff soon.  Additionally, the Fund's broker communicated to Defendants on or about August 5, 2024, that the Fund's assets were insufficient to meet the Fund's margin requirements.

189.    Despite Defendants' acknowledging that Plaintiff was entitled to the $447,218.52 associated with his withdrawal, and having been informed that Plaintiff's money was in imminent peril of being used by the Fund's broker to liquidate the Fund's account, Defendants retained Plaintiff's money to use for their own benefit.

190.    Under these circumstances, it is inequitable to allow Defendants to retain the benefit of Plaintiff's money, having used it to satisfy their own financial obligations, without paying that money to Plaintiff.  Defendants have been unjustly enriched.

191.    Plaintiff is entitled to be compensated in the amount of the withdrawal that he was owed ($447,218.52) to prevent Defendants' unjust enrichment.

**Count IX**

**Conversion**

**(Against All Defendants)**

192.    Plaintiff repeats and realleges every allegation in Paragraphs 1–82 as if fully set forth herein.

PLAINTIFF'S COMPLAINT WITH JURY DEMAND - 41

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

193.     This cause of action is based on Defendants' improper conversion of the funds that should have been set aside for Plaintiff's partial withdrawal of his investment in the Fund.

194.     Plaintiff, the Fund, and Pentium Invest agreed that Pentium would withdraw half of Plaintiff's investment of the Fund as of July 31, 2024.

195.     As of July 31, 2024, half of Plaintiff's investment in the Fund amounted to $447,218.52.

196.     As of July 31, 2024, the Fund had reduced to cash a sufficient amount of its positions, so that half of Plaintiff's investment could be withdrawn from the Fund.

197.     As of July 31, 2024, Plaintiff had a right to be paid the $447,218.52, representing half of his investment in the Fund, within 30 days, as provided in the LP Agreement.

198.     Defendants caused the Fund to retain the money necessary for Plaintiff's withdrawal, and to keep it in the Fund's brokerage account, where it served as collateral for the Fund's margin requirements and remained at risk of being liquidated by the Fund's broker.

199.     Pentium Invest directly benefited by keeping the money associated with Plaintiff's withdrawal in the Fund's brokerage account because doing so minimized any obligation Pentium Invest would owe to the Fund's broker if the Fund's assets were not sufficient to satisfy its margin requirements.

200.     The Individual Defendants directly benefited from keeping the money associated with Plaintiff's withdrawal in the Fund's brokerage account because the Individual Defendants had pledged their own personal assets in other investment accounts, separate from any investments they had made in the Fund, as collateral for the Fund's margin obligations. Therefore, by causing the Fund to use the money associated with Plaintiff's withdrawal as collateral for its margin obligations, the Individual Defendants minimized the amount of their personal assets that might be spent by the Fund's broker during a liquidation of the Fund's account.

CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

201.    Therefore, as of July 31, 2024, Defendants had improperly retained Plaintiff's withdrawal money for their own benefit: (i) the Fund to comply with its margin requirements, (ii) Pentium Invest to minimize any obligation it would owe to the Fund's broker if the Fund's assets were not sufficient to satisfy its margin requirements, and (iii) the Individual Defendants to minimize the amount of their personal assets that might be spent during a liquidation of the Fund's account (and to maximize the value of their ownership interest in Pentium Invest).

202.    On or around August 5, 2024, Defendants received notice from the Fund's broker that the Fund was out of compliance with its margin requirements, and that Defendants needed to provide additional collateral, or else the broker would begin liquidating the Fund's positions to satisfy the margin requirements.

203.    Despite receiving this notice, Defendants kept the funds for Plaintiff's withdrawal in the Fund's brokerage account where they remained at risk of imminently being used by the Fund's broker to close out the Fund's substantial short positions in index options.

204.    On or about August 6, 2024, the Fund's broker liquidated all of the Fund's positions, thereby using the funds for Plaintiff's withdrawal, and all other assets held by the Fund, to close out the Fund's short positions.

205.    By permitting the funds for Plaintiff's withdrawal to remain in the Fund's brokerage account, especially after having been warned that a liquidation was imminent, Defendants deprived Plaintiff of his right to possess his withdrawal funds.  That deprivation became permanent when the Fund's broker liquidated all of the Fund's investments.

206.    As a result of Defendants' wrongful conversion of Plaintiff's withdrawal funds, for their own purposes, Plaintiff has been damaged in the amount of $447,218.52.

**Corr Cronin llp**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1

2

3

**Count X**

**Breach of Contract**

**(Against the Fund)**

4    207.    Plaintiff repeats and realleges every allegation in Paragraphs 1–82 as if fully set forth

5    herein.

6    208.    By entering into the Subscription Agreement with the Fund and Pentium Invest,

7    Plaintiff became a party to the Fund's initial limited partnership agreement and, after that agreement

8    was amended, the LP Agreement.

9    209.    Plaintiff paid valuable consideration of $800,000 when entering into the

10    Subscription Agreement and, ultimately, entering into the LP Agreement.

11    210.    The LP Agreement is an enforceable contract between Plaintiff and the Fund.

12    211.    Plaintiff has performed all of his obligations under the LP Agreement.

13    212.    On July 9, 2024, Plaintiff submitted a written request, using the Fund's own Form

14    of Request for Withdrawal, to withdraw 50% of his investment in the Fund.

15    213.    The Fund agreed in writing, both on the withdrawal form and through emails sent

16    by Kevin Kwong on behalf of Pentium Invest and the Fund, that it had "[a]ccepted" Plaintiff's

17    withdrawal of 50% of his investment in the Fund as of July 31, 2024.

18    214.    The Fund and Pentium Invest, therefore, waived any further notice restrictions, or

19    other restrictions, that may otherwise have applied to Plaintiff's withdrawal.  *See* Ex. A § 4.01(a)

20    (giving Pentium Invest the authority to "waive[]" the 60-day notice period ordinarily required for

21    withdrawals).

22    215.    As of July 31, 2024, 50% of Plaintiff's investment in the Fund amounted to

23    $447,218.52.    Therefore, the amount of the withdrawal to which Plaintiff was entitled was

24    $447,218.52.

25

26

27    PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 44

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

216. Pursuant to the terms of the LP Agreement, Plaintiff was entitled to receive his withdrawn funds within 30 days of the withdrawal date. *See* Ex. A § 4.01(b).

217. The Fund did not pay Plaintiff any amount of his withdrawn investment in the Fund, within 30 days of the withdrawal date, or at any other time.

218. Plaintiff has been damaged by the Fund's failure to comply with the LP Agreement's provisions governing his withdrawal in an amount no less than $447,218.52, plus interest thereon.

### Count XI

### Violation of Washington Consumer Protection Act (RCW § 19.86.020)

### (Against All Defendants)

219. Plaintiff repeats and realleges every allegation in Paragraphs 1–82 as if fully set forth herein.

220. This cause of action is based on Defendants' violations of Washington's Consumer Protection Act, specifically RCW § 19.86.020; *see also* RCW § 19.86.090 (providing a private right of action for violations of RCW § 19.86.020).

221. Defendants engaged in an unfair or deceptive act or practice when they specifically targeted Plaintiff, an individual residing in Washington, along with other investors, for investment in the Fund based on materially misleading information.

222. When soliciting Plaintiff's investment in the Fund, Defendants made materially misleading statements about material facts related to the Fund's operations, as described above, including in Paragraphs 45–47. Most significantly, Defendants delivered to Plaintiff the PPM and Investor Presentation, which contained materially misleading statements about the Fund's use of leverage, use of multiple investment strategies, diversification of investments, and limited use of short positions.

223. These statements were materially misleading because, as described above, including in Paragraphs 50–65: (i) the Fund used substantial leverage when investing, and shortly before it

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 45

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

was liquidated, had only about $10.5 million in assets yet had nearly $45 million in liabilities, (ii) the Fund employed a single strategy of selling options and reinvesting the premiums it received from those sales almost entirely in cash and U.S. Treasuries, (iii) the Fund invested almost exclusively in a short position in the same type of SPX index option, and (iv) the Fund's short positions in options vastly exceeded the Fund's long positions in options (or any other type of long position).

224. Upon information and belief, Defendants would have shared with other investors the same materially misleading information in the PPM and Investor Presentation. The Fund's form Subscription Agreement, which investors were required to execute to invest in the Fund, required each investor to confirm that he or she had received the PPM. The Investor Presentation was not customized for soliciting Plaintiff's investment, and upon information and belief, Defendants would have presented the Investor Presentation to other investors in the Fund.

225. Defendants' unfair and deceptive actions, including their materially misleading statements, were made in the conduct of Defendants' trade or commerce, specifically Defendants' management of the investments in the Fund and solicitation of investors in the Fund, from whose investments Defendants would profit.

226. Defendants' actions affect the public interest because individuals other than Plaintiff invested in the Fund based on Defendants' material misrepresentations. At the time the Fund was liquidated, its assets were purportedly worth approximately $10.5 million, of which Plaintiff's investment represented only approximately 9%.

227. As a result of Defendants' unfair and deceptive actions, Plaintiff has been injured in his business and property. Plaintiff invested $800,000 in the Fund, and immediately prior to the Fund's liquidation, Plaintiff's limited partnership interest in the Fund was worth $894,437.04. Defendants' unfair and deceptive actions caused Plaintiff to lose his entire investment.

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1    228.    Plaintiff's loss of the value of his investment was caused by Defendants' unfair and
2    deceptive actions.

3    229.    Plaintiff is entitled to an award of attorneys' fees and costs and treble damages
4    pursuant to RCW § 19.86.090.

**PRAYER FOR RELIEF**

6    230.    WHEREFORE, Plaintiff prays for relief and judgment as follows:

a.    Awarding Plaintiff damages for the loss of his investment caused by
Defendants' material misrepresentations in the amount of $894,437.04; or

b.    Rescinding Plaintiff's investment in the Fund and returning to Plaintiff the
$800,000 he paid in connection with his investment; or

c.    Awarding Plaintiff damages of $447,218.52 caused by: (i) Pentium Invest's
and the Individual Defendants' breach of their fiduciary duty of loyalty to
Plaintiff, (ii) Defendants' wrongful conversion of Plaintiff's withdrawal
proceeds or Defendants' resulting unjust enrichment, and (iii) the Fund's
failure to comply with the LP Agreement's provisions governing limited
partners' ability to withdraw part or all of their investment; and

d.    Awarding Plaintiff treble damages no less than $25,000, pursuant to RCW §
19.86.090; and

e.    Awarding all other damages to which Plaintiff is entitled as a result of
Defendants' violations of law described in this complaint; and

f.    Awarding Plaintiff his reasonable costs and expenses incurred in this action,
including attorneys' fees, the fees of any expert witnesses, and other costs
and disbursements, pursuant to RCW §§ 19.86.090 and 21.20.430(1); and

g.    Awarding Plaintiff pre- and post-judgment interest as allowed by law; and

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 47

**CORR CRONIN LLP**
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

1          h.  Awarding Plaintiff such other relief as may be deemed just and proper by the

2          Court.

3                          **JURY TRIAL DEMAND**

4    231.   Plaintiff demands a trial by jury.

5

6    Respectfully submitted this 13th day of August, 2025.

7                          CORR CRONIN LLP

8                          *s/ Jack M. Lovejoy*

9                          Jack M. Lovejoy, WSBA No. 39692

10                         1015 Second Avenue, Floor 10
   Seattle. WA 98104-1001

11                         Ph: (206) 625-8600
   jlovejoy@corrcronin.com

12

13                         FISHKIN LUCKS LLP
   S. Aaron Loterstein (*pro hac vice*

14                         forthcoming)
   Brendan Herrmann (*pro hac vice*

15                         forthcoming)
   233 Broadway, Suite 820

16                         New York, NY 10279
   Ph: (646) 755-9200

17                         aloterstein@fishkinlucks.com

18                         bherrmann@fishkinlucks.com

19                         *Attorneys for Plaintiff James Gao*

20

21

22

23

24

25

26

27   PLAINTIFF'S COMPLAINT WITH JURY
   DEMAND - 48

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 13, 2025, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Wen Cruz*
Wen Cruz

PLAINTIFF'S COMPLAINT WITH JURY
DEMAND - 49

# Exhibit A

f

**EXHIBIT A – FIRST AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT**

**FIRST AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT**

**OF**

**PENTIUM ATLAS FUND III, LP**

Dated as of November 1, 2023

**TABLE OF CONTENTS**

Page

ARTICLE I – FORMATION AND PURPOSE..................................................................................................1

ARTICLE II – ADMISSION OF PARTNERS; CAPITALIZATION..................................................................1

ARTICLE III – CAPITAL ACCOUNTS; PROFITS AND LOSSES................................................................2

ARTICLE IV – DISTRIBUTIONS OF CASH FLOWS; WITHDRAWALS......................................................5

ARTICLE V – POWERS, DUTIES AND RIGHTS OF GENERAL PARTNER...............................................8

ARTICLE VI – POWERS, RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS.................................13

ARTICLE VII – ACCOUNTING, BOOKS AND RECORDS; REPORTS TO PARTNERS............................14

ARTICLE VIII –TRANSFER AND ASSIGNMENT OF PARTNERSHIP INTERESTS.................................15

ARTICLE IX – DISSOLUTION OF PARTNERSHIP...................................................................................16

ARTICLE X – POWER OF ATTORNEY....................................................................................................18

ARTICLE XI – MISCELLANEOUS............................................................................................................18

APPENDIX A – DEFINITIONS..................................................................................................................22

This FIRST AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT (the "**Agreement**") of Pentium Atlas Fund III, LP, a Delaware limited partnership (the "**Partnership**"), is made and entered into as of this 1st day of November, 2023, by and among Pentium Invest, LLC (the "**General Partner**" or the "**GP**"), a Delaware limited liability company, as the GP, and the Limited Partners.

### WITNESSETH

**WHEREAS**, the Partnership was formed on August 1, 2023 by the filing of the Certificate of Limited Partnership with the Delaware Department of State, Division of Corporations in accordance with and pursuant to the Act, and the General Partner and Limited Partners executed an original limited partnership agreement as of even date therewith (the "**Original Agreement**").

**WHEREAS**, the General Partner and the Limited Partners desire to amend and restate the Original Agreement in its entirety and to adopt this Agreement; and

**NOW, THEREFORE**, in consideration of the mutual promises and agreements made herein and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties hereto intending to be legally bound, hereby agree to amend and restate the Original Agreement in its entirety and to adopt this Agreement:

### ARTICLE I – FORMATION AND PURPOSE

01.1    <u>Name</u>.  The name of the Partnership shall be Pentium Atlas Fund III, LP, and the business of the Partnership shall be conducted under such name.

02.1    <u>Offices</u>.  The registered office of the Partnership is at 16192 Coastal Highway, Lewes, DE 19958. The Partnership's initial registered agent for service of process at such address shall be Harvard Business Services, Inc.  The business office of the Partnership is 3200 Concord Cliff Ave, Henderson, NV 89044. The Partnership may have such additional offices at such other places as the GP shall deem advisable.

1.04    <u>Term</u>. The Partnership shall continue until the earlier of (i) the termination, bankruptcy, insolvency or dissolution of the GP, (ii) the complete withdrawal of the GP from the Partnership, unless a successor general partner is appointed pursuant to *Section 4.02(b)* hereof, (iii) entry of a decree of judicial dissolution under Section 17-802 of the Act, (iv) a determination by the GP that the Partnership should be dissolved or (v) in the event of (a) the death of Keumhwan (Kevin) Kwong and David Yeow or (b) an adjudication in a final non-appealable decision on the merits of a court of competent jurisdiction that Keunhwan (Kevin) Kwong and David Yeow are physically or mentally incapable of making investment decisions on behalf of the GP.

05.1    <u>Purpose of Partnership.</u>

(a)    The Partnership is organized for the purpose of investing in Securities and engaging in all activities and transactions as the GP may deem necessary or advisable in connection therewith and doing such other lawful acts as the GP may deem necessary or advisable in connection with the maintenance and administration of the Partnership.

(b)    The Partnership may engage in other activities and businesses incidental to the purpose of the Partnership as may be necessary or desirable, in the opinion of the GP, to promote and carry out the principal purposes of the Partnership, as set forth above; *provided, however*, that, without the written consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time, (i) the purpose of the Partnership shall not be changed, and (ii) the Partnership shall not engage in any substantial business endeavor other than those consistent with the purpose of the Partnership, or incidental thereto.

06.1    <u>Investment Management Techniques Proprietary</u>.  The investment management systems, techniques and methods employed by the General Partner in the management of the Partnership's investments shall be the sole property of the General Partner, and neither the Partnership nor any Limited Partner shall have any interest in or right or claim with respect to such investment management systems, techniques or methods or in any of the research products or recommendations generated through their use.

07.1    <u>Definitions</u>.  Capitalized terms used and not defined herein shall have the meaning attributed to such terms in the definitions set forth in <u>Appendix A</u> hereto, or in the relevant section of this Agreement listed on <u>Appendix A</u>.

## ARTICLE II – ADMISSION OF PARTNERS; CAPITALIZATION

2.01    <u>Admission of Partners</u>.  The GP may admit one or more new Partners at such times and on such terms as the GP deems appropriate, subject only to the conditions that:

(a)    Each new Partner shall have executed a Subscription Agreement pursuant to which it agrees to be bound by the terms and provisions hereof;

(b)    The total number of Limited Partners may not at any time exceed 100 (as interpreted under Section 3 of the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder); and

(c)    The GP reasonably believes that any new Partner satisfies the minimum investor suitability standards established by the GP.

2.02    <u>Capital Contributions of Limited Partners</u>.  Upon admission to the Partnership, each Limited Partner shall contribute Cash (or, in the sole discretion of the GP, Securities), in the amount set forth in such Partner's Subscription Agreement.  Each Limited Partner who has contributed or may contribute Securities to the Partnership shall, prior to the date of any such contribution, furnish to the Partnership evidence, satisfactory to the GP, as to his dates of acquisition of such Securities, and his adjusted basis thereof for federal income tax purposes.  The minimum initial capital contribution to the Partnership by a Limited Partner is generally $200,000, subject to the GP's sole discretion to accept subscriptions for lesser amounts or, upon giving notice to the Limited Partners, to require a higher minimum.  Limited Partners may be admitted on the first calendar day of any calendar month, or at any other time the GP chooses to accept initial capital contributions.  The GP may, in its sole discretion, reject any initial subscription request.

2.03    <u>Additional Capital Contributions</u>.  A Partner may make additional contributions in Cash (or, in the sole discretion of the GP, Securities, as described in *Section 2.02*) to the Partnership in amounts of not less than $100,000, with the consent of the GP and subject to its sole and absolute discretion to accept lesser amounts. Additional capital contributions may be accepted from existing Limited Partners on the first calendar day of any calendar month, or at any other time the GP chooses to accept such additional capital contributions.  The GP may, in its sole discretion, reject any additional contribution request.

In the event a Limited Partner makes an additional capital contribution which, together with such Limited Partner's prior capital contributions and withdrawals, is equal to or exceeds the Class Minimum Investment applicable to a superior Class (regardless of such Limited Partner's Capital Account balance at the time), such Limited Partner shall receive a "step up" to such applicable superior Class as of the date of such additional capital contribution.

2.04    <u>No Interest on Contributions</u>.  No Partner shall be entitled to receive interest on its capital contributions.

2.05    <u>No Right to Return of Capital Contribution</u>.  No Partner shall have the right to withdraw from the Partnership or to demand a return of all or any part of his capital contribution during the term of the Partnership except as provided in *Article IV* hereof.

2.06    <u>Liability of Limited Partners</u>.  Notwithstanding any other term or provision of this Agreement to the contrary, in no event shall any Limited Partner be liable for (i) any debts, obligations, liabilities or indemnifications of the Partnership in an amount that exceeds the capital contribution of such Limited Partner or for (ii) any debts, obligations, liabilities or indemnifications of any other Partner, nor shall the Limited Partners have any personal liability for contributing any capital to the Partnership.

2.07    <u>Classes of Interests</u>. There will be three (3) classes of Interests available to Limited Partners: Class A Interests, Class B Interests and Class C Interests (each of Class A, Class B and Class C, a "***Class***"). Classes of Interests are subject to the following minimum initial capital contribution thresholds, subject to the GP's sole discretion to accept subscriptions for lesser amounts with respect to each Class. Limited Partners holding a Class A Interest (each, a "***Class A Limited Partner***") shall be those Limited Partners who have made a minimum aggregate dollar amount of capital contributions (i) greater than or equal to two hundred thousand dollars ($200,000) (the "***Class A Minimum Investment***") but (ii) less than one million dollars ($1,000,000). Limited Partners holding a Class B Interest (each, a "***Class B Limited Partner***") shall be those Limited Partners who have made a minimum aggregate dollar amount of capital contributions (i) greater than or equal to one million dollars ($1,000,000) (the "***Class B Minimum Investment***") but (ii) less than ten million dollars ($10,000,000). Limited Partners holding a Class C Interest (each, a

"*Class C Limited Partner*") shall be those Limited Partners who have made a minimum aggregate dollar amount of capital contributions greater than or equal to ten million dollars ($10,000,000) (the "*Class C Minimum Investment*", and collectively with the Class A Minimum Investment and the Class B Minimum Investment, a "*Class Minimum Investment*"). Other than the Management Fee and Performance Allocation, Class A, Class B and Class C Interests are subject to identical terms and conditions under the Partnership Agreement.

## ARTICLE III – CAPITAL ACCOUNTS; PROFITS AND LOSSES

3.01    Capital Accounts.

(a)    One or more Capital Accounts shall be established and maintained on the books of the Partnership for each Partner.  The amount of each Partner's initial capital contribution shall be credited to its Capital Account at the beginning of the Accounting Period in which such capital contribution is accepted.  At the end of such Accounting Period (and each Accounting Period thereafter), the Capital Account of each Partner shall be increased or decreased by the amount credited or debited to the Capital Account of such Partner pursuant to *Section 3.02(a) through (c)*. At the beginning of each Accounting Period thereafter, the Capital Account of each Partner shall be increased by the amount of any additional capital contributions made by such Partner on the first day of such Accounting Period, and decreased by the amount of any withdrawals made by such Partner pursuant to *Article IV* as of the end of the immediately preceding Accounting Period. At the beginning of each calendar quarter, each Limited Partner's Capital Account shall be decreased by the amount of the Management Fee then due pursuant to *Section 5.06(a)*.

(b)    Capital Account balances and the value of any capital contributed to the Partnership shall be determined by application of the capital accounting rules in Regulations Section 1.704-1(b)(2)(iv).

3.02    Interests in Profits and Losses; Performance Allocation.

(a)    The Net Profit or Net Loss for each Accounting Period shall be tentatively allocated as of the last day of such Accounting Period to each Partner's respective Capital Account in proportion to the Partner's Allocation Percentage for such Accounting Period, subject only to reduction pursuant to *Section 3.02(b) and (c)*. For purposes of calculating Net Profit or Net Loss, the Partnership will include both realized and unrealized gains and losses on its investments.  In the case of the GP, the entire amount initially allocated to its Capital Account pursuant to the first sentence of this *Section 3.02(a)* shall be finally allocated to its Capital Account at the close of the Accounting Period.

(b)    Subject to the limitations set forth in *Section 3.03 through 3.08*, at the end of each calendar year (the "*Performance Allocation Period*"), the aggregate Net Profit, if any, allocated to each Limited Partner for such calendar year shall be finally allocated as follows:

(i)    High-Water Mark.  First, 100% to such Limited Partner until such time as the balance, if any, in such Limited Partner's Cumulative Loss Account has been eliminated (but in no event more than the balance existing in such account);

(ii)    General Partner/Limited Partner Split.  Thereafter,

(1)    Class A.

(A)    80/20 Split. First, eighty percent (80%) to such Class A Limited Partner and twenty percent (20%) to the General Partner as to aggregate Net Profits attributable to such Class A Limited Partner's Capital Account representing a rate of return less than or equal to the Hurdle;

(B)    50/50 Split. Thereafter, fifty percent (50%) to such Class A Limited Partner and fifty percent (50%) to the General Partner (such amounts allocated to the General Partner pursuant to Section 3.02(b)(ii)(1), the "*Class A Performance Allocation*").

(2)    Class B.

(A)    82.5/17.5 Split. First, eighty-two and one-half percent (82.5%) to such Class B Limited Partner and seventeen and one-half percent (17.5%) to

3

the General Partner as to aggregate Net Profits attributable to such Class B Limited Partner's Capital Account representing a rate of return less than or equal to the Hurdle;

(B)  50/50 Split. Thereafter, fifty percent (50%) to such Class B Limited Partner and fifty percent (50%) to the General Partner (such amounts allocated to the General Partner pursuant to Section 3.02(b)(ii)(2), the "**Class B Performance Allocation**").

(3)  Class C.

(A)  85/15 Split. First, eighty-five percent (85%) to such Class C Limited Partner and fifteen percent (15%) to the General Partner as to aggregate Net Profits attributable to such Class C Limited Partner's Capital Account representing a rate of return less than or equal to the Hurdle;

(B)  50/50 Split. Thereafter, fifty percent (50%) to such Class C Limited Partner and fifty percent (50%) to the General Partner (such amounts allocated to the General Partner pursuant to Section 3.02(b)(ii)(1), the "**Class C Performance Allocation**" and collectively with the Class A Performance Allocation and the Class B Performance Allocation, the "**Performance Allocation**").

The final allocations set forth in this *Section 3.02(b)* (and *3.02(c)* below) shall be computed and allocated at the end of an Accounting Period for a Limited Partner who effects a partial or complete withdrawal from its Capital Account at the end of such Accounting Period as if the applicable Withdrawal Date were the last day of a Performance Allocation Period, by multiplying (i) the portion of the Net Profits allocable to the withdrawing Limited Partner pursuant to this *Section 3.02* in excess of the balance, if any, existing in such Limited Partner's Cumulative Loss Account, by (ii) the ratio obtained by dividing the amount being withdrawn by the balance in such Limited Partner's Capital Account immediately prior to the withdrawal.  If such Limited Partner is making a partial withdrawal of its Capital Account, the allocations set forth in this *Section 3.02* for the remainder of the Performance Allocation Period in which such Accounting Period occurs shall be based on such Limited Partner's Allocation Percentage and Cumulative Loss Account immediately following such withdrawal.  The GP may, in its sole discretion, enter into arrangements with Limited Partners under which the Performance Allocation is reduced, waived or calculated differently with respect to such Limited Partners, including, without limitation, Limited Partners that are members, affiliates or employees of the GP, members of the immediate families of such persons and trusts or other entities for their benefit, or Limited Partners that make a substantial investment or otherwise are determined by the GP in its sole discretion to represent a strategic relationship.

(c)  Subject to the limitations set forth in *Section 3.03 through 3.08*, at the end of each calendar year, the aggregate Net Loss, if any, allocated to each Limited Partner for such calendar year shall be finally allocated to such Limited Partner (and such Limited Partner's Cumulative Loss Account shall be adjusted accordingly).

3.03    Limitation on Allocations.  Any Net Losses or items of loss or deduction allocated to a Limited Partner pursuant to this *Article III* shall not exceed the maximum amount of such items that can be allocated without causing the Partner to have a negative Capital Account balance, after giving effect to the following adjustments:  (a) debit to such Capital Account balance the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6), and (b) credit to such Capital Account balance the sum of (i) the amount that the Partner is obligated to restore to the capital of the Partnership, and (ii) the amount that the Partner is deemed to restore pursuant to Regulations Section 1.704-1(b)(2)(ii)(c)(1) and (2).  The Partnership shall allocate all Net Losses or items of loss or deduction in excess of the limitations set forth in this *Section 3.03* first to any Limited Partners to whom the limitation in the preceding sentence does not apply, in proportion to their respective Allocation Percentages.  Any Net Losses that the Partnership cannot allocate to any Limited Partner as a result of the limitation set forth in the first sentence of this *Section 3.03* shall be allocated to the GP.

3.04    Qualified Income Offset.  In the event that any Partner unexpectedly receives any adjustments, allocations or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that cause a deficit balance in such Partner's Capital Account, the Partnership shall allocate items of Partnership income and gain to that Partner in an amount and manner sufficient to eliminate the deficit balance as quickly as possible, *provided that* the

4

Partnership shall make an allocation pursuant to this *Section 3.04* only if and to the extent that a Partner would have a deficit Capital Account balance after the Partnership makes all other allocations provided for in this *Article III* as if this *Section 3.04* were not in the Agreement. For purposes of any allocation pursuant to the preceding sentence, in determining any deficit balance in a Partner's Capital Account, the Partnership shall (a) reduce the Partner's Capital Account by expected adjustments, allocations or distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d) (4), (5) or (6), and (b) increase the Partner's Capital Account by any amount that the Partner must restore to the deficit balance of his Capital Account or that Regulations Section 1.704-1(b)(2)(ii)(c) deems the Partner to restore to the deficit balance of his Capital Account.

      3.05    <u>Gross Income</u>. In the event that any Partner has a deficit balance in its Capital Account as of the end of any Fiscal Year in excess of the sum of the amount such Partner is obligated to restore to the capital of the Partnership pursuant to any provision of this Agreement, or that such Partner is deemed to be obligated to restore pursuant to Regulations Section 1.704-1(b)(c)(1) and (2), then the Partnership shall allocate to each such Partner items of income and gain for such Fiscal Year and subsequent Fiscal Years, if necessary, in an amount and manner sufficient to eliminate as quickly as possible such Capital Account deficit. The Partnership shall make an allocation pursuant to this *Section 3.06* if and only to the extent that such Partner would have such an excess deficit balance in its Capital Account after the Partnership tentatively has made all other allocations pursuant to this *Article III* as if *Section 3.04* and this *Section 3.05* were not in this Agreement.

      3.06    <u>Section 754 Adjustments</u>. To the extent that the Partnership makes an election pursuant to Code Section 754 and *Section 7.06* hereof, the amount of any adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or 743(b) that is required, pursuant to Regulations Section 1.704-1(b)(2)(iv) (m), to be taken into account in determining Capital Accounts, shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and the gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Regulations section.

      3.07    <u>Curative Allocations</u>. The Partnership intends that any allocations made pursuant to the last sentence of *Section 3.03* or pursuant to *Section 3.04, Section 3.05 or Section 3.06* (collectively, "**Regulatory Allocations**") comply with certain requirements of the Regulations. The Partnership also intends that, to the extent possible, the Partnership offset all Regulatory Allocations either with other Regulatory Allocations or with special allocations pursuant to this *Section 3.07*. Therefore, notwithstanding any other provisions of this *Article III* (other than the Regulatory Allocations), the Partnership shall make such offsetting special allocations in whatever manner it determines appropriate so that, after it makes the offsetting allocations, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance the Partner would have had if the Regulatory Allocations were not part of the Agreement and the Partnership allocated all items pursuant to the remaining Sections of this *Article III*.

      3.08    <u>Priority of Allocations</u>. The Partnership shall make the allocations pursuant to *Section 3.02* through *Section 3.07* and *Section 3.12* in the following order and priority: (a) first, the Partnership shall make the Regulatory Allocations in the order and priority in which they appear in this Agreement; and (b) next, the Partnership shall make the allocations pursuant to *Section 3.02*.

      3.09    <u>Contributed and Revalued Property</u>. For Federal income tax purposes, any income, gain, loss or deduction with respect to property contributed by a Partner to the Partnership that has a fair market value different from its adjusted basis for Federal income tax purposes shall be allocated among the Partners in accordance with Code Section 704(c) and the Regulations Section 1.704-3, using any method prescribed in Regulations Section 1.704-3 determined by the GP. With respect to any Partnership asset that is revalued pursuant to the terms hereof, subsequent allocations of income, gain, loss and deduction with respect to the asset shall take into account any variation between the adjusted basis of such asset for Federal income tax purposes and its fair market value at the time of revaluation in the same manner as under Code Section 704(c) and Regulations Section 1.704-3, using any method prescribed therein as determined by the GP.

      3.10    <u>Varying Interest</u>. In the event of the transfer of an Interest during a Fiscal Year, or in the event that a Partner's percentage interest changes during a Fiscal Year, the Net Profits, Net Losses or items of income, gain, loss or deduction allocated for the Fiscal Year during which the transfer occurs shall (a) be prorated between the transferor and transferee as of the date of the transfer, or (b) be prorated between the portion of the Fiscal Year prior to the change in percentage interest and the portion of the Fiscal Year after the change, using any method that the Partnership determines in good faith reasonably and fairly represents the portion of the Net Profits, Net Losses or items of income, gain, loss and deduction properly allocable to the Partners.

3.11    Tax Items.  Except as otherwise provided herein, any allocation to a Partner of a portion of the Net Profits, Net Losses or items of income, gain, loss or deduction for a Fiscal Year shall be deemed to be an allocation to that Partner of the same proportionate part of each item of income, gain, loss, deduction or credit that is earned, realized or available by or to the Partnership for Federal income tax purposes.  In addition, all items of gain or loss recognized from the sale, exchange or other disposition of Securities (including closing a position or determining a security worthless) in any tax period will generally be allocated among the Partners, so that to the extent possible, consistent with a fair allocation of such items of gain or loss among all of the Partners, each Partner's gain or loss for tax purposes is equal to the amount of gain or loss allocated to his Capital Account in respect of such transactions.

3.12    Stuffing Provision.  As of the close of each Fiscal Year, the capital gains and capital losses of the Partnership shall be allocated to the Partner's Capital Account so as to minimize, to the extent possible, any disparity between the "book" Capital Account and the "tax" Capital Account, consistent with the principles set forth in section 704 of the Code.  To the extent permitted by the Treasury Regulations (or successor regulations) in effect under Code Sections 704(b) and 704(c), allocations of capital gain that have been realized up to the time a Capital Account was completely withdrawn may be allocated first to each Capital Account that was completely withdrawn during the applicable Fiscal Year to the extent that the "book" Capital Account as of the Withdrawal Date exceeds the "tax" Capital Account at that time, and allocations of capital loss that have been realized up to the time a Capital Account is completely withdrawn may be allocated first to each Capital Account that was completely withdrawn during the applicable Fiscal Year to the extent that the "tax" Capital Account as of the Withdrawal Date exceeded the "book" Capital Account of such Capital Account at that time.  Notwithstanding anything herein to the contrary, capital gain or capital loss recognized with respect to Securities contributed to the Partnership, if any, shall be specifically allocated to the contributing Partner in the amount and manner required by Code Section 704(c) and the regulations thereunder, and, to the extent so allocated, shall be excluded from the computation of the Partnership's capital gain or capital loss, as applicable, for the relevant Fiscal Year.

**ARTICLE IV – DISTRIBUTIONS OF CASH FLOWS; WITHDRAWALS**

4.01    Withdrawals of Limited Partners' Capital Account.

(a)    With respect to each Class of Interests, and beginning twelve (12) months from the date of a Limited Partner's admission to the Partnership (such period to be the "*Lock-Up Period*"), such Limited Partner will be generally permitted to make withdrawals from its Capital Account as of the last day of any calendar month, or such other date as the GP may determine, in its sole discretion (each such date, a "*Withdrawal Date*") subject to the provisions of this *Section 4.01*, by delivering to the GP a request in writing for withdrawal in the form of *Appendix A* to the Subscription Agreement *provided that* the Partnership receives notice of such withdrawal not less than sixty (60) days prior to the Withdrawal Date (unless such notice period is waived in whole or in part by the GP in its sole discretion with respect to one or more Limited Partners). Withdrawals permitted by the GP, in its sole discretion, during the Lock-Up Period shall be subject to an early withdrawal penalty of five percent (5%) of the withdrawal proceeds (the "*Early Withdrawal Penalty*").  The Early Withdrawal Penalty may be reduced by the GP in its sole discretion.  Any amount paid as an Early Withdrawal Penalty shall be an asset of the Partnership. Capital contributions made after the Lock-Up Period are not subject to any additional lock-up periods.

In the event of a partial withdrawal, a Limited Partner must withdraw at least $50,000 and shall maintain a minimum Capital Account balance, after giving effect to the withdrawal, of not less than $200,000.  A Limited Partner failing to maintain the minimum Capital Account balance may be required to withdraw the balance of its Capital Account at any time without notice.  The GP, in its sole discretion, may waive this minimum amount.

Further, in the event a Limited Partner effectuates a withdrawal from the Partnership which, together with such Limited Partner's prior capital contributions and withdrawals, is less than the Class Minimum Investment of the Class in which such Limited Partner is then participating (regardless of such Limited Partner's Capital Account balance at the time), such Limited Partner shall receive a "step down" in Class as of the date of such withdrawal.

(b)    Payments for withdrawals are generally made within 30 days of the applicable Withdrawal Date; *provided, however*, in the event a Partner withdraws 90% or more of the balance of such Partner's Capital Account (or if a withdrawal, when combined with all other withdrawals effected by such Partner during the preceding 12 months, would result in such Partner having withdrawn 90% or more of the sum of (i) the aggregate amount of all prior withdrawals during such 12 month period, and (ii) such Partner's Capital Account balance as of the date of the most recent withdrawal request), a portion (generally not to exceed 10%) of the withdrawal payment will be retained in the GP's discretion pending completion of the audit of the

Partnership's annual financial statements for the Fiscal Year in which the applicable Withdrawal Date occurs. No interest shall accrue on such retained withdrawal payments. Payment of any amounts in respect of a withdrawal pursuant to this *Section 4.01(b)* shall be net of any accrued but unpaid Management Fee and, if applicable, earned Performance Allocation on the withdrawn portion of the applicable Limited Partner's Capital Account.

(c)    The GP may in its sole discretion require or permit any Partner, for any reason or no reason and at any time, with or without notice, to effect a complete or partial withdrawal of amounts contained in his Capital Account in accordance with the procedures outlined in this *Section 4.01* except that in such case (i) any dollar limitations may be waived by the GP and (ii) the GP may, in its sole and absolute discretion, distribute to such Partner up to 100% of his Capital Account at any time prior to the date on which that Partner would have been entitled to receive such a distribution had the Partner properly requested such a complete withdrawal.  As with all withdrawals, any such required or permitted withdrawal may be effectuated via a distribution (or distributions) of Securities in-kind, either in lieu of, or in combination with, Cash.  The undistributed remainder, if any, of such a Capital Account shall be distributed pursuant to the provisions of *Section 4.01*.

(d)    Any Partner who effects a withdrawal during a Fiscal Year shall be obligated upon notice by the GP to reimburse the Partnership in Cash or immediately available funds for any overpayment made pursuant to such withdrawal, as determined after completion of the annual accounting of the Partnership's books for that Fiscal Year and after any adjustments to the Capital Accounts of the Partners as are necessary in light of accounting; *provided, however*, that such reimbursement shall be required only to the extent that the overpayment exceeded the aggregate of any amount retained by the Partnership and any balance remaining in such Partner's Capital Account at the time of such determination.  Any obligation of a Partner arising under the provisions of this section to reimburse the Partnership for an overpayment shall terminate unless notice of the amount of the overpayment and a reasonable explanation of the calculation of such overpayment amount has been given on or before the 30th day following completion of the audit of the Partnership's annual financial statements for the Fiscal Year in which the subject withdrawal was made.  In the event that proper reimbursement has not been received by the Partnership within 30 days after proper notice, the amount of an overpayment shall begin to bear interest payable to the Partnership beginning as of the date that proper notice of the overpayment has been given, with the rate of interest equal to 10% per annum compounded monthly.

(e)    At the discretion of the GP, any withdrawal by a Limited Partner may be subject to a charge, as the GP may reasonably require, in order to defray the costs and expenses of the Partnership in connection with such withdrawal including, without limitation, any charges or fees imposed by any Partnership investment in connection with a corresponding withdrawal or redemption by the Partnership from such investment or any other costs associated with the sale of any of the Partnership's portfolio investments.

(f)    If aggregate withdrawal requests are received for a particular Withdrawal Date for more than twenty-five percent (25%) of the Net Asset Value of the Partnership as of such Withdrawal Date, the General Partner may, in its discretion, reduce all withdrawal requests for the Partnership for such Withdrawal Date *pro rata* in proportion to the amount sought to be withdrawn by each withdrawing Partner so that only twenty-five percent (25%) of the Net Asset Value of the Partnership as of such Withdrawal Date is withdrawn (the "**Gate**").  The Gate may be waived with respect to certain Limited Partners whose remaining Capital Account would otherwise be less than the minimum Capital Account required by the Partnership.  To the extent that any Partner's request has been reduced by the Gate, such request shall be satisfied as of the end of the next Withdrawal Date (and if not fully satisfied as of that date because of the Gate, then as of the next Withdrawal Date and, if necessary, successive Withdrawal Dates), each time subject to the Gate.  Any deferred withdrawal requests shall be treated in priority to withdrawal requests received for Withdrawal Dates subsequent to the initial Withdrawal Date at which the deferred request would have been effected in the absence of the Gate.  Any unsatisfied portion of any such withdrawal requests shall continue to be at risk in the Partnership's business until the effective date of the withdrawal.

(g)    In the event that Keumhwan (Kevin) Kwong and David Yeow die, become incapacitated or are adjudicated incompetent, the Limited Partners will be promptly notified of such event  and the Partnership shall be liquidated and terminated.

4.02    <u>Withdrawals of GP's Capital Account</u>.

(a)    As of the last business day of any Accounting Period, the GP may effect a withdrawal of some or all of the Performance Allocation allocated to its Capital Account; otherwise, the GP shall have the same withdrawal rights as a Limited Partner.

(b)    If the GP provides not less than 90 days prior notice to each Limited Partner of its intent to resign as general partner of the Partnership or is disqualified pursuant to *Section 4.06* hereof, the Partnership shall dissolve and thereafter conduct only those activities necessary to wind up its affairs in accordance with the provisions of *Article IX* hereof, unless within 90 days after receipt of notice of such resignation or disqualification Limited Partners representing a majority of the Allocation Percentages of all Limited Partners vote to continue the Partnership and in connection therewith appoint a successor general partner.  For the avoidance of doubt, if no successor general partner is appointed and the Partnership dissolves, all unsatisfied withdrawal requests and pending distributions shall be postponed until the completion of the winding up of the Partnership and a final accounting pursuant to *Article IX*.

(c)    If the Limited Partners appoint a successor general partner in accordance with paragraph (b) above, the Partnership shall pay to the GP or its legal representatives the GP's ending Capital Account balance (after computation of any applicable Performance Allocation) within 30 days of the appointment of such successor general partner (and the date of such appointment shall be deemed the end of an Accounting Period for all purposes under this Agreement); *provided however*, that a portion (generally not to exceed 10%) of the withdrawal payment will be retained pending completion of a potential audit of the Partnership's annual financial statements for the Fiscal Year in which the appointment of such successor general partner occurs.

4.03    Limitations on Withdrawals.  The GP may suspend the right of withdrawal or postpone the date of payment for any period during which (i) any stock exchange or over-the-counter market on which a substantial part of the Securities owned by the Partnership are traded is closed, (other than weekend or holiday closings) or trading on any such exchange or market is restricted or suspended, (ii) there exists a state of affairs that constitutes a state of emergency, as a result of which disposal of the Securities owned by the Partnership is not reasonably practicable or it is not reasonably practicable to determine fairly the value of its assets, (iii) a breakdown occurs in any of the means normally employed in ascertaining the value of a substantial part of the assets of the Partnership or when for any other reason the value of such assets cannot reasonably be ascertained, or (iv) a delay is reasonably necessary, as determined in the reasonable discretion of the GP, in order to effectuate an orderly liquidation of the Partnership's investments in a manner that does not have a material adverse impact on the Partnership or the non-withdrawing Limited Partners.  The GP shall provide notice of such suspension of the right of withdrawal to each Limited Partner within 5 days of the occurrence of such suspension. At the conclusion of such period, the GP shall resume permitting withdrawals otherwise permitted pursuant to this *Article IV* and shall resume any payments pursuant to such withdrawals as soon as reasonably practicable.

4.04    Distributions.    Except as otherwise set forth in this *Article IV*, a Partner who has satisfied the applicable notice requirements set forth herein with respect to withdrawal requests shall receive a distribution (or distributions) in Cash or, in the sole discretion of the GP, a distribution (or distributions) of Securities in-kind, either in lieu of, or in combination with, Cash, in accordance with the provisions of *Section 4.01(b)*.

4.05    Withholding from Distributions.    The GP may establish reserves for expenses, liabilities or contingencies (including those not addressed by GAAP) arising from events occurring during the period of time during which a withdrawing Limited Partner was a Limited Partner of the Partnership including, without limitation, contingent liabilities relating to pending or anticipated litigation, IRS audits or other governmental proceedings, which could reduce the amount of a distribution upon withdrawal (a "***Reserve Withholding***").  All such Reserve Withholding or other amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Partnership or to the Partners shall be treated as amounts distributed to the Partners pursuant to this *Article IV* for all purposes of this Agreement.  Any such Reserve Withholding or other amounts withheld, if and when released, shall be allocated among the Capital Accounts of the Partners who are Partners at the time of such release in the manner provided in *Article III*, unless the GP determines that it would be more equitable to allocate such release among the Capital Accounts of those persons who were Partners at the time such Reserve Withholding was established.  The Partnership is hereby authorized at all times to make payments with respect to each Partner in amounts required to discharge any obligation of the Partnership (pursuant to the Code or any provision of United States federal, state or local or non-United States tax law or otherwise) to withhold or make payments to any Taxing Authority with respect to any distribution or allocation by the Partnership of income or gain to such Partner and to withhold the same from distributions to such Partner (including payments made pursuant to Section 6225 of the Code and allocable to a Partner as determined by the Partnership Representative in its sole discretion). Any funds withheld from a distribution by reason of this Section 4.05 shall nonetheless be deemed distributed to the Partner in question for all purposes under this Agreement and, at the option of the General Partner,

shall be charged against the Partner's Capital Account. If there are any assets that, in the judgment of the GP, cannot be valued properly until sold or realized or cannot be sold without sacrificing a substantial portion of the value thereof, such assets may be excluded from the valuation of assets for purposes of computing the amount available for distribution to a Limited Partner upon withdrawal of any portion of its Capital Account pursuant to this *Article IV*. Any Partner's *pro rata* interest in such assets shall not be paid until such time as the GP, in its sole and absolute discretion, determines that circumstances no longer require such assets to be so excluded (in whole or in part). If there is any contingent liability of the Partnership or any pending transaction or claim by the Partnership as to which the withdrawing Partner's share of such liability or claim cannot, in the judgment of the GP, then be determined, the probable loss or liability, or value of the claim, as the case may be, may be excluded from the valuation of assets or liabilities for purposes of computing the amount owing to any Partner upon its withdrawal pursuant to this *Article IV*. No amount shall be paid or charged to any such Partner's Capital Account on account of any such contingency, transaction or claim until its final settlement or such earlier time as the GP shall determine. The Partnership may retain from sums otherwise due such Partner an amount that the GP estimates to be sufficient to cover the share of such Partner of any probable loss or liability on account of such contingency, or the probable value of the transaction or claim. Any amount so withheld from a Partner shall be held in a segregated interest-bearing account (which may be commingled with similar accounts of other Partners). Any unused portion of such reserve shall be distributed with interest accrued thereon once the GP has determined that the need therefor has ceased. Upon determination by the GP that circumstances no longer require the exclusion of assets or retention of sums as provided in this *Section 4.05*, the GP shall, at the earliest practicable time, pay such sums or the proceeds realized from the sale of such assets to each Partner from whom such sums or assets have been withheld.

4.06    Disqualification.

(a)    For the purposes of this Agreement, a Partner shall be deemed to be "disqualified" upon the occurrence of any of the following events:

(i)    If the Partner is a natural person, upon his death, his adjudication as an incompetent, his becoming bankrupt or adjudicated insolvent, or his making an assignment for the benefit of creditors; or

(ii)    If the Partner is not a natural person, upon its voluntary dissolution or liquidation, its bankruptcy or adjudication of insolvency, its making an assignment for the benefit of creditors, or its becoming subject to involuntary reorganization or liquidation proceedings and such proceedings not being dismissed within 90 days after filing.

(b)    Neither the withdrawal nor the disqualification of a Limited Partner shall dissolve the Partnership. Upon the disqualification of a Limited Partner, the successor-in-interest of the Limited Partner shall become a transferee of the Limited Partner and be credited or paid, or charged with, as the case may be, all further allocations and distributions on account of the Interest of the disqualified Limited Partner; *provided*, no such successor-in-interest shall become a substituted Limited Partner without first obtaining the written consent of the GP, whose consent may be withheld for any or no reason, and without complying with the provisions of *Section 8.02* hereof.

(c)    The disqualification of the GP shall cause the dissolution of the Partnership unless a successor general partner is appointed in accordance with the terms of *Section 4.02* hereof.

4.07    Distributions to Non-U.S. Partners.    The U.S. Foreign Account Tax Compliance Act (FATCA) imposes a 30% withholding tax on U.S. persons holding offshore accounts on certain "withholdable payments" to "foreign financial institutions" which do not provide information about their U.S. accounts to the IRS. A "withholdable payment" is generally any U.S. source income, such as interest, dividends, rents, royalties and other fixed or determinable income. A Limited Partner that is not a "United States person" (as defined in Code Section 7701(a)(30)) will generally be required to provide the Partnership information which identifies its direct and indirect U.S. ownership. Any such information provided to the Partnership will be shared with the IRS. A non-U.S. Limited Partner that is a "foreign financial institution" within the meaning of Section 1471(d)(4) of the Code will generally be required to enter into an agreement with the IRS identifying certain direct and indirect U.S. account holders or equity holders. A non-U.S. Limited Partner who fails to provide such information to the Partnership or enter into such an agreement with the IRS, as applicable, would be subject to a 30% withholding tax with respect to its share of any such payments attributable to actual and deemed U.S. investments in the Partnership and the GP may take any action in relation to a Limited Partner's interests or redemption proceeds to ensure that such withholding is economically borne by the relevant Limited Partner whose failure to provide the necessary information gave rise to the withholding.

## ARTICLE V – POWERS, DUTIES AND RIGHTS OF GENERAL PARTNER

5.01    <u>Management of the Partnership</u>.  The assets, affairs and operations of the Partnership shall be managed by the General Partner. The Limited Partners shall take no part in the management or control of the Partnership's business and shall have no authority to act for or bind the Partnership.

5.02    <u>Powers of GP</u>.  All references herein to any action to be taken by the Partnership shall mean action taken in the name of the Partnership and on its behalf by the GP.  Except as otherwise provided in this Agreement, the GP will have exclusive management and control of the business of the Partnership and will (except as otherwise provided in any other agreements) make all decisions affecting the Partnership and the Partnership's assets. Notwithstanding any other provision of this Agreement, the GP will not materially change the investment strategy of the Partnership from that described in the Partnership's confidential private placement memorandum accompanying this Agreement without the consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time.  In addition to the rights, powers, and authority granted elsewhere in this Agreement and by law, the GP will have the right, power, and authority to obligate and bind the Partnership and, on behalf of and in the name of the Partnership, to take any action of any kind and to do anything it deems necessary or advisable in pursuit of the Partnership's purposes, including, without limitation, the following:

(a)    To purchase, hold, sell (including to "write" put and call options), lend, or otherwise deal in Securities (on margin or otherwise), and in furtherance of the foregoing, to:

(i)    Exercise all rights, powers, privileges and other incidents of ownership with respect thereto (including, without limitation, voting rights with respect to Securities);

(ii)    Acquire a long or short position with respect to any Security and to make purchases or sales increasing, decreasing or liquidating such position, without any limitations as to the frequency of the fluctuation in such positions or as to the frequency of the changes in the nature of such positions;

(iii)    Enter into contracts for or in connection with investments in Securities;

(iv)    Liquidate Securities that have been distributed to the Partnership in-kind; and

(v)    Delegate the authority to engage in such activities as to some or all of the Partnership's assets to one or more investment managers.

(b)    To borrow funds on behalf of the Partnership and to pledge and hypothecate Securities and other assets of the Partnership for such loans, and to lend (with or without security) any Securities or other assets of the Partnership;

(c)    To open, maintain, conduct, and close accounts, including margin accounts with broker-dealers, futures commission merchants, exchanges and with banks or other custodians for Partnership assets, each as selected by the GP, and to draw checks or other orders for the payment of money by the Partnership, and in furtherance of the foregoing, to:

(i)    Issue instructions and authorizations to broker-dealers regarding Securities and/or money held in accounts of the Partnership with such broker-dealers;

(ii)    Enter into prime broker agreements, clearing agreements, custodial agreements, margin account agreements and agreements with executing brokers and futures commission merchants;

(iii)    Combine purchase or sale orders on behalf of the Partnership with orders for the Other Accounts and allocate Securities or other assets so purchased or sold, on an average-price basis or by any other method of fair allocation, among such accounts;

(iv)    Pay or authorize the payment and reimbursement of brokerage commissions (or in the case of riskless principal transactions, spreads) that may be in excess of the lowest (or smallest spreads) available that are paid to broker-dealers who execute transactions for the account of the Partnership and who (a) supply, or pay for (or rebate a portion of the Partnership's brokerage commissions to the Partnership for payment of) the cost of brokerage, research or execution services utilized by the Partnership or the Other Accounts and/or (b) "step out" of a portion

of the transaction in favor of a broker-dealer that has provided or is willing to provide research or execution products or services; *provided that* the General Partner considers, among other things and without limitation, in selecting a broker-dealer (that may be of benefit to the Partnership, the General Partner and the Affiliated Persons, and the Other Accounts): (i) commission rates, (ii) historical net prices (after mark-ups, mark-downs or other transaction-related compensation) on other transactions, (iii) execution, clearance and settlement capabilities, (iv) willingness to commit capital, (v) reliability, responsiveness and financial stability, (vi) size of the transaction, (vii) availability of Securities to borrow for short sales, (viii) the value of any research provided, and (ix) other products and/or services provided by such broker-dealers to the General Partner and Affiliated Persons or the Partnership, including, among other things, referral of prospective Limited Partners and payment of all or a portion of the Partnership's or the General Partner's or the Affiliated Person's costs of operations (including, for example, supplies, salaries, employee benefits, telephone, office equipment, news wire and data processing charges, attorneys' and accountants' fees, office rent, travel and entertainment expenses related to the General Partner's or the Partnership's business, quotation services, periodical subscription fees, and custody, record keeping and similar services);

(v)     Enter into arrangements with broker-dealers to open average price accounts wherein orders placed during a trading day are placed on behalf of the Partnership and Other Accounts and are allocated among such accounts using an average price;

(vi)    The General Partner may engage broker-dealer(s) or finders introducing Limited Partners to the Partnership and to pay such persons selling commissions and/or referral fees from (i) a portion of the General Partner's Management Fee and/or Performance Allocation or (ii) deduct such commissions or referral fee from the Capital Contribution of the Limited Partner being introduced to the Partnership by such broker dealer or finder. The GP may also direct brokerage from Partnership trades to broker-dealers which introduce Limited Partners to the Partnership, subject to applicable laws.

(d)     To employ from time to time, at the expense of the Partnership, persons required for the Partnership's business, including portfolio managers or other managers to manage any asset of the Partnership, accountants, attorneys, investment advisers, financial consultants, and others (who may be affiliated with the GP) on such terms and for such compensation as the GP determines to be reasonable; and to give receipts, releases, indemnities, and discharges with respect to all of the foregoing and any matter incident thereto as the GP may deem advisable or appropriate;

(e)     To engage in any transaction with the GP's affiliates to the extent permitted by applicable securities laws (including, without limitation, the ability to effect on behalf of the Partnership any "agency cross transaction" (as contemplated in Rule 206(3)-2 under the Investment Advisers Act of 1940, as amended) through the GP or any affiliate of the GP that is registered as a broker or dealer);

(f)     To make all tax elections required or permitted to be made by the Partnership, including elections under Section 754 of the Code;

(g)     To file, conduct and defend legal proceedings of any form, including proceedings against Partners, and to compromise and settle any such proceedings, or any claims against any person, including claims against Partners, on whatever terms deemed appropriate by the GP;

(h)     To admit Limited Partners or additional or successor GPs to the Partnership and to remove Limited Partners;

(i)     To maintain for the conduct of the Partnership's affairs one or more offices and in connection therewith rent or acquire office space, and do such other acts as the GP may deem necessary or advisable in connection with the maintenance and administration of the Partnership;

(j)     To waive or reduce, in whole or in part, any notice period, minimum amount requirement, or other limitation or restriction imposed on capital contributions or withdrawals of capital; waive, reduce or, by agreement with any Limited Partner, otherwise vary any fee or special allocation to the GP, and/or any

11

requirement imposed on that Limited Partner by this Agreement. The GP will have such right, power and authority regardless of whether such notice period, minimum amount, limitation, restriction, fee, or special allocation, or the waiver or reduction thereof, operates for the benefit of the Partnership, the GP or fewer than all the Limited Partners;

(k)    To retain an investment manager affiliated with the General Partner or other persons, firms or entities selected by the General Partner to provide certain management, brokers and prime brokers and administrative services to the Partnership and to cause the Partnership to compensate such Persons for such services in accordance with the terms of investment management agreements pursuant to which such investment manager will have discretionary investment authority over the Partnership's assets

(l)    To amend this Agreement in accordance with *Section 11.05*;

(m)    To authorize any member, officer, employee or other agent of the GP to act for and on behalf of the Partnership in all matters incidental to the foregoing;

(n)    To force the immediate withdrawal of any Limited Partner involved in or subject to a "Bad Actor Event";

(o)    establish or act as investment manager to additional affiliated investment vehicles including, but not limited to, offshore entities offering their interests primarily to non-U.S. individuals and U.S. tax-exempt entities for subsequent investment into the Partnership in a "mini-master-feeder" arrangement or subsequent investment, with the Partnership, into an affiliated offshore entity in a "master-feeder" arrangement; and

(p)    To do any and all acts on behalf of the Partnership as it may deem necessary or advisable in connection with, or incidental to the accomplishment of, the purposes of the Partnership or the maintenance and administration thereof.

5.03    <u>Consent of the Partners</u>. Notwithstanding *Section 5.02* to the contrary, without the consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time, in no event shall the GP take any action outside the scope of the purposes of the Partnership.

5.04    <u>Duties of GP</u>. Subject to the limitations in *Section 5.03*, the GP shall be charged with the full responsibility for managing and promoting the Partnership's purpose and business. The GP shall devote its diligent efforts to the business and affairs of the Partnership, including such time as shall be required, in the reasonable opinion of the GP, for the proper conduct of the business of the Partnership. The GP shall not assign its duties under this Agreement except pursuant to the terms of *Section 8.05* hereof. The GP shall have authority in its sole discretion to delegate any responsibilities hereunder to third parties with whom it contracts to provide services on behalf of the Partnership. No such delegation shall relieve the GP from its duties or obligations hereunder.

5.05    <u>Other Activities of the GP</u>. The General Partner and their respective affiliates, shareholders, members, partners, managers, directors, officers and employees (collectively, the "**Affiliated Persons**") will only devote so much time to the affairs of the Partnership as is reasonably required in the judgment of the General Partner. The Affiliated Persons will not be precluded from engaging directly or indirectly in any other business or other activity, including exercising investment advisory, research related advice, management responsibility and buying, selling or otherwise dealing with Securities and other investments for their own accounts, for the accounts of family members, for the accounts of other funds and for the accounts of individual and institutional clients (collectively, "**Other Accounts**"). Such Other Accounts may have investment objectives or may implement investment strategies similar to those of the Partnership. The Affiliated Persons may also have investments in certain of the Other Accounts. Each of the Affiliated Persons may give advice and take action in the performance of their duties to their Other Accounts that could differ from the timing and nature of action taken with respect to the Partnership. The Affiliated Persons will have no obligation to purchase or sell for the Partnership any investment that the Affiliated Persons purchase or sell, or recommend for purchase or sale, for their own accounts or for any of the Other Accounts. The Partnership will not have any rights of first refusal, co-investment or other rights in respect of the investments made by Affiliated Persons for the Other Accounts, or in any fees, profits or other income earned or otherwise derived from them. If a determination is made that the Partnership and one or more Other Accounts should purchase or sell the same investments at the same time, the Affiliated Persons will allocate these purchases and sales as is considered equitable to each. No Limited Partner will, by reason of being a Limited Partner of the Partnership, have any right to participate in any manner in any profits or income earned or derived by or accruing to the Affiliated Persons from the conduct of any business or from any transaction in investments effected by the Affiliated Persons for any account other than that of the Partnership.

12

5.06     Management Fee and Expenses.

(a)      In consideration for its services, the General Partner receives a management fee with respect to each Class of Interests paid quarterly in advance equal to (i) one-half of a percent (0.5%) (two percent (2%) annually) of the beginning Capital Account balance of each Class A Limited Partner for such calendar quarter (the "**Class A Management Fee**"), (ii) seven-sixteenths of a percent (0.4375%) (one and three-fourths percent (1.75%) annually) of the beginning Capital Account balance of each Class B Limited Partner for such calendar quarter (the "**Class B Management Fee**") or (iii) three-eighths of a percent (0.375%) (one and one-half percent (1.5%) annually) of the beginning Capital Account balance of each Class C Limited Partner for such calendar quarter (the "**Class C Management Fee**", and collectively with the Class A Management Fee and the Class B Management Fee, the "**Management Fee**").   A *pro rata* portion of the Management Fee will be paid out of any initial or additional capital contributions to the Partnership on any date that does not fall on the first day of a calendar quarter, based on the number of days remaining in such partial quarter. No portion of the Management Fee will be refunded in connection with any withdrawals from a Limited Partner's Capital Account occurring prior to a Withdrawal Date.   The General Partner may, in its sole discretion, enter into arrangements with Limited Partner under which the Management Fee is reduced, waived or calculated differently with respect to such Limited Partners, including, without limitation, Limited Partners that are members, affiliates or employees of the General Partner, members of the immediate families of such persons and trusts or other entities for their benefit, or Limited Partners that make a substantial investment or otherwise are determined by the General Partner in its sole discretion to represent a strategic relationship.

(b)      All expenses of the Offering and organization of the Partnership (including legal and other expenses) ("**Organizational Expenses**") will be paid by the Partnership and/or reimbursed by the Partnership to the extent paid by the General Partner.  The Organizational Expenses will be amortized and charged to the Partners' Capital Accounts on a monthly basis over a period of five (5) years commencing from the launch of the Partnership's investment activities. GAAP requires that organizational costs be treated as an expense when incurred. The General Partner believes that the impact on the Partnership's results from this departure from GAAP will result in a fairer apportionment of such expenses among Limited Partners. This departure from GAAP may also result in a qualified audit opinion from the Partnership's auditors. If the Partnership is terminated within five (5) years of the commencement of investment activities, any unamortized expenses will be recognized.

(c)      The Partnership shall pay (or reimburse the GP) for all ordinary and reasonable operating and other expenses necessary for the Partnership's operations, including, but not limited to, investment and due diligence related expenses related to Independent Portfolio Manager selection; fees and expenses of the Independent Portfolio Funds, including, but not limited to, the management and performance fees assessed by Independent Portfolio Funds, investment-related expenses (*e.g.*, exchange and brokerage commissions, exchange deposit and withdrawal fees, clearing and settlement charges, custodial fees, interest expenses, and expenses relating to consultants, brokers or other professionals or advisors who provide research, advice or due diligence services with regard to investments); research costs and expenses (including fees for news, quotation and similar information and pricing services); registered agent fees; legal expenses (including, without limitation, the costs of on-going legal advice and services, blue sky filings and all costs and expenses related to or incurred in connection with the Partnership's compliance obligations under applicable federal and/or state securities and investment adviser laws, as well as extraordinary legal expenses, such as those related to litigation or regulatory investigations or proceedings); the Management Fee; accounting fees and audit expenses; administrative fees; tax preparation expenses and any applicable tax liabilities (including transfer taxes and withholding taxes); other governmental charges or fees payable by the Partnership; costs of printing and mailing reports and notices; and other similar expenses related to the Partnership, as the GP determines in its sole discretion.

(d)      The GP will pay for its own administrative and overhead expenses incurred in connection with providing services to the Partnership. These expenses include all expenses incurred by the GP in providing for its normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, insurance, utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above.

5.07     Reliance on Authority of GP.  No Person dealing with the GP or the Partnership shall be required to determine the authority of the GP to make any undertaking on behalf of the Partnership or to determine any fact or circumstance bearing upon the existence of such authority.  No purchaser of any property or interest owned by the

Partnership shall be required to determine the sole and exclusive authority of the GP to execute and deliver, on behalf of the Partnership, any and all documents and instruments in connection therewith or to see to the application or distribution of revenues or proceeds paid or credited in connection therewith.

5.08    Limitation of Liability; Indemnification.

(a)    The General Partner, each Affiliated Person and the legal representatives of any of them (each, an "**_Indemnified Party_**"), shall not be liable, responsible nor accountable in damages or otherwise to the Partnership or any Partner, or to any successor, assignee or transferee of the Partnership or of any Partner, for (i) any acts performed or the omission to perform any acts, within the scope of the authority conferred on such Indemnified Party by this Agreement, except by reason of acts or omissions found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence; (ii) performance by such Indemnified Party of, or the omission to perform, any acts on advice of legal counsel, accountants, or other professional advisors to the Partnership; (iii) the negligence, dishonesty, bad faith, or other misconduct of any consultant, employee, or agent of the Partnership, including, without limitation, an Affiliated Person of the GP, selected or engaged by such Indemnified Party with reasonable care and in good faith; or (iv) the negligence, dishonesty, bad faith, or other misconduct of any Person in which the Partnership invests or with which the Partnership participates as a partner, joint venturer, or in another capacity, which was selected by such Indemnified Party with reasonable care and in good faith. No Indemnified Party shall be liable to the Partnership or to any Partner, or any successors, assignees, or transferees of the Partnership or any Partner, for any loss, damage, expense, or other liability due to any cause beyond its reasonable control, including, but not limited to, strikes, labor troubles, riots, fires, tornadoes, floods, bank moratoria, trading suspensions on any exchange, acts of a public enemy, insurrections, acts of God, acts of terrorism, failures to carry out the provisions hereof due to prohibitions imposed by law, rules, or regulations promulgated by any governmental agency, or any demand or requisition by any government authority.

(b)    Nothing in this Agreement may be interpreted to limit or modify the GP's fiduciary duty to the Limited Partners nor waive any right or remedy a Limited Partner may have under federal or state securities laws. Federal and state securities laws impose liabilities under certain circumstances on persons who act in good faith.

(c)    To the fullest extent permitted by law, the Partnership, in the GP's sole discretion, shall indemnify and hold harmless each Indemnified Party from and against any loss, liability, damage, cost or expense suffered or sustained by an Indemnified Party by reason of (i) any acts, omissions or alleged acts or omissions arising out of or in connection with the Partnership, this Agreement or any investment made or held by the Partnership (including, without limitation, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim), _provided that_ such acts, omissions or alleged acts or omission upon which such actual or threatened action, proceeding or claim are based are not found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence by such Indemnified Party, or (ii) any acts or omissions, or alleged acts or omissions, of any broker or agent of any Indemnified Party, _provided that_ such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with reasonable care.

(d)    The Partnership shall, in the sole discretion of the GP, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct.  In the event that such an advance is made by the Partnership, the Indemnified Party shall agree to reimburse the Partnership for such fees, costs and expenses to the extent that it shall be determined that it was not entitled to indemnification under this _Section 5.08_.

(e)    Notwithstanding any of the foregoing to the contrary, the provisions of this _Section 5.08_ shall not be construed so as to provide for the indemnification of any Indemnified Party for any liability (including liability under federal or state securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this _Section 5.08_ to the fullest extent permitted by law.

**ARTICLE VI – POWERS, RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS**

6.01    <u>Powers and Rights</u>.  Except as expressly set forth herein, the Limited Partners shall not take part in, or interfere in any manner with, the conduct or control of the Partnership business, or have any right or authority to act or sign for, or to obligate the Partnership.  The Limited Partners shall not at any time be entitled to withdraw all or any part of their contribution to the capital of the Partnership except to the extent they are entitled to withdrawals pursuant to the provisions of *Article IV* hereof.  Except as expressly set forth herein, the Limited Partners shall have no right to amend or terminate the Partnership, or to appoint, select, vote for or remove the GP or its agents, or to otherwise participate in the business decisions of the Partnership.  The Limited Partners shall have no right to demand and receive any property other than Cash in return for their contributions, and, prior to the dissolution and liquidation of the Partnership pursuant to *Article IX* hereof, their right to Cash shall be limited to the rights set forth in *Article IV* hereof.

6.02    <u>BHCA Subject Persons</u>.  Notwithstanding any other provision of this Agreement to the contrary, solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the Partnership a written notice to the GP of its election not to be treated as a BHCA Subject Person, and shall not thereafter have given the Partnership a notice of revocation of such election, and that at any time has an Allocation Percentage in excess of 4.9% of the aggregate Allocation Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, shall be deemed to hold an Allocation Percentage of only four and nine-tenths percent of the aggregate Allocation Percentages of the Limited Partners (after giving effect to the limitations imposed by this *Article VI* on all such Limited Partners), and such Allocation Percentage in excess of said four and nine-tenths percent shall be deemed held by the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Allocation Percentages; *provided that* this limitation shall not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of the Agreement up to the full amount of its Allocation Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the affected Interest. The foregoing voting restriction shall continue to apply with respect to any assignee or other transferee of such BHCA Subject Person's Interest; *provided, however*, that the foregoing voting restriction shall not continue to apply if the Interest is transferred: (i) to the Partnership; (ii) to the public in an offering registered under the Securities Act of 1933, as amended (the "***Securities Act***"); (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Investments Act in which no person acquires more than 2% of the aggregate Capital Account balances of the Limited Partners; or (iv) in a single transaction to a third party who acquires at least a majority of the aggregate Capital Account balances of the Limited Partners without regard to the transfer of Interests to which such Capital Accounts relate.

**ARTICLE VII – ACCOUNTING, BOOKS AND RECORDS; REPORTS TO PARTNERS**

7.01    <u>Accounting Methods</u>.  The GP shall prepare the accounting statements for the Partnership on an accrual basis in accordance with GAAP (except to the extent that accounting for Organizational Expenses may depart from GAAP)and shall be empowered to make any changes of accounting method that it shall deem advisable.

7.02    <u>Books and Records</u>.  The GP shall keep or cause to be kept, at the Partnership's expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts, Net Profits and Net Losses of the Partnership, the respective Capital Accounts of the Partners and such other matters required by the Act.  Such books of account shall be the property of the Partnership, shall be kept in accordance with sound accounting principles and procedures consistently applied, and shall be open to the reasonable inspection and examination of the Partners or their duly authorized representatives upon notice to the GP. The books of account shall be maintained at the principal office of the GP or at the office of the Partnership's accounting or administrative firm, as determined by the GP in its sole discretion. Notwithstanding the foregoing, however, the GP is not obligated to show any Partners records detailing the actual Securities trades placed by the Partnership. Information regarding the Partnership's trading and specific investments is proprietary.

7.03    <u>Partnership Representative</u>.  The General Partner is hereby designated as the Partnership's "partnership representative" in accordance with Code Section 6223 ("***Partnership Representative***"), in all cases to exercise all authority permitted of a Partnership Representative, as applicable, under the Code.  The General Partner is hereby authorized to make any and all elections for U.S. federal, state, local and non-U.S. tax matters relating to the Partnership.  The General Partner shall also be entitled to appoint and replace from time to time the Partnership's "designated individual" within the meaning of Proposed Treasury Regulation § 301.6223-1(b)(3), and any successor provision thereto. The General Partner shall exercise its authority as Partnership Representative in such manner as it determines to be in the best interests of the Partners.

7.04    <u>Reports to Partners</u>.  The GP will furnish audited financial statements, prepared by a firm of independent public accountants, to all Limited Partners within one hundred twenty (120) days, or as soon thereafter

as is reasonably practicable, following the conclusion of each Fiscal Year, although the GP may elect to postpone the first audit of the Partnership's annual financial statements until the completion of the Partnership's first full fiscal year, in which case the initial audit will cover the applicable fiscal year as well as the partial "stub" year in which the Partnership commenced operation.  At the GP's sole discretion, financial statements will include a balance sheet or statement of financial condition, an income statement or statement of operations, and a cash flow statement, if required.  In addition, all Limited Partners will receive the information necessary to prepare federal and state income tax returns following the conclusion of such Fiscal Year as soon thereafter as is reasonably practical.

All Limited Partners will also receive unaudited performance reports on a monthly basis (including all gains and losses in each Limited Partner's Capital Account and the Net Asset Value of such Capital Account) and such other information as the GP determines.  With regard to these reports, the GP is not required to provide information about specific investment transactions of the Partnership.

7.05    Preparation of Reports.  In the preparation of any reports required to be delivered pursuant to *Section 7.04*, Securities shall be valued at their Fair Market Value, and any change in such Fair Market Value shall be treated as an item of Net Profit or Net Loss.

7.06    Adjustment of Tax Basis.  In the event of a transfer of an Interest in accordance with the terms of this Agreement, upon the request of any Partner, the GP may, at its sole discretion, cause the Partnership to elect, pursuant to Section 754 of the Code ("**Section 754 Election**"), to adjust the basis of the Partnership property if (a) the effect of such adjustment is to increase the adjusted basis of Partnership property and (b) such requesting Partner agrees to bear any additional expense attributable to accounting and recordkeeping required as a result of the Partnership's Section 754 Election.

7.07    Confidentiality.  Every Limited Partner shall keep confidential and shall not disclose to any other Person without the prior written consent of the GP, and shall not use for any purpose other than monitoring such Limited Partner's investment in the Partnership, any and all information with respect to the Partnership or its portfolio; provided, however, that a Limited Partner may disclose any such information (1) as has become generally available to the public other than as a result of a breach of this *Section 7.07* by such Limited Partner or any agent or affiliate of such Limited Partner, (2) as may be required to be included in any report, statement or testimony required to be submitted to any municipal, state or national regulatory body having jurisdiction over such Limited Partner, (3) as may be required in response to any summons or subpoena or in connection with any litigation, (4) to the extent necessary in order to comply with any law, order, regulation or ruling applicable to such Limited Partner, (5) to its employees and professional advisors (including such Limited Partner's auditors and counsel), so long as such persons are advised of the confidentiality obligations contained herein, and (6) as may be required in connection with an audit by any taxing authority.  In the event any Limited Partner is sought to be compelled by law, regulation or legal process, including in litigation or by way of any request pursuant to any public-records laws of any jurisdiction, to disclose any such information, such Limited Partner shall notify the GP in writing of such potential disclosure as promptly as possible.

**ARTICLE VIII –TRANSFER AND ASSIGNMENT OF PARTNERSHIP INTERESTS**

8.01    General Prohibition.  No Limited Partner shall assign, convey, sell, transfer, pledge, encumber or in any way alienate all or any part of his Interest without the prior written consent of the GP, which consent may be withheld in the GP's sole and absolute discretion.

8.02    Requirements upon Transfer.  Any transfer of an Interest permitted under *Section 8.01* hereof or any other provision of this Agreement shall be subject to the following:

(a)    The permitted transferee shall have executed a written agreement, in form and substance reasonably satisfactory to the GP, to assume all of the duties and obligations of the transferor Limited Partner under this Agreement and to be bound by and subject to all of the terms and conditions of this Agreement;

(b)    The transferor Partner and the transferee shall have executed a written agreement, in form and substance reasonably satisfactory to the GP, to indemnify and hold the Partnership and the Partners harmless from and against any liabilities, losses, costs and expenses arising out of the transfer, including, without limitation, any liability arising by reason of the violation of any securities laws of the United States, any State of the United States, or any foreign country;

(c)       The transferor Partner has delivered to the GP an opinion of counsel reasonably acceptable to the GP that such transfer would not violate the Securities Act, as amended, or any blue sky laws (including any investor suitability standards);

(d)       The transferor Partner demonstrates that such transfer, when added to the total of all other sales or exchanges of Interests within the preceding 12 months, will not result in the Partnership being considered to have terminated within the meaning of Section 708 of the Code and that such transfer will not result in the Partnership being treated as a publicly-traded partnership within the meaning of Section 7704 of the Code;

(e)       The transferor Partner has demonstrated that such transfer will not cause the assets of the Partnership to be "plan assets" for purposes of ERISA;

(f)       The transferee shall have executed a power of attorney substantially identical to that contained in *Article X* hereof, and shall execute and swear to such other documents and instruments as the GP may deem necessary to effect the admission of the transferee as a Partner;

(g)       The transferee shall have executed, in favor of the Partnership and the GP, an instrument containing representations by such transferee substantially identical to the representations and investment qualifications of the Limited Partner set forth in the Subscription Agreement;

(h)       The transferee shall have paid the reasonable expenses incurred by the Partnership in connection with the admission of the transferee to the Partnership; and

(i)       The transferee shall only effect a transfer on the first calendar day of any calendar month.

8.03    Unauthorized Transfer.  Any purported transfer of an Interest not expressly permitted by this *Article VIII* or consented to by the GP shall be null and void and of no effect whatsoever.

8.04    Interest of the Transferee.  In the event that a Limited Partner shall have obtained the consent of the GP to a transfer of all or a portion of its Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that the Capital Account relates to the transferred Interest.

8.05    GP Transfers.  Without the approval of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners on the relevant date of determination, the GP may not transfer its Interest as GP in the Partnership; *provided however*, that the GP may transfer its Interest as GP without the consent of any Limited Partner (i) to any entity controlled by, controlling or under common control with it or any of its principals, or (ii) pursuant to a transaction not deemed to involve an "assignment" of this Agreement within the meaning of the Investment Advisers Act of 1940, as amended.  In the case of any transfer pursuant to the preceding clauses (i) and (ii), the transferee shall be admitted to the Partnership as a substitute GP, all references herein to the GP shall thereafter be deemed references to the transferee GP, and the GP will promptly notify the Limited Partners of any such transfer of its Interest.

**ARTICLE IX – DISSOLUTION OF PARTNERSHIP**

9.01    Dissolution.  The Partnership shall be dissolved upon the expiration of the term of the Partnership as set forth in *Section 1.04* hereof.  In the event that the Partnership is dissolved on a date other than the last day of a Fiscal Year, the date of such dissolution shall be deemed to be the last day of an Accounting Period and a Fiscal Year for purposes of adjusting the Capital Accounts of the Partners. For purposes of distributing the assets of the Partnership upon dissolution, the GP shall be entitled to a return, on a *pari passu* basis with the Limited Partners, of the amount standing to its credit in its Capital Account and, with respect to its share of profits, based upon its Allocation Percentage.

9.02    Winding Up and Distribution of Assets.

(a)       Upon the dissolution of the Partnership, the Partnership shall continue in existence for a reasonable period of time for the purpose of winding up its affairs, and the GP (or any Liquidating Agent appointed pursuant to *Section 9.02(c)* below) shall wind up the Partnership's affairs and cause the sale of the Partnership's assets (except those to be distributed in-kind or retained pursuant to *Section 9.03* below) as expediently as is practicable and prudent and in such manner as the GP or Liquidating Agent, in its sole discretion, determines appropriate to obtain the best prices.  Nothing herein shall preclude a sale of any

asset of the Partnership to any Partner or affiliate of a Partner.  Any property distributed in-kind in the liquidation shall be valued at Fair Market Value in determining the amount distributed to Partners.  Whether any assets of the Partnership shall be liquidated through sale or shall be distributed to the Partners in-kind shall be a matter left to the sole discretion of the GP or Liquidating Agent.  The GP or Liquidating Agent shall conduct (or cause to be conducted) a full accounting of the assets and liabilities of the Partnership and cause a balance sheet of the Partnership to be prepared as of the date of dissolution and a profit and loss statement for the period commencing after the end of the preceding Accounting Period and ending on the date of dissolution, and such financial statements shall be furnished to all of the Partners.

(b)     The proceeds of the sale of the Partnership's property and assets, plus any unsold assets to be distributed in-kind, shall be distributed in the following order of priority:

(i)     Payment of the debts and liabilities of the Partnership incurred in accordance with the terms of this Agreement, and payment of the expenses of liquidation;

(ii)     Setting up of reserves as set forth in *Section 9.03* below, as the GP or Liquidating Agent may deem reasonably necessary, for any contingent or unforeseen liabilities or obligations of the Partnership or any obligation or liability not then due and payable; *provided*, any unspent balance of the reserves shall be distributed in the manner hereinafter provided when deemed reasonably prudent by the GP or Liquidating Agent;

(iii)     Payment, on a *pro rata* basis, of any loans from or debts incurred in accordance with the terms of this Agreement owed to Partners; and

(iv)     Payment to the Partners, on a *pro rata* basis, of the remaining positive balances of their Capital Accounts, adjusted to the date of payment as set forth in *Article III*.

(c)     The Partnership may, from time to time, enter into (and modify and terminate) agreements with a liquidating agent or trustee selected by the GP if the GP is unwilling to manage the winding up process or, in the event the GP is disqualified pursuant to *Section 4.05* or otherwise is unable to manage the winding up process, such person as may be designated by Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time (in either such case, a "**Liquidating Agent**"), authorizing the Liquidating Agent to wind up the Partnership's affairs; *provided that* the total compensation the Partnership may become obligated to pay to such Liquidating Agent(s) during such winding up period will not exceed the aggregate amount of the Management Fee the Partnership would otherwise pay the General Partner during such winding up period.

(d)     In the event that the Partnership is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), the distributions made pursuant to this *Section 9.02* shall be made in compliance with 1.704-1(b)(2)(ii)(b)(2).  In the event that the Partnership is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), but the Partnership has not dissolved pursuant to *Section 9.01* above, the Partnership shall be deemed to distribute the Partnership's property to the Partners, who shall be deemed to assume and take such property subject to the Partnership's liabilities, all in accordance with the balances of their respective Capital Accounts.  Immediately thereafter, the Partners shall be deemed to recontribute such property in-kind to the Partnership, who shall be deemed to assume and take such property subject to all such liabilities. Notwithstanding anything in this Agreement to the contrary, no Partner shall have any obligation to restore any negative or deficit balance in its Capital Account upon dissolution or liquidation of the Partnership, or otherwise.

9.03     Reserves

(a)     If there are any assets that, in the judgment of the GP or Liquidating Agent, cannot be valued properly until sold or realized or cannot be distributed properly in-kind or cannot be sold without sacrificing a substantial portion of the value thereof, such assets may be excluded from the valuation of assets for purposes of computing the amount available for distribution upon dissolution and termination of the Partnership pursuant to this *Article IX*.  Any Partner's *pro rata* interest in such assets shall not be paid or distributed in-kind to it until such time as the GP or Liquidating Agent, in its sole and absolute discretion, determines that circumstances no longer require such assets to be so excluded (in whole or in part).

(b)    If there is any contingent liability of the Partnership or any pending transaction or claim by the Partnership the remaining value of which cannot, in the judgment of the GP or Liquidating Agent, then be determined, the probable loss or liability, or value of the claim, as the case may be, may be excluded from the valuation of assets or liabilities for purposes of computing the amount available for distribution upon dissolution and termination of the Partnership pursuant to this *Article IX*.   No amount shall be paid or charged to any such Partner's Capital Account on account of any such contingency, transaction or claim until its final settlement or such earlier time as the GP or Liquidating Agent shall determine.   The Partnership may retain from sums otherwise due each Partner an amount that the GP or Liquidating Agent estimates to be sufficient to cover the share of such Partner of any probable loss or liability on account of such contingency, or the probable value of the transaction or claim.   Any amount so withheld from a Partner shall be held in a segregated interest-bearing account (which may be commingled with similar accounts of other Partners).   Any unused portion of such reserve shall be distributed with interest accrued thereon once the GP or Liquidating Agent has determined that the need therefor has ceased.

(c)    Upon determination by the GP or Liquidating Agent that circumstances no longer require the exclusion of assets or retention of sums as provided in subsections (a) and (b) hereof, the GP or Liquidating Agent shall, at the earliest practicable time, pay such sums or distribute such assets or the proceeds realized from the sale of such assets to each Partner from whom such sums or assets have been withheld.

9.04    No Action for Dissolution.  The Partners acknowledge that irreparable damage will be done to the Partnership (on account of a premature liquidation of the Partnership's assets, loss of goodwill and reputation, and other factors) if any Partner seeks to dissolve, terminate or liquidate the Partnership by litigation or otherwise.  The Partners further acknowledge that this Agreement has been drawn carefully to provide fair treatment of all parties and equitable payments in liquidation of the Interests of all Partners, and that the Partners entered into this Agreement with the intention that the Partnership continue until dissolved and liquidated in accordance with the terms of this Agreement.  Accordingly, each Partner hereby waives and renounces any right to dissolve, terminate or liquidate the Partnership, or to obtain the appointment of a receiver or trustee to liquidate the Partnership, except as specifically set forth in this Agreement.

9.05    No Further Claim.  Each Partner shall look solely to the assets of the Partnership for the return of its investment in the Partnership (including capital contributions and loans from a Partner to the Partnership), and no Partner shall have any liability or obligation to the Partnership or to any other Partner to repay any unreturned capital contributions or loans made by any Partner to the Partnership.

## ARTICLE X – POWER OF ATTORNEY

0115.1    Grant and Scope of Power.  Each Partner hereby irrevocably constitutes and appoints the GP as its true and lawful agent and attorney-in-fact, with full power of substitution, in its name, place and stead, to make, execute and acknowledge, swear to, record, publish and file:

(a)    Any agreement, document or instrument pertaining to the sale, transfer, conveyance or encumbrance of all or any portion of the property of the Partnership in accordance with the terms of this Agreement;

(b)    Any document or instrument with respect to the Partnership that may be required or permitted to be filed under the laws of any state or of the United States, or which the GP shall deem necessary, desirable or advisable to file;

(c)    Any document that might be required to effectuate the dissolution, termination and liquidation of the Partnership;

(d)    Any documents or acts deemed advisable by the GP in connection with the withdrawal of a Limited Partner; and

(e)    Any amendment to this Agreement made in conformation with *Section 11.05* below.

The foregoing power of attorney is coupled with an interest, shall be irrevocable and shall survive the death, incompetency, dissolution, merger, consolidation, bankruptcy or insolvency of each of the Partners.   The Partners shall execute and deliver to the GP, within five days after receipt of the GP's request therefor, such further designations, powers of attorney and other instruments as the GP reasonably deems necessary to carry out the purposes of this Agreement.

## ARTICLE XI – MISCELLANEOUS

011.1    Additional Documents.  At any time and from time to time after the date of this Agreement, upon the request of the GP, the Partners shall do and perform, or cause to be done and performed, all such additional acts and deeds, and shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such additional instruments and documents, as may be required to best effectuate the purposes and intent of this Agreement.

021.1    Applicable Law.  This Agreement shall be governed by, construed under, and enforced and interpreted in accordance with, the laws of the State of Delaware.

031.1    Jurisdiction.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Delaware, and each of the parties' consents to the jurisdiction of such courts in any such action or proceeding and waives any objection to venue laid therein.

041.1    Notices.  Any notices required by this Agreement shall be in writing and shall be deemed to have been duly given if (i) delivered in person, (ii) if mailed postage prepaid, by certified or registered mail with return receipt requested, (iii) if transmitted by electronic mail or facsimile, (iv) if sent by second day service by Federal Express or any other nationally recognized courier service, postage prepaid or (v) if sent by Federal Express or any other nationally recognized overnight courier service or overnight express U.S. Mail, postage prepaid, to the Partner at the address set forth in the Subscription Agreement, or to such other address of which the GP subsequently shall have been notified in writing by such Partner.  Notices personally delivered or transmitted by electronic mail or facsimile shall be deemed to have been given on the date so delivered or transmitted.  Notices mailed shall be deemed to have been given on the date three business days after the date posted, notices sent in accordance with (iv) above shall be deemed to have been given on the date two business days after the date posted, and notices sent in accordance with (v) above shall be deemed to have been given the next business day after delivery to the courier service or U.S. Mail (in time for next day delivery).

051.1    Agreement; Amendments.  This Agreement constitutes the entire agreement among the parties and supersedes any prior understanding or agreement among them respecting the subject matter hereof.  There are no representations, arrangements, understandings or agreements, oral or written, among the parties hereto relating to the subject matter of this agreement, except those fully expressed herein.  No change or modification of this Agreement or waiver of any provision hereof shall be valid or binding on the parties hereto, unless such change, modification or waiver shall be in writing and signed by or on behalf of the parties hereto, and no waiver on one occasion shall be deemed to be a waiver of the same or any other provision hereof in the future.  Notwithstanding the foregoing sentence, amendments can be effected pursuant to the following conditions:

(a)        Except as set forth elsewhere in this *Section 11.05,* this Agreement may be amended from time to time, in whole or in part, with the written consent of Limited Partners holding a majority of the Allocation Percentages of all Limited Partners at such time (and the affirmative vote of the GP).  Notwithstanding the foregoing or anything to the contrary in *Section 11.05(b),* below, or elsewhere in this Agreement, the GP may amend this Agreement to conform to applicable laws and regulations without the consent of the Limited Partners.  The GP shall provide Limited Partners with at least 15 days' notice of any amendments to this Agreement to comply with applicable law.

(b)        The GP may, without the consent of the other Limited Partners, issue side letters to investors providing a materially different fee schedule, liquidity structure, and certain information regarding the Partnership, including its portfolio, not shared with other Limited Partners and may also amend this Agreement (i) to change the Partnership's name, registered office or business office, (ii) to make a change that is necessary or, in the GP's opinion advisable, to qualify the Partnership as a partnership (or other entity in which the Limited Partners have limited liability) under the laws of any state and/or to preserve the Partnership's classification for federal tax purposes as a partnership that is not a "publicly traded partnership" treated as a corporation under Code Section 7704, (iii) to make any amendment hereof as long as such amendment does not adversely affect the Limited Partners in any material respect (although an amendment made to conform with applicable laws and regulations, as referenced in *Section 11.05(a),* may adversely affect the Limited Partners and the consent of the Limited Partners is not required for such an amendment), (iv) to make any change that is necessary or desirable to satisfy any requirements, conditions, or guidelines contained in any opinion, directive, order, statute, ruling, or regulation of any federal or state entity applicable to the Partnership or the GP, so long as such change is made in a manner that minimizes any adverse effect on the Limited Partners, (v) to prevent the Partnership from, in any manner, being

20

deemed an investment company subject to registration under the Investment Company Act, (vi) if the Partnership is advised that any allocations of income, gain, loss or deduction provided herein are unlikely to be respected for Federal income tax purposes, to amend the allocation provisions hereof, on advice of legal counsel, to the minimum extent necessary to effect the plan of allocations and distributions provided herein, (vii) to create a new class or series of Interests, which shall have such rights (including voting rights), powers, duties and obligations, including the payment of fees and performance allocations, as the GP may specify, (viii) to cure any ambiguity or to correct or supplement any provision contained herein which may be defective or inconsistent with any other provisions contained herein, or (ix) to take such actions as may be necessary or appropriate to avoid the assets of the Partnership being treated for any purpose of ERISA or Code Section 4975 as assets of any "employee benefit plan" as defined in and subject to ERISA or of any plan or account subject to Code Section 4975 (or any corresponding provisions of succeeding law) or to avoid the GP's engaging in a "prohibited transaction" as defined in Section 406 of ERISA or Code Section 4975(c).

(c)     Nothing contained herein shall permit the amendment of this Agreement to reduce a Limited Partner's Capital Account or Allocation Percentage, permit assessments on the Limited Partners or to increase the Management Fee or Performance Allocations chargeable with respect to a Limited Partner without the prior consent of the affected Limited Partner(s); nor shall the following provisions hereof be amended without the consent of each of the Limited Partners adversely affected thereby and the GP: *Sections 2.06*, *4.01*, *5.08*, *9.01* and this *Section 11.05*.

(d)     Copies of each amendment of this Agreement (other than an amendment pursuant to paragraph (b)) shall be delivered to each Limited Partner at least ten days prior to the effective date thereof; *provided that* any amendment that the GP determines is necessary or appropriate to prevent the Partnership from being a publicly traded partnership treated as a corporation under Code Section 7704 shall be effective on the date provided in the instrument containing such amendment.  Amendments approved in accordance with this *Section 11.05* shall be binding on all Limited Partners, including any that did not vote to approve the same, except as set forth in *Section 11.05(c)*.

(e)     Limited Partners shall have no right (i) to amend (except to the extent provided in *Section 11.05(a)*) or terminate this Agreement, (ii) to appoint, select, vote for, or remove the GP or its agents, or (iii) to exercise voting rights or otherwise participate in the Partnership's management or business decisions or otherwise in connection with the Partnership property.

(f)     For purposes of obtaining a written consent to any matter or action, including any amendment to this Agreement, the GP may require a response within a specified reasonable time period (which shall not be less than fifteen (15) days), and failure by a Limited Partner to respond within such time period shall constitute a vote in favor of and consent to such matter or action.  The GP may, in its sole discretion, choose to deliver any request for written consent and materials relating thereto via email, password-protected website posting or other electronic reporting medium in lieu of providing the Limited Partners with paper copies of such request.

061.1    Severability.  If any portion of this Agreement is held illegal or unenforceable, the Partners hereby covenant and agree that such portion or portions are absolutely and completely severable from all other provisions of this Agreement and such other provisions shall constitute the agreement of the Partners with respect to the subject matter hereof.

071.1    Successors.  Subject to the provisions hereof imposing limitations and conditions upon the transfer, sale or other disposition of the Interests of the Partners in the Partnership, all the provisions hereof shall inure to the benefit of and be binding upon the heirs, successors, legal representatives and assigns of the parties hereto.

081.1    Counterparts.  This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement.

091.1    Section Headings.  Section and other headings contained in this Agreement are for reference purposes only and are in no way intended to define, interpret, describe or limit the scope, extent or intent of this Agreement or any provision hereof.

101.1    Pronouns.  All pronouns used in this Agreement in reference to any Partner shall include the neuter, masculine and feminine genders and the singular and the plural, as the context requires.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

**GENERAL PARTNER:**


Pentium Invest, LLC

By:_____
Keumhwan (Kevin) Kwong
Manager

**LIMITED PARTNERS:**

Each person who shall sign an Investor Signature Page in the form attached in the Subscription Agreement and accepted to the Partnership as a Limited Partner

## APPENDIX A – DEFINITIONS

"**_Accounting Period_**" shall initially mean the period beginning on the effective date of the first capital contribution to the Partnership and ending on the first to occur of the events set forth in (a) through (e) of this definition.  Each subsequent Accounting Period shall commence immediately after the close of the preceding Accounting Period and will continue until the close of business on the earlier to occur of (a) the last calendar day of each calendar month, (b) the first calendar day immediately preceding the effective date of a capital contribution by a new or existing Partner, (c) a date on which one or more Partners effects a withdrawal from their Capital Accounts, (d) the date of the dissolution of the Partnership, or (e) such other dates as the GP determines, in its sole discretion.

"**_Act_**" shall mean the Delaware Revised Uniform Limited Partnership Act (6 Del. C. 17-101 et. seq.), including amendments from time to time.

"**_Affiliated Persons_**" shall have the meaning set forth in *Section 5.05*.

"**_Allocation Percentage_**" shall mean with respect to any Partner for any Accounting Period the quotient obtained by dividing (i) the Capital Account balance for such Partner as of the beginning of such Accounting Period (as determined pursuant to *Section 3.01*) by (ii) the Capital Account balance for all Partners as of the beginning of such Accounting Period (as determined pursuant to *Section 3.01*).

"**_Bad Actor Event_**" means any sanction, suspension, order, disciplinary proceeding or conviction delineated in Rule 506(d)(1)(i) – (vii) of Regulation D of the Securities Act of 1933.

"**_BHCA_**" means the Bank Holding Company Act of 1956, as amended.

"**_BHCA Subject Person_**" shall mean any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the BHCA and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder.

"**_Capital Account_**" shall mean, with respect to any Partner, the account established and maintained on the books of the Partnership for such Partner, which shall be credited with the amount of such Partner's capital contributions, and increased, or decreased, from time to time as provided in this Agreement.

"**_Cash_**" shall mean, with reference to the payment in cash of all or any part of a capital contribution or distribution, payment by electronic fund transfer or by wire transfer of funds between banks or other financial institutions.

"**_Code_**" shall mean the Internal Revenue Code of 1986, as amended.

"**_Cumulative Loss Account_**" refers to a memorandum account to be recorded on the books and records of the Partnership for each Limited Partner that shall have an initial balance of zero and that shall be adjusted at the end of each Performance Allocation Period, after all tentative allocations of Net Profits or Net Losses have been made for the period, as follows: the balance of the Cumulative Loss Account shall be increased by the amount if any by which (A) the sum of Net Losses allocated to the Capital Account of a Limited Partner during the Performance Allocation Period exceeds (B) the sum of Net Profits allocated to the Capital Account of the Limited Partner for the same period, and shall be reduced by the amount if any by which (X) the sum of Net Profits allocated to the Capital Account of the Limited Partner during the Performance Allocation Period exceed (Y) the sum of Net Losses allocated to the Capital Account of the Limited Partner for the same period, *provided that* the cumulative amount of such adjustment for any period shall not reduce the balance of the Cumulative Loss Account below zero.  In the event that there is a positive balance in the Limited Partner's Cumulative Loss Account at the time the Limited Partner makes a withdrawal from its Capital Account, such positive balance shall be reduced (effective as of the date of such withdrawal) in the proportion which the amount of the withdrawal bears to the balance of the Limited Partner's Capital Account immediately prior to giving effect to such withdrawal.

"**_ERISA_**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**_Fair Market Value_**" shall be determined by using the following method:

(a)    Securities which are listed on one or more United States or foreign securities exchanges or are traded on a recognized over-the-counter market (including the NASDAQ), or for which market quotations are available shall be valued at their last reported sales price on the date of determination on the primary exchange or market on which such Securities are traded or, if no sale occurred on the valuation

date, the value for long positions shall be the "last bid" and the value for short positions shall be the "last ask" (or, if on such date securities markets were closed, then the last preceding business day on which they were open).

(b)    Securities in the form of options listed on a securities exchange will be valued at the last reported sales price on the date of determination on the primary exchange or market on which such Securities are traded or, if the last sales price does not fall between the "last bid" and "last ask" price for such options on such date, such options will be valued at the mean between "last bid" and "last ask" prices on the date of determination.

(c)    Futures instruments will be valued at the settlement price on the exchange on which that futures interest is traded on the day the value is being determined.  However, if a futures interest could not have been liquidated on that day because of the operation of daily limits or other rules of the exchange or otherwise, the settlement price on the first subsequent day on which the futures interest could be liquidated will be the market value of that futures interest for that day.

(d)    For purposes of this definition, sales and bid and ask prices reported in newspapers of general circulation, or in electronic quotation systems or in standard financial periodicals or in the records of securities exchanges or other markets, any one or more of which may be selected by the General Partner, shall be accepted as evidence of the price of a Security.

(e)    A Security purchased, and awaiting payment against delivery, shall be included for valuation purposes as a Security held, and the cash account shall be adjusted by the deduction of the purchase price, including brokers' commissions or other expenses of the purchase. A Security sold but not delivered pending receipt of proceeds shall be valued at the net sales price.

(f)    The General Partner may make adjustments to the value of Securities to best reflect Fair Market Value.  All matters concerning the valuation of Securities, the allocation of profits, gains, and losses among the Partners, and accounting procedures not specifically and expressly provided for by the terms of this Agreement, shall be determined by the General Partner and shall be final and conclusive as to all of the Partners.

"**_Fiscal Year_**" of the Partnership shall be the calendar year.

"**_GAAP_**" means generally accepted accounting principles, consistently applied.

"**_Gate_**" shall have the meaning set forth in _Section 4.01(f)_.

"**_General Partner_**" or "**_GP_**" shall mean Pentium Invest, LLC, a Delaware limited liability company, and shall also mean any Person who becomes GP pursuant to the provisions of _Section 4.02_ and any Person who succeeds to all or a portion of the GP's Interest pursuant to _Section 8.05_ of this Agreement.

"**_Hurdle_**" shall mean an annual rate of return equal to twenty percent (20%) of such Limited Partner's beginning Capital Account balance for such calendar year. The Hurdle is cumulative (but not compounded) such that if the Net Profits allocated to a Limited Partner during a calendar year are insufficient to provide an annual rate of return equal to the Hurdle, any such deficiency below the Hurdle (excluding a negative return, if any) shall carry forward to the immediately succeeding Performance Allocation Period, and, if not achieved therein, to the Performance Allocation Periods thereafter, as applicable. The Hurdle shall be calculated separately with respect to each capital contribution made (for Interests) by a Limited Partner. If a Limited Partner makes a capital contribution during a Performance Allocation Period, the Hurdle applicable to such capital contribution for such Performance Allocation Period shall be pro-rated by multiplying the Hurdle, by the ratio obtained by dividing (i) the number of days remaining in such partial Performance Allocation Period by (ii) the total number of days in such period. If a Limited Partner makes a capital withdrawal during a Performance Allocation Period, the Hurdle applicable to such capital withdrawal for such Performance Allocation Period will be pro-rated by multiplying the Hurdle, by the ratio obtained by dividing (i) the number of days completed in such partial Performance Allocation Period by (ii) the total number of days in such period. The Hurdle is not a guaranteed minimum return.

"**_Independent Portfolio Fund_**" shall have the meaning ascribed in the Memorandum.

"**_Independent Portfolio Manager_**" shall have the meaning ascribed in the Memorandum.

"***Interest***" shall mean, for each Partner, all rights and interests of that Partner in the Partnership in its capacity as a Partner together with any and all obligations imposed on it hereunder or under the Act.

"***Limited Partners***" shall mean those persons whose Subscription Agreements to become a limited partner shall have been accepted by the GP on behalf of the Partnership, or anyone subsequently admitted as a Limited Partner, but excluding any Limited Partner who has withdrawn from the Partnership or been removed from the Partnership under *Article IV* hereof.  Reference to a "Limited Partner" shall mean any one of the Limited Partners.

"***Lock-Up Period***" shall have the meaning set forth in *Section 4.01(a)*.

"***Management Fee***" shall have the meaning set forth in *Section 5.06(a)*.

"***Net Asset Value***" means the net asset value of the assets of the Partnership determined on the last day of an Accounting Period by:

      (a)        Adding:

            (i)       the aggregate Fair Market Value of the Partnership's investments;

            (ii)     the aggregate uninvested cash balances of the Partnership (such cash balances being adjusted as required under the definition of "*Fair Market Value*");

            (iii)    the aggregate Fair Market Value of such assets as would generally be considered pre-payments of expenses to be amortized over future periods;

            (iv)    the aggregate Fair Market Value of all dividends and distributions payable in cash, stock or other property received by the Partnership and the face value of all notes and other receivables; and

            (v)     the aggregate Fair Market Value of such other assets of the Partnership as should be considered assets in accordance with GAAP (*provided that* the name and goodwill of the Partnership shall not be included in calculating the Net Asset Value of the Partnership).

      (b)        Deducting from the total sum obtained pursuant to sub-Section (a) above any liabilities and expenses due in accordance with GAAP.

All amounts under sub-sections (a) and (b) above shall be stated in United States Dollars, with assets and liabilities denominated in currencies other than United States Dollars to be converted to United States Dollars at published exchange rates in effect on the last day of such Accounting Period.  The resulting Net Asset Value at the end of such Accounting Period shall constitute the initial Net Asset Value for the subsequent Accounting Period after adjustment to reflect withdrawals pursuant to *Article IV* and additional capital contributions by Partners and the admission of new Partners pursuant to *Article II*.  Whenever ratios or percentages are to be calculated based upon or relating to Partners' Capital Accounts, they shall be calculated to four decimal places with any adjustments resulting from rounding charged or credited to all of the Partners' Capital Accounts proportionally.

"***Net Capital Appreciation***" or "***Net Capital Depreciation***" shall mean, with regard to any Accounting Period, the difference between the Net Asset Value of the Partnership at the beginning of the Accounting Period (after giving effect to withdrawals for the preceding Accounting Period and capital contributions for the current Accounting Period) and the Net Asset Value of the Partnership at the close of the same Accounting Period (before giving effect to withdrawals for such Accounting Period).  Any increase in the Net Asset Value shall be deemed Net Capital Appreciation and any decrease in Net Asset Value shall be deemed Net Capital Depreciation.

"***Net Profit***" or "***Net Loss***" shall mean, with respect to any Partner for any Accounting Period, the difference between (i) the sum of the Net Capital Appreciation, if any, allocated to a Partner's Capital Account for such Accounting Period pursuant to *Section 3.02(a)*, and (ii) the Net Capital Depreciation, if any, allocated to a Partner's Capital Account for such Accounting Period pursuant to *Section 3.02(a)*. Any positive difference between the sums set forth in clause (i) and clause (ii) above shall be deemed Net Profit, and any negative difference between such sums shall be deemed Net Loss.

"***Organizational Expenses***" shall have the meaning set forth in *Section 5.06(b)*.

"***Other Accounts***" shall have the meaning set forth in *Section 5.05*.

"***Partners***" shall mean, collectively, the GP and the Limited Partners, and reference to a "***Partner***" shall mean any one of the Partners.

"***Performance Allocation***" shall have the meaning set forth in *Section 3.02(b)*.

"***Performance Allocation Period***" shall mean each performance period over which the allocations provided for in *Section 3.02(b) and (c)* are measured.

"***Person***" shall mean an individual, partnership, joint venture, association, corporation, trust or any other legal entity.

"***Regulations***" shall mean Treasury Regulations promulgated under the Code as such Regulations may be amended from time to time (including corresponding provisions of succeeding Regulations).

"***Reserve Withholding***" shall have the meaning set forth in *Section 4.04*.

"***Securities***" shall mean, without limitation, long and short positions in equity securities and options on equities, exchange-traded funds and exchange-traded notes; and financial futures and options thereon. Such securities may also include holdings in other hedge funds managed by (i) the principals of the General Partner and (ii) independent third-party investment managers (such managers, "***Independent Portfolio Managers***", each such fund, an "***Independent Portfolio Fund***" and such funds collectively, "***Independent Portfolio Funds***"). The Partnership may periodically maintain all or a portion of its assets in money market instruments and other cash equivalents and may not be fully invested at all times.

"***Subscription Agreement***" means any subscription booklet, including a subscription agreement containing appropriate representations, warranties, acknowledgments, agreements, indemnifications, confirmations and reciting and evidencing such qualifications as are deemed necessary or appropriate in the GP's discretion, prescribed by the GP as a condition precedent to becoming a Limited Partner.

"***Taxing Authority***" means any federal, state, local or foreign taxing authority.

"***Withdrawal Date***" shall have the meaning set forth in *Section 4.01(a)*.

# Exhibit B

Name of Offeree: _____          Copy No. _____

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

---

**PENTIUM ATLAS FUND III, LP**

*A Delaware Limited Partnership*

**LIMITED INTERESTS**

**MINIMUM INVESTMENT: $200,000**

**GENERAL PARTNER:**

**PENTIUM INVEST, LLC**

**SEPTEMBER 2023**

---

---

**Pentium Atlas Fund III, LP**

---

3200 Concord Cliff Ave
Henderson, NV 89044

This Confidential Private Placement Memorandum (the "***Memorandum***") has been prepared on a confidential basis and is intended solely for the use of the recipient named on the cover hereof in connection with this offering. Each recipient, by accepting delivery of this Memorandum, agrees not to make a copy of the same or to divulge the contents hereof to any person other than a legal, business, investment or tax advisor in connection with obtaining the advice of any such persons with respect to this offering.

This Memorandum relates to the offering (the "***Offering***") of limited partnership interests (the "***Interests***") of Pentium Atlas Fund III, LP, a Delaware limited partnership (the "***Partnership***"). Interests are suitable only for sophisticated investors (a) who do not require immediate liquidity for their investments, (b) for whom an investment in the Partnership does not constitute a complete investment program and (c) who fully understand and are willing to assume the risks involved in the Partnership's investment program. The Partnership's investment practices, by their nature, involve a substantial degree of risk. See "*Investment Program*" and "*Risk Factors*." The Offering is made only to certain eligible investors. See "*Qualification of Investors*." Prospective investors should carefully consider the material factors described in "*Risk Factors*," together with the other information appearing in this Memorandum, prior to purchasing any of the Interests offered hereby.

**THE INTERESTS OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*") OR THE SECURITIES REGULATORY AUTHORITY OF ANY STATE, NOR HAS THE SEC OR ANY SUCH AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE INTERESTS ARE BEING OFFERED PURSUANT TO EXEMPTIONS FROM REGISTRATION WITH THE SEC AND STATE SECURITIES REGULATORY AUTHORITIES; HOWEVER, NEITHER THE SEC NOR ANY STATE SECURITIES REGULATORY AUTHORITY HAS MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREIN ARE EXEMPT FROM REGISTRATION.**

THE INFORMATION IN THIS MEMORANDUM IS GIVEN AS OF THE DATE ON THE COVER PAGE, UNLESS ANOTHER TIME IS SPECIFIED, AND INVESTORS MAY NOT INFER FROM EITHER THE SUBSEQUENT DELIVERY OF THIS MEMORANDUM OR ANY SALE OF INTERESTS THAT THERE HAS BEEN NO CHANGE IN THE FACTS DESCRIBED SINCE THAT DATE.

This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, the Interests by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

No offering literature or advertising in any form other than this Memorandum and the agreements and documents referred to herein shall be considered to constitute an Offering of the Interests. No person has been authorized to make any representation with respect to the Interests except the representations contained herein. Any representation other than those set forth in this Memorandum and any information other than that contained in documents and records furnished by the Partnership upon request, must not be relied upon. This Memorandum is accurate as of its date, and no representation or warranty is made as to its continued accuracy after such date.

Sales of Interests may be made only to investors deemed suitable for an investment in the Partnership under the criteria set forth in this Memorandum. The Partnership reserves the right, notwithstanding any such offer, to withdraw or modify the Offering and to reject any subscriptions for the Interests in whole or in part for any or no reason.

The Interests being offered have not been registered under the Securities Act of 1933, as amended (the "***Securities Act***"), and have not been registered under the securities laws of any state, but are being offered and sold for purposes of investment and in reliance on the statutory exemptions contained in Sections 4(2) and/or 3(b) of the Securities Act and in reliance on applicable exemptions under state securities laws. Such Interests may not be sold, pledged, transferred or assigned except in a transaction which is exempt under the Securities Act and applicable state securities laws, or pursuant to an effective registration statement thereunder or in a transaction otherwise in compliance with the Securities Act, applicable state securities laws, this Memorandum and the Partnership's Limited Partnership Agreement (the "***Partnership Agreement***").

THERE IS NO PUBLIC MARKET FOR THE INTERESTS AND NONE IS EXPECTED TO DEVELOP IN THE FUTURE.

The Partnership is not registered as an investment company under the Investment Company Act of 1940, as amended (the "**Investment Company Act**"), in reliance upon Section 3(c)(1) thereof. As a result of its reliance upon Section 3(c)(1), the Interests may not at any time be owned by more than 100 beneficial owners (as determined under the Investment Company Act).

Prospective investors are invited to meet with their legal, tax and financial advisors to discuss, and to ask questions and receive answers, concerning the terms and conditions of this Offering of the Interests, and to obtain any additional information, to the extent the GP (as defined below) or its delegate possess such information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.

**ERISA PLAN AND IRA INVESTORS**

IN CONNECTION WITH ERISA OR IRA INVESTORS, THE GENERAL PARTNER DOES NOT (I) ACT OR REPRESENT THAT IT IS ACTING, IN A FIDUCIARY CAPACITY TO SUCH INVESTORS AND DOES NOT (II) PROVIDE IMPARTIAL "INVESTMENT ADVICE" OR A RECOMMENDATION THAT AN INVESTMENT IN THE PARTNERSHIP IS SUITABLE, ADVISABLE OR APPROPRIATE FOR SUCH AN INVESTOR, WHETHER GENERALLY OR IN LIGHT OF SUCH INVESTOR'S PARTICULAR CIRCUMSTANCES. FURTHERMORE, THE GENERAL PARTNER HAS A FINANCIAL INTEREST IN MANAGING THE PARTNERSHIP AND ITS INTERESTS MAY CONFLICT WITH THE INTERESTS OF ERISA AND IRA INVESTORS. IN MAKING AN INVESTMENT DECISION, ERISA AND IRA INVESTORS MUST RELY ON THE RECOMMENDATION OF AN INDEPENDENT PLAN FIDUCIARY OR THEIR OWN EXAMINATION OF THE PARTNERSHIP, THE TERMS OF THE OFFERING AND THE RISKS ATTENDANT WITH AN INVESTMENT IN THE PARTNERSHIP.

**NASAA Uniform Disclosure:**

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**Florida Residents:**

IF SALES ARE MADE TO FIVE OR MORE PERSONS IN FLORIDA, AND YOU PURCHASE SECURITIES HEREUNDER, THEN YOU MAY VOID SUCH PURCHASE EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY YOU TO THE ISSUER, AN AGENT OF THE ISSUER, OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THIS PRIVILEGE IS COMMUNICATED TO YOU, WHICHEVER OCCURS LATER.

## TABLE OF CONTENTS

Page

EXECUTIVE SUMMARY.................................................................................................1

DIRECTORY................................................................................................................2

INVESTMENT PROGRAM..............................................................................................3

MANAGEMENT OF THE PARTNERSHIP...........................................................................5

SUMMARY OF KEY TERMS OF PARTNERSHIP AGREEMENT................................................6

RISK FACTORS........................................................................................................14

POTENTIAL CONFLICTS OF INTEREST........................................................................23

VALUATION OF INVESTMENTS....................................................................................24

SERVICE PROVIDERS...............................................................................................26

BROKERAGE AND CUSTODY......................................................................................29

QUALIFICATION OF INVESTORS.................................................................................31

FEDERAL TAX ASPECTS............................................................................................34

ERISA CONSIDERATIONS..........................................................................................44

RESTRICTIONS ON TRANSFER OF INTERESTS............................................................46

ADDITIONAL INFORMATION.......................................................................................46

PRIVACY NOTICE.....................................................................................................47

---

**EXECUTIVE SUMMARY**

---

Pentium Atlas Fund III, LP was organized as a Delaware limited partnership (the "***Partnership***") on August 1, 2023 to operate as a private investment partnership. The Partnership was formed for the purpose of employing a multi-strategy approach to investing, with the objectives of diversification, effective risk management, and potential enhanced returns. The Partnership's strategy encompasses, but is not limited to, statistical arbitrage, short- to mid-term options, and mid- to long-term complex options structures, while concurrently implementing portfolio hedging techniques. While the primary focus lies in utilizing index options, the Partnership also explores investing excess capital in short-term Treasury bills to optimize fund utilization. Additionally, the Partnership's strategy incorporates allocating funds to other hedge funds managed by (i) the Principals (each, a "***Principal Portfolio Fund***" and collectively, "***Principal Portfolio Funds***") and (ii) independent third-party investment managers (such managers, "***Independent Portfolio Managers***", each such fund, an "***Independent Portfolio Fund***" and such funds collectively, "***Independent Portfolio Funds***") (each of the Principal Portfolio Funds and Independent Portfolio Funds, a "***Portfolio Fund***" and collectively, "***Portfolio Funds***"), with allocations to Principal Portfolio Funds not subject to management and performance fees or expenses at the Principal Portfolio Fund level, further enhancing diversification and accessing varied investment expertise and strategies outside of the strategy's core focus.

Pentium Invest, LLC, a Delaware limited liability company, serves as the general partner (the "***GP***" or "***General Partner***") of the Partnership. Under the Partnership's Limited Partnership Agreement (as the same may be amended, supplemented or revised from time to time, the "***Partnership Agreement***"), the GP is primarily responsible for the management of the Partnership. The office of the GP is located at 3200 Concord Cliff Ave, Henderson, NV 89044, and its telephone number is 206-900-3161.

The Partnership is presently accepting subscriptions from a limited number of sophisticated investors (as described in the "*Summary of Key Terms*," below), generally in minimum amounts of not less than $200,000. The Partnership will generally accept initial or additional capital contributions as of the first calendar day of any calendar month, or at any other time the GP chooses to accept such contributions.

Investors in the Partnership are subject to (i) a quarterly management fee equal to 0.5% (2% annually), payable in advance, of each investor's capital account balance as of the beginning of such calendar quarter; and (ii) an annual performance allocation equal to twenty percent (20%) of each investor's ratable share of the Partnership's profits for such calendar year, provided that such profits exceed such investor's "high water mark."

Investors will generally be permitted to make withdrawals of capital as of the close of business on the last day of each calendar month, provided the withdrawing investor notifies the GP not less than sixty (60) days in advance of the applicable withdrawal date of its intent to make a withdrawal (each such date, a "***Withdrawal Date***"), and provided further, a Limited Partner may not make withdrawals from its Capital Account for a period of twelve (12) months from the date of such Limited Partner's admission to the Partnership (the "***Lock-Up Period***"). Withdrawals permitted by the GP, in its sole discretion, during the Lock-Up Period shall be subject to an early withdrawal penalty of five percent (5%) of the withdrawal proceeds. If aggregate withdrawal requests are received for a particular Withdrawal Date for more than twenty-five percent (25%) of the Net Asset Value (as defined herein) of the Partnership as of such Withdrawal Date, the General Partner may, in its discretion, reduce all withdrawal requests for the Partnership for such Withdrawal Date *pro rata* in proportion to the amount sought to be withdrawn by each withdrawing Partner such that only twenty-five percent (25%) of the Net Asset Value of the Partnership as of such Withdrawal Date is withdrawn (the "***Gate***").

## DIRECTORY

| | |
|---|---|
| **The Partnership:** | Pentium Atlas Fund III, LP<br>c/o Pentium Invest, LLC<br>3200 Concord Cliff Ave<br>Henderson, NV 89044 |
| **General Partner:** | Pentium Invest, LLC<br>3200 Concord Cliff Ave<br>Henderson, NV 89044<br>Tel: 206-900-3161<br>Email: kevin@pentiumcapitalpartners.com<br>Attn: Keumhwan (Kevin) Kwong |
| **Administrator:** | NAV Fund Administration Group<br>NAV Consulting \| NAV Cayman \| NAV Backoffice<br>1 Trans Am Plaza Drive, Suite 400<br>Oakbrook Terrace, IL 60181<br>P: +1 630-954-1919, P: +1 345-946-5006<br>F: +1 630-596-8555, F: +1 345-946-5007<br>F: +1 630-954-2881<br>Transfer.agency@navconsulting.net |
| **Auditor:** | Spicer Jeffries LLP<br>4601 DTC Blvd., Suite 700<br>Denver, CO 80237 |
| **Brokers:** | Charles Schwab & Co., Inc.<br>3000 Schwab Way<br>Westlake, TX 76262<br><br>Interactive Brokers LLC<br>1 Pickwick Plaza, #100<br>Greenwich, CT 06830 |
| **Legal Advisor:** | Riveles Wahab LLP<br>230 Park Avenue<br>4th Floor<br>New York, NY 10169 |

**INVESTMENT PROGRAM**

**Investment Objective and Strategy Overview**

The Partnership was formed for the purpose of employing a multi-strategy approach to investing, with the objectives of diversification, effective risk management, and potential enhanced returns. The Partnership's strategy encompasses, but is not limited to, statistical arbitrage, short- to mid-term options, and mid- to long-term complex options structures, while concurrently implementing portfolio hedging techniques. While the primary focus lies in utilizing index options, the Partnership also explores investing excess capital in short-term Treasury bills to optimize fund utilization. Additionally, the Partnership's strategy incorporates allocating funds to other hedge funds managed by the Principals (each, a "***Principal Portfolio Fund***" and collectively, "***Principal Portfolio Funds***") and (ii) independent third-party investment managers (such managers, "***Independent Portfolio Managers***", each such fund, an "***Independent Portfolio Fund***" and such funds collectively, "***Independent Portfolio Funds***") (each of the Principal Portfolio Funds and Independent Portfolio Funds, a "***Portfolio Fund***" and collectively, "***Portfolio Funds***"), with allocations to Principal Portfolio Funds not subject to management and performance fees or expenses at the Principal Portfolio Fund level, further enhancing diversification and accessing varied investment expertise and strategies outside of the strategy's core focus.

**Selection of Portfolio Funds and Independent Portfolio Managers**

It is the responsibility of the General Partner to identify Portfolio Funds, to satisfy itself as to the suitability of the terms and conditions of such Portfolio Funds, and to allocate and reallocate the Partnership's assets among such Portfolio Funds.

Generally, the Partnership purchases a partnership interest in another limited partnership, or an interest in another vehicle or entity through which a Portfolio Fund conducts its activities. Such partnerships may have limitations on the right to withdraw, which may further reduce the liquidity of an investment in the Partnership.

The General Partner selects Portfolio Funds and Independent Portfolio Managers on the basis of various criteria, including, among other things, the Portfolio Fund's or Independent Portfolio Manager's investment performance during various time periods and market cycles, the Portfolio Fund's infrastructure, the Independent Portfolio Manager's reputation, experience and training and the Portfolio Fund's investment philosophy and policies.

The identity and number of Portfolio Funds may change over time. The General Partner may cause the Partnership to withdraw from or invest in different Portfolio Funds without prior notice to or the consent of the Limited Partners. The General Partner is not restricted in either the amount or percentage of the Partnership's assets which can be allocated to any single Portfolio Fund.

**Partnership Investments**

The assets of the Partnership may be invested and traded in a broad variety of securities and other instruments, whether traded on exchanges, over-the counter or negotiated on electronic markets.

The Partnership has broad and flexible investment authority. Accordingly, the investments of the Partnership may at any time include, without limitation, long and short positions in equity securities and options on equities, exchange-traded funds and exchange-traded notes; and financial futures and options thereon. The Partnership may periodically maintain all or a portion of its assets in money market instruments and other cash equivalents and may not be fully invested at all times.

**Distributions and Reinvestment**

The Partnership does not expect to make any dividend payments or other distributions to Limited Partners out of the Partnership's earnings and profits, but rather expects that such income will be reinvested. Potential investors should keep this limitation in mind when determining whether or not an investment in the Partnership is suitable for their particular purposes. The GP reserves the right to change such policy.

**Plan of Distribution and Use of Proceeds; Cash Equivalents**

Interests will be offered through private placement to a variety of sophisticated investors. See "*Qualification of Investors.*" The net proceeds of the private offering contemplated herein will be invested in accordance with the policies set forth under "*Investment Objective and Strategy.*" The Partnership, without limitation, may hold cash or invest in cash equivalents for short-term investments. Among the cash equivalents in which the Partnership may invest are obligations of the U.S. Government, its agencies or instrumentalities (*e.g.,* U.S. Government Securities; U.S. Treasury Bills), commercial paper and repurchase agreements, money market mutual funds, certificates of deposit and bankers' acceptances issued by domestic branches of U.S. banks that are members of the Federal Deposit Insurance Corporation. In the event the GP determines that there is not sufficiently good value in any investments suitable for the Partnership's capital, all such capital may be held in cash and cash equivalents.

**Borrowing and Lending**

While the GP does not generally expect to utilize leverage as a part of the Partnership's investment program, the Partnership, in the sole discretion of the GP, retains the authority to do so, including, without limitation, borrowing cash and entering into derivative transactions that have the effect of leveraging the Partnership's portfolio. The use of leverage may, in certain circumstances, maximize the adverse impact to which the Partnership's investment portfolio may be subject. The Partnership may also engage in securities lending transactions.

The Partnership is permitted to borrow for purposes of providing liquidity to fund withdrawals by Limited Partners and/or for investment purposes, subject to regulatory requirements, and for the payment of fees, expenses and other short-term Partnership obligations. Loans with respect to the Partnership generally may be obtained from securities brokers and dealers or from other financial institutions or third-party lenders; such loans will be secured by securities or other capital of the Partnership, as the case may be, pledged to such brokers, financial institutions or third-party lenders.

In the event the Partnership obtains a credit facility, the GP's investment discretion may be subject to certain limitations prior to and/or following an event of default. For example, pursuant to the terms of the credit facility, the Partnership's trading may have to abide by certain formulas, or the GP may have to obtain the lender's consent to engage in some or all transactions while the credit facility is outstanding. After the occurrence of an event of default (whether because of nonpayment or otherwise), it is likely that, among other consequences, the lender would assume total control of the Partnership's assets and/or trading activities and no distributions could be made or withdrawals effected without the lender's consent.

If securities are sold short, the Partnership may be required to pay a premium and/or interest to the lender of the securities, which would increase the cost of the securities sold. Until the borrowed securities are replaced, the Partnership generally will be required to pay to the lender amounts equal to any dividends or interest that accrue on the securities borrowed during the period of the loan. A security may be sold short by the Partnership not only for hedging purposes but also when the GP believes the security is likely to lose value.

**Possible Master-Feeder Structure in the Future**

In the future, the GP or affiliated entities may sponsor the formation of an offshore company (the "***Offshore Feeder***") which will offer its interests primarily to non-U.S. individuals and U.S. tax-exempt entities. In such event, the Partnership, together with the Offshore Feeder (when and if established), will place all or substantially all of its assets in, and conduct its investment activities primarily through, a master fund structured as an offshore company or limited partnership (the "***Master Fund***") utilizing a "Master-Feeder" structure. When and if such events occur, the General Partner or an affiliate will serve as the investment manager to the Offshore Feeder and the Master Fund and will conduct the investment activities of the Master Fund, managing its day-to-day activities. The Partnership and the Offshore Feeder would participate on a *pro rata* basis in the profits and losses of the Master Fund, except to the extent that certain expenses of the Partnership and Offshore Feeder shall only be borne by the investors in each such entity. The purpose of establishing the Master Fund would be to achieve trading and administrative efficiencies.

**Limits of Description of Investment Program**

The GP is not limited by the above discussion of the investment program. Further, the investment program is a strategy as of the date of this Memorandum only. The GP has wide latitude to invest or trade the Partnership's assets, to pursue any particular strategy or tactic, or to change the emphasis without obtaining the approval of the Limited Partners, although the GP will only cause a material change to the Partnership's investment strategy with the consent of a majority in interest of Limited Partners. Except as specifically provided in this section, the investment program imposes no significant limits on the types of instruments in which the GP may take positions, the type of

4

positions it may take, its ability to borrow money, or the concentration of investments. The foregoing description is general and is not intended to be exhaustive. Prospective investors must recognize that there are inherent limitations on all descriptions of investment processes due to the complexity, confidentiality, and subjectivity of such processes. In addition, the description of virtually every trading strategy must be qualified by the fact that trading approaches are continually changing, as are the markets invested in by the GP.

There can be no assurance that the Partnership will achieve its investment objective or avoid substantial losses. An investor should not make an investment in the Partnership with the expectation of sheltering income or receiving cash distributions. Investors are urged to consult with their personal advisors before investing in the Partnership. Because risks are inherent in all the investments in which the Partnership engages, no assurances can be given that the Partnership's investment objectives will be realized.

## MANAGEMENT OF THE PARTNERSHIP

Pentium Invest, LLC, a Delaware limited liability company, serves as the GP of the Partnership. Under the Partnership Agreement, the GP is primarily responsible for the management of the Partnership. The office of the GP is located at 3200 Concord Cliff Ave, Henderson, NV 89044, and its telephone number is 206-900-3161.

Keumhwan (Kevin) Kwong, Ryan Miller and David Yeow are the principals of the GP (the "***Principals***").

The GP is not registered as an investment adviser with the SEC under the Investment Advisers Act of 1940, as amended (the "***Advisers Act***") nor with the securities division of any state. However, the GP filed as an exempt-reporting adviser with the Nevada Department of State Securities Division under the state's private fund manager exemption.

### Ryan Miller

Ryan Miller is the Founder & Managing Director at Pentium Capital Partners, LLC., specializing in Financial Consulting and VC syndication. Ryan was previously Chief Financial Officer at a national, award-winning InsurTech company and managed and mentored approximately 200 professionals while serving in this role. Additionally, Ryan has mentored over 200 emerging fund managers to start and scale their investment funds, totaling around $4B in funds raised to date and has managed separately a $250M Technology Portfolio. Ryan has a Bachelors of Science and a Master of Financial Management.

### David Yeow

David Yeow is an investment strategist with over 15 years of public and private market experience, specializing in recession-resistant investment strategies. He is a multi-talented individual who has worn various hats throughout his career, serving as an investment fund manager, pharmacist, real estate investor, and entrepreneur. Earning his doctorate in pharmacy and pharmaceutical science at the age of 24, David spent the next decade diligently serving his patients before retiring from his clinical management role at Kaiser Permanente at the age of 35 to pursue his passion for investment full-time. With 15 years of concurrent investment experience, David leveraged his expertise in business, analytics, strategy, and investment to build a diverse portfolio of real estate and businesses. He also  launched two hedge funds before co-founding Pentium Invest.

### Keumhwan (Kevin) Kwong

As Chief Investment Officer, Keumhwan (Kevin) Kwong embarked on an entrepreneurial journey, founding and leading two hedge funds that performed  in a tough market of 2022. He also has a mission of breaking barriers in finance, to prove that success as a hedge fund manager isn't reserved for Wall Street elite. Keumhwan's journey highlights talent and determination as the true catalysts for achievement. Keumhwan has a Bachelors of Science and 15 years of experience in the Hong Kong equity market.

## SUMMARY OF KEY TERMS OF PARTNERSHIP AGREEMENT

The following is a summary of certain of the principal terms governing an investment in Pentium Atlas Fund III, LP. This summary is not complete and is qualified in its entirety by reference to the more detailed information set forth elsewhere in this Memorandum and by the terms and conditions of the Partnership Agreement, each of which should be read carefully by any prospective investor before investing. Prospective investors are urged to read the entire Memorandum and to seek the advice of their own counsel, tax consultants and business advisors with respect to the legal, tax and business aspects of investing in the Partnership. Capitalized terms used herein and not otherwise defined will have the same meaning as set forth in the Partnership Agreement. If any disclosure made herein is inconsistent with any provision of the Partnership Agreement, the provision of the Partnership Agreement will control.

| | |
|---|---|
| **PARTNERSHIP:** | The Partnership was organized as a Delaware limited partnership on August 1, 2023 to operate as a private investment partnership. |
| **GENERAL PARTNER:** | The GP of the Partnership is Pentium Invest, LLC, a Delaware limited liability company. Under the Partnership Agreement, the GP is primarily responsible for the management of the Partnership.<br><br>The GP is not registered as an investment adviser with the SEC under the Advisers Act nor with the securities division of any state. However, the GP filed as an exempt-reporting adviser with the Nevada Department of State Securities Division under the state's private fund manager exemption. |
| **ELIGIBLE INVESTORS:** | Interests in the Partnership are being offered under Rule 506(b) of Regulation D of the Securities Act and Section 3(c)(1) of the Investment Company Act for investment by up to 100 persons who are (i) "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act and (ii) "qualified clients" as defined in Rule 205-3 under the Advisers Act who have sufficient knowledge and experience in financial and business matters to make them capable of evaluating the merits and risks of an investment in the Partnership.<br><br>The Interests will not be registered under the Securities Act or the securities laws of any state or any other jurisdiction, nor is any such registration contemplated.<br><br>An investment in the Partnership will be suitable only for investors who can bear the economic risk of the investment. Investors will be required to make representations to the foregoing effect to the Partnership as a condition to acceptance of their subscription.<br><br>Rule 506(d) of Regulation D of the Securities Act provides for disqualification of a Rule 506 offering if any of the Principals of the GP, or in the event 20% or more of the Partnership's interests are owned by a Limited Partner involved in a 'disqualifying event' in connection with the sale of securities, a disciplinary sanction within the securities industry or with the SEC (a "***Bad Actor Event***"). A prospective investor subject to a Bad Actor Event may be denied admittance to the Partnership in the GP's sole discretion. An existing Limited Partner must inform the GP immediately upon being subject to a Bad Actor Event. The GP may remove such Limited Partner at its sole discretion. See *"Qualification of Investors"* below for specific Limited Partners eligibility requirements. |
| **THE OFFERING:** | There is no minimum aggregate dollar amount of capital contributions the Partnership must accept to commence operations. There is no maximum dollar amount of capital contributions the Partnership may accept.<br><br>Capital contributions may be made in cash (by means of a wire transfer or electronic fund transfer) or, in the sole discretion of the General Partner, an in-kind contribution of securities, at the time of subscription. |

| | |
|---|---|
| | The Partnership may issue additional classes of Interests in the future which may differ in terms of, among other things, the Performance Allocation and/or the Management Fee, minimum investment amounts, withdrawal rights and other rights. The terms of such additional classes will be determined by the General Partner, without the approval of the Limited Partners, and may be described in a supplement to this Memorandum. |
| **INITIAL CAPITAL CONTRIBUTION:** | The minimum initial capital contribution by an investor to the Partnership is $200,000, subject to the GP's sole discretion to accept subscriptions for lesser amounts. The Partnership shall accept initial capital contributions on the first day of each calendar month or any other date as determined in the GP's sole discretion. The GP may, in its sole discretion, elect to temporarily or permanently suspend the offering of Interests. The GP may, in its sole discretion, reject any subscription request for any reason or no reason. |
| **CAPITAL ACCOUNT:** | The Partnership will establish on its books a capital account ("***Capital Account***" or "***Account***") for each limited partner (each, a "***Limited Partner***," and collectively with the GP, the "***Partners***") as of the date on which the Limited Partner first makes a capital contribution. The Partnership generally will credit a Limited Partner's Capital Account with: (i) such Limited Partner's initial contribution, (ii) such Limited Partner's additional capital contribution(s) to that Account, (iii) such Capital Account's pro rata share of the Partnership's economic profits, both realized and unrealized, and debit such Account with (i) any distributions to or withdrawals by such Limited Partner from such Account, (ii) such Account's pro rata share of the Partnership's economic losses, both realized and unrealized, (iii) such Account's pro rata share of the Partnership's expenses, (iv) the Management Fees charged against such Account and paid to the General Partner (discussed below) and (v) the Performance Allocations charged against such Account and allocated to the General Partner (discussed below). <br><br> At the beginning of each accounting period, an allocation percentage (the "***Allocation Percentage***") will be determined for each Partner by dividing such Partner's Capital Account balance as of the beginning of such period by the aggregate Capital Account balances of all Partners as of the beginning of such period. |
| **ADDITIONAL CAPITAL CONTRIBUTIONS:** | Existing Limited Partners may make additional capital contributions in amounts of not less than $100,000, with the consent of the GP and subject to its sole and absolute discretion to accept lesser amounts. The Partnership shall accept additional capital contributions on the first day of each calendar month or any other date as determined in the GP's sole discretion. The GP may, in its sole discretion, elect to temporarily or permanently suspend the ability of investors to contribute capital to the Partnership. |
| **PERFORMANCE ALLOCATION:** | At the end of each accounting period of the Partnership, any net capital appreciation or depreciation is allocated to the Capital Accounts of all Partners in proportion to their respective Allocation Percentages for such period. For this purpose, each accounting period shall end at the close of each calendar month, at any other time a Partner makes an additional capital contribution or effects a withdrawal,  and at such other times as the General Partner may determine. Net capital appreciation and depreciation are determined on an accrual basis of accounting in accordance with GAAP and are deemed to include net unrealized profits or losses on investments and securities  as of the end of each accounting period, as well as Partnership expenses. <br><br> In addition, the GP shall receive an annual performance profit allocation (the "***Performance Allocation***") in an amount equal to twenty percent (20%) of the net capital appreciation allocated to each Limited Partner during each calendar year (the "***Performance Allocation Period***") *provided* that such Performance Allocation shall be subject to a loss carry-forward provision, also known as a "high water mark," so that the Performance Allocation will only be deducted from a Limited Partner's Capital Account to the extent that such Limited Partner's *pro rata* share of such appreciation causes its Capital Account balance, measured on a cumulative basis and net of any losses, to exceed such Limited Partner's highest historic Capital Account balance as of the end of any prior calendar year or, if higher, such Limited Partner's Capital Account balance immediately following its admission to the Partnership (as adjusted |

| | |
|---|---|
| | for any withdrawals at a time when a Limited Partner's Capital Account balance is below the applicable "high water mark"). The Performance Allocation shall be computed and allocated at the time a Partner makes a partial or complete withdrawal.<br><br>Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and current Internal Revenue Service ("**IRS**") regulations prohibit fee payments to oneself and/or an affiliate from one's individual retirement account or other self-directed retirement account. Accordingly, such an account of an officer of the GP (or of his spouse) will not be subject to the Management Fee or Performance Allocation. |
| **MANAGEMENT FEE:** | In consideration for its services, the GP receives a management fee (the "**Management Fee**") paid quarterly in advance equal to 0.5% (2% *per annum*) of the beginning Capital Account balance of each Limited Partner for such calendar quarter.<br><br>A *pro rata* portion of the Management Fee will be paid out of any initial or additional capital contributions to the Partnership on any date that does not fall on the first day of a calendar quarter, based on the number of days remaining in such partial quarter. No portion of the Management Fee will be refunded in connection with any withdrawals from a Limited Partner's Capital Account occurring prior to a Withdrawal Date. |
| **SELLING COMMISSIONS:** | The GP may remit a portion of the Management Fee and/or Performance Allocation to registered broker-dealers introducing Limited Partners to the Partnership. Investor capital will not be utilized to pay such selling commissions or referral fees. |
| **LIMITATION OF LIABILITY:** | The Partnership Agreement provides that the GP and their respective affiliates, shareholders, members, partners, managers, directors, officers and employees, agents and representatives (collectively, the "**Indemnified Parties**") shall not be liable, responsible nor accountable in damages or otherwise to the Partnership or any Partner, or to any successor, assignee or transferee of the Partnership or of any Partner, for (i) any acts performed or the omission to perform any acts, within the scope of the authority conferred on such Indemnified Party by the Partnership Agreement, except by reason of acts or omissions found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence; (ii) performance by such Indemnified Party of, or the omission to perform, any acts on advice of legal counsel, accountants, or other professional advisors to the Partnership; (iii) the negligence, dishonesty, bad faith, or other misconduct of any consultant, employee, or agent of the Partnership, including, without limitation, an affiliate of the GP, selected or engaged by such Indemnified Party with reasonable care and in good faith; or (iv) the negligence, dishonesty, bad faith, or other misconduct of any person in which the Partnership invests or with which the Partnership participates as a partner, joint venturer, or in another capacity, which was selected by such Indemnified Party with reasonable care and in good faith.<br><br>Nothing in the Partnership Agreement nor this Memorandum may be interpreted to limit or modify the GP's fiduciary duty to the Limited Partners nor waive any right or remedy a Limited Partner may have under federal or state securities laws. Federal and state securities laws impose liabilities under certain circumstances on persons who act in good faith. |
| **WITHDRAWALS:** | A Limited Partner will be generally permitted to make withdrawals from its Capital Account as of the last calendar day of any calendar month, or such other date as the GP may determine in its discretion (each such date, a "**Withdrawal Date**"), provided that the Partnership receives at least sixty (60) days written notice (the "**Notice Period**") of such withdrawal prior to the applicable Withdrawal Date, and provided further, that a Limited Partner may not make withdrawals from its Capital Account for a period of twelve (12) months from the date of such Limited Partner's admission to the Partnership (the "**Lock-Up Period**"). The GP, in its sole discretion, may reduce or waive the Notice Period or the Lock-Up Period.  Withdrawals permitted by the GP, in its sole discretion, during the Lock-Up Period shall be subject to an early withdrawal |

penalty of five percent (5%) of the withdrawal proceeds (the "**_Early Withdrawal Penalty_**"). The Early Withdrawal Penalty may be reduced by the GP in its sole discretion. Any amount paid as an Early Withdrawal Penalty shall be an asset of the Partnership. Capital contributions made after the Lock-Up Period are not subject to any additional lock-up periods.

In the event of a partial withdrawal, a Limited Partner must withdraw at least $50,000 and shall maintain a minimum Capital Account balance, after giving effect to the withdrawal, of not less than $200,000. A Limited Partner failing to maintain the minimum Capital Account balance may be required to withdraw the balance of its Capital Account at any time without notice. The GP, in its sole discretion, may waive these minimum amounts.

Payments for withdrawals are generally made within 30 days of the effective Withdrawal Date; _however,_ in the event a Partner withdraws 90% or more of the funds from such Partner's Capital Account (or if a withdrawal, when combined by all other withdrawals effected by such Partner during the preceding 12 months, would result in such Partner having withdrawn 90% or more of its Capital Account during such period), a portion (generally not to exceed 10%) of the withdrawal payment will be retained in the GP's discretion pending completion of the annual audit for the fiscal year in which the withdrawal occurs. No interest shall accrue on such retained withdrawal payments. Withdrawals may be effectuated in cash (by means of an electronic fund transfer or wire transfer) or, in the sole discretion of the GP, a distribution of securities in-kind.

The GP may suspend the right of withdrawal or postpone the date of payment for any period during which (i) any stock exchange or over-the-counter market on which a substantial part of the investments owned by the Partnership are traded is closed, (other than weekend or holiday closings) or trading on any such exchange or market is restricted or suspended, (ii) there exists a state of affairs that constitutes a state of emergency, as a result of which disposal of the investments owned by the Partnership is not reasonably practicable or it is not reasonably practicable to determine fairly the value of its assets, (iii) a breakdown occurs in any of the means normally employed in ascertaining the value of a substantial part of the assets of the Partnership or when for any other reason the value of such assets cannot reasonably be ascertained, or (iv) a delay is reasonably necessary, as determined in the reasonable discretion of the GP, in order to effectuate an orderly liquidation of the Partnership's investments in a manner that does not have a material adverse impact on the Partnership or the non-withdrawing Limited Partners. The GP has reserved the right, in its sole discretion and without notice, to require any Limited Partner to withdraw entirely from the Partnership, for any reason or no reason. As with all other withdrawals, any such required withdrawals may be effectuated in cash (by means of an electronic fund transfer or wire transfer) or, in the sole discretion of the GP, a distribution of securities in-kind.

If aggregate withdrawal requests are received for a particular Withdrawal Date for more than twenty-five percent (25%) of the Net Asset Value of the Partnership as of such Withdrawal Date, the General Partner may, in its discretion, reduce all withdrawal requests for the Partnership for such Withdrawal Date _pro rata_ in proportion to the amount sought to be withdrawn by each withdrawing Partner so that only twenty-five percent (25%) of the Net Asset Value of the Partnership as of such Withdrawal Date is withdrawn (the "**_Gate_**"). The Gate may be waived with respect to certain Limited Partners whose remaining Capital Account would otherwise be less than the minimum Capital Account required by the Partnership. To the extent that any Partner's request has been reduced by the Gate, such request shall be satisfied as of the end of the next Withdrawal Date (and if not fully satisfied as of that date because of the Gate, then as of the next Withdrawal Date and, if necessary, successive Withdrawal Dates), each time subject to the Gate. Any deferred withdrawal requests shall be treated in priority to withdrawal requests received for Withdrawal Dates subsequent to the initial Withdrawal Date at which the deferred request would have been effected in the absence of the Gate. Any unsatisfied portion of any such withdrawal requests shall continue to be at risk in the Partnership's business until the effective date of the withdrawal.

|  | The GP may establish reserves for expenses, liabilities or contingencies (including those not addressed by U.S. generally accepted accounting principles ("**GAAP**") which could reduce the amount of a distribution upon withdrawal (a "**Reserve Withholding**"). Any such Reserve Withholding, if and when released, shall be allocated among the Capital Accounts of Partners pro rata who are Partners during the period when such Reserve Withholding was in place and distributed pro rata to any Partner who withdrew capital at the time such Reserve Withholding was in place.<br><br>At the discretion of the GP, any withdrawal by a Limited Partner may be subject to a charge, as the GP may reasonably require, in order to defray the costs and expenses of the Partnership in connection with such withdrawal including, without limitation, any charges or fees imposed by any Partnership investment in connection with a corresponding withdrawal or redemption by the Partnership from such investment or any other costs associated with the sale of any of the Partnership's portfolio investments.<br><br>In the event that Keumhwan (Kevin) Kwong and David Yeow die, become incapacitated or are adjudicated incompetent, the Limited Partners will be promptly notified of such event, and the Partnership shall be liquidated and terminated. |
| **EXPENSES:** | Organizational Expenses. All expenses of the Offering and organization of the Partnership (including legal and other expenses) ("**Organizational Expenses**") will be paid by the Partnership and/or reimbursed by the Partnership to the extent paid by the General Partner. The Organizational Expenses will be amortized and charged to the Partners' Capital Accounts on a monthly basis over a period of five (5) years commencing from the launch of the Partnership's investment activities. GAAP requires that organizational costs be treated as an expense when incurred. The General Partner believes that the impact on the Partnership's results from this departure from GAAP will result in a fairer apportionment of such expenses among Limited Partners. This departure from GAAP may also result in a qualified audit opinion from the Partnership's auditors. If the Partnership is terminated within five (5) years of the commencement of investment activities, any unamortized expenses will be recognized.<br><br>Partnership Expenses. The Partnership shall pay (or reimburse the GP) for all ordinary and reasonable operating and other expenses necessary for the Partnership's operations, including, but not limited to, investment and due diligence related expenses related to Independent Portfolio Manager selection; fees and expenses of the Independent Portfolio Funds, including, but not limited to, the management and performance fees assessed by Independent Portfolio Funds, investment-related expenses (e.g., brokerage commissions, clearing and settlement charges, custodial fees, interest expenses, expenses relating to consultants, brokers or other professionals or advisors who provide research, advice or due diligence services with regard to investments, appraisal fees and expenses); research costs and expenses (including fees for news, quotation and similar information and pricing services); legal expenses (including, without limitation, the costs of on-going legal advice and services, blue sky filings and all costs and expenses related to or incurred in connection with the Partnership's compliance obligations under applicable federal and/or state securities and investment adviser laws, as well as extraordinary legal expenses, such as those related to litigation or regulatory investigations or proceedings); the Management Fee; accounting fees and audit expenses; administrative fees; tax preparation expenses and any applicable tax liabilities (including transfer taxes and withholding taxes); other governmental charges or fees payable by the Partnership; costs of printing and mailing reports and notices; and other similar expenses related to the Partnership, as the GP determines in its sole discretion.<br><br>General Partner Expenses. The GP will pay for its own administrative and overhead expenses incurred in connection with providing services to the Partnership. These expenses include all expenses incurred by the GP in providing for its normal operating overhead, including, but not limited to, the cost of providing relevant support and |

| | administrative services (e.g., employee compensation and benefits, rent, office equipment, insurance, utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above. |
|---|---|
| **BROKERAGE AND CUSTODY:** | The Partnership's brokers and qualified custodians of the Partnership's assets will initially be Charles Schwab & Co, Inc. and Interactive Brokers LLC. The Partnership reserves the right to use other and/or additional firms for such services. |
| **BROKERAGE COMMISSIONS:** | The General Partner may enter into one or more "soft dollar" arrangements with brokers that execute trades for the Partnership's account. Under these "soft dollar" arrangements, the broker would provide certain products and services (or arrange for and pay third parties to provide such products and services) based upon the volume of commissions generated by the Partnership's trading activities. Subject to the General Partner's duty to obtain best execution, these arrangements may not result in the execution of trades at the lowest available commission rates. As a result of these arrangements, the Partnership may pay higher commissions than would be the case in the absence of such arrangements. In the event the General Partner generates "soft dollars" with respect to Partnership trades, the General Partner shall comply with the safe harbor of Section 28(e) of the Securities Exchange Act of 1934, as amended. In all events, the General Partner will always seek to obtain best execution for the Partnership's portfolio transactions. |
| **LEVERAGE:** | While the GP does not generally expect to utilize leverage as a part of the Partnership's investment program, the Partnership, in the sole discretion of the GP, retains the authority to do so, including, without limitation, borrowing cash and entering into derivative transactions that have the effect of leveraging its portfolio and may engage in securities lending transactions. The use of leverage may, in certain circumstances, maximize the adverse impact to which the Partnership's investment portfolio may be subject. As with any margin borrowing it is possible for the Partnership to lose more money than was initially invested – although each Limited Partner is only liable for his entire capital contribution. |
| **SIDE LETTERS:** | The GP may enter into agreements with certain Limited Partners that will result in different terms of an investment in the Partnership than the terms applicable to other Limited Partners. As a result of such agreements, certain Limited Partners may receive additional benefits that other Limited Partners will not receive. The GP will not be required to notify the other Limited Partners of any such agreement or any of the rights and/or terms or provisions thereof, nor will the GP be required to offer such additional and/or different terms or rights to any other Limited Partner. The GP may enter into any such agreement with any Limited Partner at any time in its sole discretion. |
| **RISK FACTORS:** | In general, investment in the Interests involves various and substantial risks, including (but not limited to) the risk that the Partnership assets may be invested in volatile and high-risk investments, risks for certain tax-exempt investors, risks related to the limited transferability of a Limited Partner's interest in the Partnership, the lack of operating history of the Partnership, the Partnership's dependence upon the General Partner, and certain tax risks. (See "*Risk Factors*.") |
| **NET ASSET VALUE:** | The Net Asset Value of the Partnership ("**Net Asset Value**") will be determined as is required by the Partnership Agreement or as may be determined by the GP, but in any case no less than monthly. Each Partner's share of the Net Asset Value is determined by multiplying the total value of the Partnership's investments and other assets less any liabilities, by the Partner's Allocation Percentage. (See "*Valuation of Investments*.") |
| **RESTRICTIONS ON TRANSFER:** | A Limited Partner may not pledge, assign, sell, exchange or transfer its Interest (or any portion thereof), and no assignee, purchaser or transferee may be admitted as a substitute Limited Partner, except with the consent of the GP, which consent may be given or withheld in its sole and absolute discretion. |
| **FISCAL YEAR:** | The Partnership's fiscal year shall end on December 31. |

| | |
|---|---|
| **REPORTS:** | The Partnership's books of account will be audited at the end of each fiscal year by a firm of certified public accountants selected by the GP. Books of account will generally be kept by the Partnership, in accordance with GAAP. The GP will furnish audited financial statements to all Limited Partners within one hundred twenty (120) days, or as soon thereafter as is reasonably practicable, following the conclusion of each fiscal year, although the GP may elect to postpone the first audit of the Partnership's annual financial statements until the completion of the Partnership's first full fiscal year, in which case the initial audit will cover the applicable fiscal year as well as the partial "stub" year in which the Partnership commenced operation.  In addition, all Limited Partners will receive the information necessary to prepare federal and state income tax returns following the conclusion of such fiscal year as soon thereafter as is reasonably practical. <br><br>Each Limited Partner will also receive unaudited reports of Partnership activity on a monthly basis (including all gains and losses in each Limited Partner's Capital Account and the Net Asset Value of such Capital Account) and such other information as the GP determines. The GP will not be required to provide information with regard to specific investment transactions of the Partnership. |
| **TERM:** | The Partnership shall continue until the earlier of (i) the termination, bankruptcy, insolvency or dissolution of the GP, (ii) the complete withdrawal of the GP from the Partnership, unless a successor general partner is appointed, (iii) entry of a decree of judicial dissolution, (iv) a determination by the GP that the Partnership should be dissolved or (v) in the event of (a) the death of Keumhwan (Kevin) Kwong and David Yeow or (b) an adjudication in a final non-appealable decision on the merits of a court of competent jurisdiction that Keumhwan (Kevin) Kwong and David Yeow are physically or mentally incapable of making investment decisions on behalf of the GP. |
| **AMENDMENT OF THE PARTNERSHIP AGREEMENT:** | The Partnership Agreement provides that the GP has the right to amend the Partnership Agreement to, among other things, correct any ambiguous, false, or erroneous provision, or to otherwise amend the Partnership Agreement; provided, that no such amendment shall adversely affect the rights, privileges, and powers of the Limited Partners as a group, unless agreed to by the holders of a majority of Allocation Percentages held by Limited Partners. Notwithstanding the foregoing, the GP may amend the Partnership Agreement to conform to applicable laws and regulations without the approval of the Limited Partners. The GP shall provide Limited Partners with at least 15 days' notice of any amendment to the Partnership Agreement to comply with applicable laws. The GP is authorized on its own motion to institute proceedings for adoption of a proposed amendment to the Partnership Agreement. Investors should note that Limited Partners have no voting rights except in very limited and specific situations. |
| **AUDITOR:** | Spicer Jeffries LLP acts as auditor of the Partnership. The GP reserves the right to use other and/or additional firms for the Partnership's audit services. |
| **ADMINISTRATOR:** | The Partnership's administrative services will be provided by NAV Consulting, Inc. The GP reserves the right to use other and/or additional firms for the Partnership's administration services. |
| **LEGAL COUNSEL:** | Riveles Wahab LLP acts as legal counsel to the Partnership and GP in connection with the organization of the Partnership, the offering of Interests and other ongoing matters, and does not represent Limited Partners in any capacity. |
| **SUBSCRIPTION PROCEDURE:** | Persons interested in subscribing for Interests will be furnished, and will be required to complete and return to the GP and Administrator, subscription documents. |

**RISK FACTORS**

*An investment in the Partnership involves a number of significant risks. The risk factors set forth below are those that, at the date of this Memorandum, the GP deems to be the most significant. The following is not intended to be a complete description or an exhaustive list of risks. Other factors ultimately may affect an investment in the Partnership in a manner and to a degree not now foreseen. Prospective investors should carefully consider, in addition to the matters set forth elsewhere in this Memorandum, the factors discussed below. An investment in the Partnership should form only a part of a complete investment program, and an investor must be able to bear the loss of its entire investment. Prospective investors should also consult with their own financial, tax and legal advisors regarding the suitability of this investment.*

**Investment Instruments Traded**

Equity Securities. The value of the equity securities held by the Partnership are subject to market risk, including changes in economic conditions, growth rates, profits, interest rates and the market's perception of these securities. While offering greater potential for long-term growth, equity securities are more volatile and more risky than some other forms of investment.

Exchange-Traded Funds. The Partnership may invest in a type of investment company called an exchange-traded fund ("***ETF***"). ETFs represent an interest in a passively managed portfolio of securities selected to replicate a securities index, such as the S&P 500 Index or the Dow Jones Industrial Average, or represent exposure to a particular industry or sector. Unlike open-end mutual funds, the shares of ETFs and closed-end investment companies are not purchased and redeemed by investors directly with the fund, but instead are purchased and sold through broker-dealers in transactions on a stock exchange. Because ETF and closed-end fund shares are traded on an exchange, they may trade at a discount from or a premium to the net asset value per share of the underlying portfolio of securities. As a relatively new type of security, the trading characteristics of ETFs may not yet be fully developed or understood by potential investors. In addition to bearing the risks related to investments in equity securities, investors in ETFs intended to replicate a securities index bear the risk that the ETFs performance may not correctly replicate the performance of the index. Investors in ETFs, closed-end funds and other investment companies bear a proportionate share of the expenses of those funds, including management fees, custodial and accounting costs, and other expenses. Trading in ETF and closed-end fund shares also entails payment of brokerage commissions and other transaction costs.

Exchange-Traded Notes. Exchange-traded notes ("***ETNs***") are senior, unsecured, unsubordinated debt securities whose returns are linked to the performance of a particular market benchmark or strategy minus applicable fees. ETNs are traded on an exchange (*e.g.*, the NYSE) during normal trading hours. However, investors can also hold the ETN until maturity. At maturity, the issuer pays to the investor a cash amount equal to the principal amount, subject to the day's market benchmark or strategy factor. Some ETNs do not make periodic coupon payments and ETNs generally do not provide principal protection. ETNs are subject to credit risk and the value of the ETN may drop due to a downgrade in the issuer's credit rating, despite the underlying market benchmark or strategy remaining unchanged. The value of an ETN may also be influenced by time to maturity, level of supply and demand for the ETN, volatility and lack of liquidity in underlying assets, changes in the applicable interest rates, changes in the issuer's credit rating, and economic, legal, political, or geographic events that affect the referenced underlying asset. When the Partnership trades ETNs, it will be exposed to its proportionate share of any actual or notional fees and expenses borne by the ETN. The Partnership's ability to liquidate a position in an ETN holdings may be limited by the availability of a secondary market. ETNs are also subject to tax risk. There may be times when an ETN shares trades at a premium or discount to its market benchmark or strategy.

Option Transactions. The purchase or sale of an option by the Partnership involves the payment or receipt of a premium payment and the corresponding right or obligation, as the case may be, to either purchase or sell the underlying investment for a specific price at a certain time or during a certain period. Purchasing options involves the risk that the underlying investment does not change in price in the manner expected, so that the option expires worthless and the investor loses its premium. Selling options, on the other hand, involves potentially greater risk because the investor is exposed to the extent of the actual price movement in the underlying investment in excess of the premium payment received.

Small- and Medium-Capitalization Stocks. The Partnership may invest its assets in stocks of companies with smaller market capitalizations. Small- and medium-capitalization companies may be of a less seasoned nature or have

securities that may be traded in the over-the-counter market. These "secondary" securities often involve significantly greater risks than the securities of larger, better-known companies. In addition to being subject to the general market risk that stock prices may decline over short or even extended periods, such companies may not be well-known to the investing public, may not have significant institutional ownership and may have cyclical, static or only moderate growth prospects. Additionally, stocks of such companies may be more volatile in price and have lower trading volumes than larger capitalized companies, which results in greater sensitivity of the market price to individual transactions. Accordingly, investors in the Partnership should have a long-term investment horizon.

Small- and medium-capitalization securities may be followed by relatively few securities analysts with the result that there tends to be less publicly available information concerning these securities compared to what is available for exchange-listed or larger companies. The securities of these companies have more limited trading volumes than those of larger issuers and may be subject to more abrupt or erratic market movements than the securities of larger, more established companies or the market averages in general, and the Partnership may be required to deal with only a few market makers when purchasing and selling these securities. Transaction costs in small- and medium-capitalization stocks may be higher than those involving larger capitalized companies. Companies in which the Partnership may invest may also have limited product lines, markets or financial resources and may lack management depth and may be more vulnerable to adverse business or market developments.

Futures. Futures markets are highly volatile. Investing in the futures markets involves being able to analyze correctly such markets, which are influenced by, among other things, changing supply and demand relationships, weather, governmental, agricultural, and commercial and trade programs and policies designed to influence commodity prices, world political and economic events, and changes in interest rates. Moreover, investments in commodities, futures, and options contracts involve additional risks including, without limitation, leverage (*e.g.*, margin is usually only Five Percent (5%) to Fifteen Percent (15%) of the face value of the contract and exposure can be nearly unlimited) and credit risk vis-à-vis the contract counterparty. A futures position may be illiquid because certain commodity exchanges limit fluctuations in certain futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." Under such daily limits, during a single trading day no trades may be executed at prices beyond the daily limits. Once the price of a particular futures contract increases or decreases by an amount equal to the daily limit, positions in the future can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit. This could prevent the Partnership from promptly liquidating unfavorable positions and subject it to substantial losses.

Derivative Investments. Derivatives are financial contracts whose value depends on, or is derived from, an underlying product, such as the value of a securities index. The risks generally associated with derivatives include the risks that: (1) the value of the derivative will change in a manner detrimental to the Partnership; (2) before purchasing the derivative, the Partnership will not have the opportunity to observe its performance under all market conditions; (3) another party to the derivative may fail to comply with the terms of the derivative contract; (4) the derivative may be difficult to purchase or sell; and (5) the derivative may involve indebtedness or economic leverage, such that adverse changes in the value of the underlying asset could result in a loss substantially greater than the amount invested in the derivative itself or in heightened price sensitivity to market fluctuations.

Derivatives markets can be highly volatile. The profitability of positions of the Partnership in the derivatives markets depends on the ability of the General Partner to analyze correctly these markets, which are influenced by, among other things, changing supply and demand relationships, governmental, commercial and trade programs and policies designed to influence world political and economic events, and changes in interest rates. In addition, the assets of the Partnership may be pledged as collateral in derivatives transactions. Thus, if the Partnership defaults on such an obligation, the counterparty to such transaction may be entitled some or all of the assets of the Partnership as a result of the default.

**Risk Associated with an Investment in Portfolio Funds**

Due Diligence in Portfolio Fund Selection Process. The General Partner will conduct due diligence which the General Partner believes is adequate to select Portfolio Funds with which to invest Partnership assets. However, due diligence is not foolproof and may not uncover problems associated with the investment strategies of a particular Portfolio Fund, even if such strategies are directed by the Principals themselves. The Partnership may rely upon representations made by managers, accountants, attorneys, prime brokers, and/or other investment professionals. If any such representations are misleading, incomplete, or false, this may result in the selection of Portfolio Funds which might otherwise have been eliminated from consideration had fully accurate and complete information been made available to the Partnership. Similarly, as specifically regarding Independent Portfolio Funds, the General Partner conducts ongoing due diligence in an effort to detect material changes in an Independent Portfolio Fund's personnel or operations which could be material to the Partnership. However, such diligence may not be effective in identifying all material problems before they occur. The General Partner does not attempt to verify valuations

established by Independent Portfolio Funds nor does it monitor the investment portfolios.

<u>Unspecified Investments; Dependence on Portfolio Fund Managers</u>. The General Partner has complete discretion to select Portfolio Funds as opportunities arise. The Partnership, and, accordingly, the Limited Partners must rely upon the ability of the General Partner to identify and implement investments for the Partnership consistent with the Portfolio Fund's investment objective. Limited Partners will not receive or otherwise be privy to due diligence or risk information prepared by or for the General Partner in respect of investments made by Portfolio Funds. The General Partner has the authority and responsibility for asset allocation, the selection of Portfolio Funds and all other investment decisions for the Partnership. The success of the Partnership depends upon the ability of the General Partner to develop and implement investment strategies that achieve the investment objective of the Partnership. Investors will have no right or power to participate in the management or control of the Partnership or Portfolio Funds, or the terms of any such investments. There can be no assurance that the General Partner will be able to select or implement successful strategies or achieve their respective investment objectives.

<u>Liquidity Constraints at Portfolio Funds</u>. Portfolio Funds may have liquidity constraints, such as "gates", suspension of withdrawals/net asset value calculations, withdrawals in kind, lock-ups, withdrawal fees and less frequent withdrawal rights. As regarding Independent Portfolio Funds, the General Partner has no control over the liquidity of the Independent Portfolio Funds and will likely rely on the Independent Portfolio Funds to provide valuations as well as liquidity in order to process withdrawals. Limited Partners must recognize that under certain circumstances, withdrawals may be materially restricted or delayed. To the extent that a material portion of the Partnership's assets are allocated to Portfolio Funds that take such actions, the Partnership will likely be unable to withdraw from such Portfolio Funds for an extended period of time notwithstanding a desire to do so. Such inability to withdraw from such Portfolio Funds could expose such Partnership to losses it may have avoided if it had been able to allocate away from such Portfolio Funds. The complicated and often protracted process of withdrawing from Portfolio Funds could hinder the Partnership's ability to adjust its Portfolio Fund allocations. It could also cause the Partnership to become unbalanced in the event the Partnership withdraws from its more liquid Portfolio Funds to fund the Partnership's expenses. Also, as specifically regarding Independent Portfolio Funds, to the extent that a material portion of Independent Portfolio Funds suspend the calculation of net asset value, the General Partner and/or the Administrator may be unable to calculate the Partnership's net asset value.

<u>Access to Independent Portfolio Funds</u>. In some cases, the Partnership may not be able to gain access to or invest with desired Independent Portfolio Funds because the Partnership does not meet eligibility or minimum investment requirements or because such Independent Portfolio Fund is not accepting additional investors at that time. Although the Partnership may want to invest in a particular Independent Portfolio Fund, it may not be permitted to do so for a variety of reasons beyond the control of the General Partner.

<u>Substantial Fees and Expenses of Independent Portfolio Funds</u>. Independent Portfolio Funds are subject to substantial fees, transaction costs and other costs and other expenses, regardless of whether such Independent Portfolio Funds realize any profits, and have to earn substantial profits to avoid depletion of their assets due to such fees, costs and expenses.  The Partnership bears its allocable share of the costs and expenses of Independent Portfolio Funds in which it invests (including its allocable share of the management fees and performance-based compensation payable to the Independent Portfolio Managers of such Independent Portfolio Funds). The Partnership is thus subject to two levels of fees and a potentially higher expense ratio than would be associated with an investment in an investment fund that invests and trades directly in financial instruments under the direction of a single investment manager.

<u>Importance of Portfolio Fund Principals</u>. Some of the Portfolio Funds may consist of a single principal or a limited number of principals and key employees.  If the services of any of such principal or key employee became unavailable (for example, by reason of death, disability or retirement), Portfolio Funds they manage could sustain losses.

<u>Valuation of the Partnership's Interests in Independent Portfolio Funds</u>. The valuation of the Partnership's investment in Independent Portfolio Funds is ordinarily determined based upon valuations provided by Independent Portfolio Funds on a quarterly basis or more frequent basis. No assurances can be given regarding the valuation methodology or the sufficiency of systems utilized by any Independent Portfolio Fund, the accuracy of the valuations provided by Independent Portfolio Funds, that Independent Portfolio Funds will comply with their own internal policies or procedures for keeping records or making valuations, or that Independent Portfolio Funds' policies and procedures and systems will not change without notice to the Partnership. As a result, valuations of the assets may be subjective and could prove in hindsight to have been wrong, potentially by significant amounts. Neither the General Partner nor the Administrator generally have sufficient information in order to be able to confirm or review the accuracy of valuations provided by an Independent Portfolio Fund. Furthermore, an Independent Portfolio Fund's valuation information could be inaccurate due to fraudulent activity, mis-valuation or inadvertent error. In any case, the Partnership may not uncover errors for a significant period of time, if ever. Even if the General Partner elects to cause

the Partnership to sell its interests in such an Independent Portfolio Fund, the Partnership may be unable to sell such interests quickly, if at all, and could therefore be obligated to continue to hold such interests for an extended period of time. In such a case, the Independent Portfolio Fund's valuations of such interests could remain subject to such fraud or error, and the General Partner may, in its sole discretion, determine to discount the value of the interests or value them at zero. Investors should be aware that situations involving uncertainties as to the valuations by Independent Portfolio Funds could have a material adverse effect on the Partnership if the General Partner's judgments regarding valuations should prove incorrect. Persons who are unwilling to assume such risks should not make an investment in the Partnership.

Indemnification of Portfolio Funds, Portfolio Managers and Others. The Partnership may agree to indemnify certain of Portfolio Funds and their respective managers, officers, directors, and affiliates from any liability, damage, cost, or expense arising out of, among other things, acts or omissions undertaken in connection with the management of Portfolio Funds. If the Partnership were required to make payments (or return distributions) in respect of any such indemnity, the Partnership could be materially adversely affected.

**Strategy Risks**

Leverage and Margin Transactions.  While the GP does not generally expect to utilize leverage as a part of the Partnership's investment program, the Partnership, in the sole discretion of the GP, retains the authority to do so, including, without limitation, borrowing cash and entering into derivative transactions that have the effect of leveraging its portfolio and may engage in securities lending transactions. The use of leverage may, in certain circumstances, maximize the adverse impact to which the Partnership's investment portfolio may be subject. As with any margin borrowing it is possible for the Partnership to lose more money than was initially invested – although each Limited Partner is only liable for his entire capital contribution. In the event of adverse market movements or other factors, the Partnership may have to meet calls for substantial additional margin which may limit the Partnership's assets available for other investments at an inopportune time. In addition, a change in the general level of interest rates may adversely affect the Partnership.

Concentration of Investments. The Partnership is not subject to any significant limitations on the amount of Partnership capital which may be committed to any one investment, security type, issuer or geographic location. As a consequence of this potential investment concentration, the Partnership may be subject to greater losses than would be the case if it maintained a more diversified portfolio.

In-Kind Distributions. A withdrawing Limited Partner may, in the sole discretion of the General Partner, receive financial instruments owned by the Partnership in lieu of, or in combination with, cash. The value of financial instruments distributed may increase or decrease before such financial instruments can be sold and the Limited Partner will incur transaction costs in connection with the sale of such financial instruments. Additionally, financial instruments distributed with respect to a withdrawal by a Limited Partner may not be readily marketable. The risk of loss and delay in liquidating such financial instruments will be borne by the Limited Partner, with the result that such Limited Partner may receive less cash than it would have received on the date of withdrawal.

Hedging Transactions. The GP is not required to attempt to hedge portfolio positions in the Partnership and, for various reasons, may determine not to do so. Furthermore, the GP may not anticipate a particular risk so as to hedge against it. The Partnership may utilize financial instruments, both for investment purposes and for risk management purposes in order to: (i) protect against possible changes in the market value of the Partnership's investment portfolio resulting from fluctuations in the securities markets and changes in interest rates; (ii) protect the Partnership's unrealized gains in the value of the Partnership's investment portfolio; (iii) facilitate the sale of any such investments; (iv) enhance or preserve returns, spreads or gains on any investment in the Partnership's portfolio; (v) hedge the interest rate or currency exchange rate on any of the Partnership's liabilities or assets; (vi) protect against any increase in the price of any securities the Partnership anticipates purchasing at a later date; or (vii) for any other reason that the GP deems appropriate. The success of the Partnership's hedging strategy is subject to the GP's ability to correctly assess the degree of correlation between the performance of the instruments used in the hedging strategy and the performance of the investments in the portfolio being hedged. Since the characteristics of many securities change as markets change or time passes, the success of the Partnership's hedging strategy is also subject to the GP's ability to continually recalculate, readjust and execute hedges in an efficient and timely manner. While the Partnership may enter into hedging transactions to seek to reduce risk, such transactions may result in a poorer overall performance for the Partnership than if it had not engaged in any such hedging transactions. For a variety of reasons, the GP may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged. Such imperfect correlation may prevent the Partnership from achieving the intended hedge or expose the Partnership to risk of loss. The successful utilization of hedging and risk management transactions requires skills complementary to those needed in the selection of the Partnership's portfolio holdings.

Systems Risks. The Partnership depends on the General Partner to develop and implement appropriate systems for the Partnership's activities. The Partnership relies extensively on computer programs and systems to trade, clear and settle securities transactions, to evaluate certain securities based on real-time trading information, to monitor its portfolio and net capital, and to generate risk management and other reports that are critical to oversight of the Partnership's activities. The ability of its systems to accommodate an increasing volume of transactions could also constrain the General Partner's ability to manage the portfolio. In addition, certain of the Partnership's and the General Partner's operations interface with or depend on systems operated by third parties, including prime brokers and market counterparties and their respective sub-custodians, and other service providers, and the Partnership or General Partner may not be in a position to verify the risks or reliability of such third-party systems. These programs or systems may be subject to certain defects, failures or interruptions, including, but not limited to, those caused by worms, viruses and power failures. Any such defect or failure could have a material adverse effect on the Partnership. For example, such failures could cause settlement of trades to fail, lead to inaccurate accounting, recording or processing of trades, and cause inaccurate reports, which may affect the Partnership's ability to monitor its investment portfolio and its risks. The General Partner is not liable to the Partnership for losses caused by systems failures or due to any breakdown in the means of the communication normally used to ascertain the value of the Partnership's investments or to conduct trading in such investments.

Execution of Orders. The Partnership's trading strategies depend on the ability to establish and maintain an overall market position in a combination of financial instruments selected by the General Partner. The Partnership's trading orders may not be executed in a timely and efficient manner due to various circumstances, including, without limitation, systems failures or human error attributable to employees, brokers, agents or other service providers. In such events, the Partnership might only be able to acquire some, but not all, of the components of such position, or if the overall position were to need adjustment, the Partnership might not be able to make such adjustment. As a result, the Partnership would not be able to achieve the market position selected by the General Partner, and might incur a loss in liquidating its position.

Operational Risks. The volume and complexity of the Partnership's transactions may place substantial burdens on the General Partner's operational systems and resources, including those related to trade entry and execution, position reconciliation, corporate actions, marking procedures, finance, accounting, profit and loss reporting, internal management and risk reporting and funds transfers. Human error, system failure or other problems with any of these processes could result in material losses or costs, which will generally be borne by the Partnership.

Short Selling. The Partnership may engage in short selling as part of its general investment strategy. Short selling involves selling securities that are not owned and borrowing the same securities for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the Partnership to profit from declines in market prices to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. However, because the borrowed securities must be replaced by purchases at market prices in order to close out the short position, any appreciation in the price of the borrowed securities would result in a loss upon such repurchase. The Partnership's obligations under its short sales will be marked to market daily and collateralized by the Partnership's assets held at the broker, including its cash balance and its long securities positions. Because short sales must be marked to market daily, there may be periods when short sales must be settled prematurely, and a substantial loss would occur. Purchasing securities to close out the short position can itself cause the price of the securities to rise further, thereby exacerbating the loss. Short-selling exposes the Partnership to unlimited risk with respect to that security due to the lack of an upper limit on the price to which an instrument can rise. Short sales may be utilized to enhance returns and hedge the portfolio. The Partnership anticipates that the frequency of short sales will vary substantially in different periods. There are no prescribed limits to the amount of Partnership assets that may be subject to short sales.

Highly Volatile Instruments. The prices of financial instruments in which the Partnership may invest can be highly volatile. Price movements of securities, option contracts and other derivative contracts in which the Partnership's assets may be invested are influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. In addition, governments from time to time intervene, directly and by regulation, in certain markets, particularly those in options. Such intervention is often intended directly to influence prices and may, together with other factor, cause all of such markets to move rapidly in the same direction because of, among other things, interest rate fluctuations.

Failure of Broker-Dealers. Institutions, such as brokerage firms or banks may hold certain of the Partnership's assets in "street name." Bankruptcy or fraud at one of these institutions could impair the operational capabilities or the capital position of the Partnership. In addition, if the Partnership were to borrow money or securities, the Partnership will post certain of its assets as collateral securing the obligations ("**Margin Securities**"). The Partnership's broker generally holds the Margin Securities on a commingled basis with margin securities of its other customers and may use certain

of the Margin Securities to generate cash to fund the Partnership's leverage, including pledging such Margin Securities. Some or all of the Margin Securities may be available to creditors of the Partnership's broker in the event of its insolvency. The Partnership's broker has netting and set off rights over all the assets held by it (which may indirectly include amounts held for the Partnership's benefit in the special segregated bank account) to satisfy the Partnership's obligations under its agreements with the Partnership's broker, including obligations relating to any margin or short positions.

Trading on Exchanges Outside the United States. The Partnership may trade contracts on non-U.S. exchanges. Non-U.S. trading involves risks -- including exchange-rate exposure, excessive taxation, possible governmental regulation and lack of regulation -- which U.S. trading does not. In addition, some non-U.S. markets, in contrast to U.S. exchanges, are "principals' markets" where performance is the responsibility only of the individual member with whom the trader has entered into a contract and not of any exchange or clearing corporation. In addition, the Partnership's rights and responsibilities if a non-U.S. exchange or clearing house defaults or declares bankruptcy are likely to be more limited than if a U.S. exchange does the same. Consequently, daily price movements for these instruments may be unlimited, and there can be no guarantee that markets will exist for liquidation of such instruments following investment.

Stop Loss May Not Be Effective. The placement of contingent orders by the General Partner, such as a "stop-loss" or "stop-limit" orders, will not necessarily limit the Partnership's losses to the intended amounts, since market conditions may make it impossible to execute such orders.

Spread Position May Be Riskier. A "spread" position may not be less risky than a simple "long" or "short" position.

The General Partner Methodology. Trading decisions of the General Partner are on a discretionary basis using fundamental and/or technical analysis and no assurance can be given that such trading strategies used by the General Partner will be successful, or that losses could not occur. In entering orders into the Partnership's accounts, the General Partner will use market, limit, stop, and other qualified orders, if in its judgment, that appears appropriate under given market conditions. In addition, when liquidating a position, the General Partner may place a reversal order, e.g., the current position is liquidated and an opposite one is established.

**Management Risks**

Reliance on the General Partner and no Authority by Limited Partners. All decisions regarding the management and affairs of the Partnership will be made exclusively by the  General Partner. Accordingly, no person should invest in the Partnership unless such person is willing to entrust all aspects of management of the Partnership to the General Partner. Limited Partners will have no right or power to take part in the management of the Partnership. As a result, the success of the Partnership for the foreseeable future depends solely on the abilities of the General Partner.

Dependence on Key Personnel. The General Partner is dependent on the services of the Principals and there can be no assurance that it will be able to retain the Principals, whose credentials are described under the heading "*Management of the Partnership*." The departure or incapacity of the Principals could have a material adverse effect on the General Partner's management of the investment operations of the Partnership.

Changes in Investment Strategies. The Partnership's investment strategies may only be materially altered from time to time with the approval of a majority-in-interest of Limited Partners. In such event, a Limited Partner who does not consent to such change may nevertheless be out-voted by other Limited Partners in which case the opposing Limited Partner may only withdraw from the Partnership pursuant to the terms of the Partnership Agreement and subject to the limitations described therein.

Proprietary Nature of Investment Strategy. All documents and other information concerning the Partnership's portfolio of investments will be made available to the Partnership's auditors, accountants, attorneys and other agents in connection with the duties and services performed by them on behalf of the Partnership. However, because the General Partner's investment techniques may be proprietary, the Partnership Agreement will provide that neither the Partnership nor any of its auditors, accountants, attorneys or other agents will disclose to any person, including investors in the Partnership, any of the investment techniques employed by the General Partner in managing the Partnership's investments or the identity of specific investments held by the Partnership at any particular time.

Limitations on Liability and Indemnification. The Partnership Agreement provides that the General Partner and any of its respective affiliates, shareholders, members, partners, managers, directors, officers and employees, agents and representatives and the legal representatives of any of them (each, an "***Indemnified Party***"), shall not be liable, responsible nor accountable in damages or otherwise to the Partnership or any Partner, or to any successor, assignee or transferee of the Partnership or of any Partner, for (i) any acts performed or the omission to perform any

acts, within the scope of the authority conferred on such Indemnified Party by the Partnership Agreement, except by reason of acts or omissions found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence; (ii) performance by such Indemnified Party of, or the omission to perform, any acts on advice of legal counsel, accountants, or other professional Managers to the Partnership; (iii) the negligence, dishonesty, bad faith, or other misconduct of any consultant, employee, or agent of the Partnership, including, without limitation, an affiliate of the General Partner selected or engaged by such Indemnified Party with reasonable care and in good faith; or (iv) the negligence, dishonesty, bad faith, or other misconduct of any Person in which the Partnership invests or with which the Partnership participates as a partner, joint venturer, or in another capacity, which was selected by such Indemnified Party with reasonable care and in good faith. No Indemnified Party shall be liable to the Partnership or to any Partner, or any successors, assignees, or transferees of the Partnership or any Partner, for any loss, damage, expense, or other liability due to any cause beyond its reasonable control, including, but not limited to, strikes, labor troubles, riots, fires, blowouts, tornadoes, floods, bank moratoria, trading suspensions on any exchange, acts of a public enemy, insurrections, acts of God, acts of terrorism, failures to carry out the provisions hereof due to prohibitions imposed by law, rules, or regulations promulgated by any governmental agency, or any demand or requisition by any government authority.

Furthermore, to the fullest extent permitted by law, the Partnership, in the General Partner's sole discretion, shall indemnify and hold harmless each Indemnified Party from and against any loss, liability, damage, cost or expense suffered or sustained by an Indemnified Party by reason of (i) any acts, omissions or alleged acts or omissions arising out of or in connection with the Partnership, the Partnership Agreement or any investment made or held by the Partnership (including, without limitation, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim), provided that such acts, omissions or alleged acts or omission upon which such actual or threatened action, proceeding or claim are based are not found by a court of competent jurisdiction upon entry of a final non-appealable judgment to have been made in bad faith or to constitute fraud, willful misconduct or gross negligence by such Indemnified Party, or (ii) any acts or omissions, or alleged acts or omissions, of any broker or agent of any Indemnified Party, provided that such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with reasonable care.

Limited Reporting. The Partnership will provide monthly unaudited reports of Partnership activity. As a result, Limited Partners will not be able to evaluate the Partnership's activity at shorter intervals. Additionally, as a result of side letter arrangements, questions, due diligence requests, meetings or other communications, certain Limited Partners may receive information that is not generally available or otherwise provided to other Limited Partners, which may affect such Limited Partners' decision to request a withdrawal of their respective Capital Accounts or take other actions on the basis of such information.

Cyber Security Breaches and Identity Theft. The technology systems used by the General Partner may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by its professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the General Partner has implemented certain measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the General Partner and/or the Partnership may have to make a significant investment to fix or replace them. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the operations of the Partnership and/or the General Partner and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including private keys, and personal information relating to investors (and the beneficial owners of investors). Such a failure could harm the General Partner's and/or the Partnership's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance.

Transactions with Affiliated Persons of the General Partner: Principal Portfolio Funds. The Management Fee and the Carried Interest Distributions to the General Partner are intended to be the only direct compensation from the Partnership and its investments. However, the Partnership may engage in transactions with related or Affiliated Persons including investing, purchasing, and selling assets to, related or Affiliated Persons and/or entities wholly owned, partially owned or otherwise controlled by related or Affiliated Persons, including the Principal Portfolio Funds, which are directly managed by the Principals. While the Partnership will not be charged any fees or expenses at the Principal Portfolio Fund level in connection with investing in the Principal Portfolio Funds and the General Partner has an obligation to act in the best interests of the Partnership, such related or affiliated investments and transactions may create a material conflict of interest between the interests of the Partnership, on the one hand, and interests of such related or Affiliated Persons, on the other hand, which may incentivize the General Partner to act, or fail to act, in a manner more favorable to the related or Affiliated Person than it otherwise would in the absence of such affiliate or other relationship. All Limited Partners are advised to consult with their advisors prior to making an investment in the Partnership.

**Other Risks**

No Operating History. The Partnership is a recently formed entity and has no operating history upon which prospective investors can evaluate its likely performance. There can be no assurance that the Partnership will achieve its investment objective.

Force Majeure**.** The Partnership's investments may be affected by force majeure events (*i.e.*, events beyond the control of the party claiming that the event has occurred, including, without limitation, acts of God, fire, flood, earthquakes, outbreaks of an infectious disease, pandemic or any other serious public health concern, war, terrorism, labor strikes, major plant breakdowns, pipeline or electricity line ruptures, failure of technology, defective design and construction, accidents, demographic changes, government macroeconomic policies, social instability, etc.). Some force majeure events may adversely affect the ability of a party (including the Partnership or a counterparty to the Partnership) to perform its obligations until it is able to remedy the force majeure event and/or prompt precautionary government-imposed closures of certain travel and business. In addition, forced events, such as the cessation of the operation of machinery for repair or upgrade, could similarly lead to the unavailability of essential machinery and technologies. These risks could, among other effects, adversely impact the Partnership's returns, cause personal injury or loss of life, disrupt global markets, damage property, or instigate disruptions of service. In addition, the cost to the Partnership of repairing or replacing damaged assets resulting from such force majeure event could be considerable. Force majeure events that are incapable of or are too costly to cure may have a permanent adverse effect on the Partnership's expected returns. Certain force majeure events (such as war or an outbreak of an infectious disease) could have a broader negative impact on the world economy and international business activity generally, or in any of the countries in which the Partnership may invest and the markets the Partnership may trade specifically. Additionally, a major governmental intervention into industry, including the nationalization of an industry or the assertion of control over industry assets, could result in losses to the Partnership, including if its investments are canceled, unwound or acquired (which could be without adequate compensation). Any of the foregoing may therefore adversely affect the performance of the Partnership and its investments.

Risk of Loss. A Limited Partner could incur substantial, or even total, losses on an investment in the Partnership. An investment in the Partnership is only suitable for persons willing to accept this high level of risk.

Effect of Performance Allocation. The General Partner will receive a Performance Allocation based on a percentage of any net realized and unrealized profits in the Partnership. Performance fees may create an incentive for the General Partner to make investments that are riskier or more speculative than would be the case in the absence of such incentive compensation arrangements. In addition, the General Partner's performance allocations will be based on unrealized as well as realized gains. There can be no assurance that such unrealized gains will, in fact, ever be recognized. Furthermore, the valuation of unrealized gain and loss may be subject to material subsequent revision.

Effect of Substantial Withdrawals. Substantial withdrawals by Limited Partners within a short period of time could require the Partnership to liquidate its investments more rapidly than would otherwise be desirable, possibly reducing the value of the Partnership's assets and/or disrupting the Partnership's investment strategies. Reduction in the Partnership's size could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Partnership's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

Lack of Liquidity. The Partnership's withdrawal provisions place certain restrictions on the right of a Limited Partner to withdraw all or part of its Interest, transfer its Interest and pledge or otherwise encumber its Interest. Thus, a Limited Partner may not be able to liquidate the entire value of his or her Capital Account on any given withdrawal date. Interests may not be transferred or pledged except in compliance with significant restrictions on transfer as required by federal and state securities and commodities laws and as provided in the Partnership Agreement. The Partnership Agreement does not permit a Limited Partner to transfer or pledge all or any part of its Interest to any person without the prior written consent of the General Partner, the granting of which is in the General Partner's sole and absolute discretion. These limitations, taken together, will significantly limit a Limited Partner's ability to liquidate an investment in the Partnership quickly. As a result, an investment in the Partnership would not be suitable for an investor who needs liquidity.

Suspension of Withdrawals and Deferment of Withdrawal Proceeds. In certain circumstances, the General Partner, in its sole and absolute discretion, may suspend the valuation of the Partnership's assets, the right or obligation to honor withdrawal requests (including the right to receive withdrawal proceeds), and/or extend the period for payment on withdrawal. In addition, the General Partner may suspend the right of withdrawal or postpone the date of payment for any period during which there is an extraordinary circumstance as determined in good faith by the General Partner.

Contingency Reserves. Under certain circumstances, the Partnership may find it necessary to set up one or more reserves for contingent or future liabilities or valuation difficulties and, upon withdrawal by a Limited Partner, withhold a portion of that Limited Partner's withdrawal proceeds. This could happen, for example, if the Partnership or the issuer of portfolio securities were involved in a dispute regarding the value of its assets, in litigation, or subject to a tax audit at the time the withdrawal request would otherwise be satisfied.

Tax Considerations; Distributions to Limited Partners and Payment of Tax Liability. It is not possible to provide here a description of all potential tax risks to a person considering investing in the Partnership. Prospective investors are urged to consult their own legal counsel and tax advisors with respect thereto, particularly in regard to the effect of the Tax Cuts and Jobs Act ("**TCJA**"), enacted December 22, 2017, with respect to an investment in the Partnership. The Partnership will not seek a ruling from the IRS with respect to any tax issues affecting the Partnership.

It should also be noted that the Partnership's tax return may be audited by the IRS, and any such audit may result in an audit of the returns of the Limited Partners for the year(s) in question or unrelated years. Partnership audit rules effective January 1, 2018, addressed below ("*Federal Tax Aspects*") may have a significant effect on IRS audits of the Partnership and its Partners. Further, any adjustment resulting from an audit would also result in adjustments to the tax returns of the Limited Partners and may result in an examination and adjustment of other items in such returns unrelated to the Partnership. Limited Partners could incur substantial legal and accounting costs in litigation of any IRS challenge, regardless of the outcome. (*See "Federal Tax Aspects."*)

Delayed Schedules K-1. The Partnership may not be able to provide final Schedules K-1 to Limited Partners for any given fiscal year until significantly after April 15 of the following year. The Partnership will provide Schedules K-1 as soon as practicable after receipt of all of the necessary information. Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the U.S. Federal, state and local level.

Undistributed Income. The General Partner in its sole discretion may, but is not required to, make distributions to Limited Partners during the term of the Partnership. Taxable income realized in any year by the Partnership will be taxable to the Partners in that year regardless of whether they have received any distributions from the Partnership. Accordingly, Limited Partners may recognize taxable income for federal, state, and local income tax purposes without receiving any or a sufficient distribution from the Partnership with which to pay the taxes thereon. The General Partner may consider such possible tax liability of the Limited Partners when determining whether to make distributions, but no assurance is given that distributions, if made, will equal the amount of any Limited Partner's tax liability.

Restrictions on Transfer. The Interests are subject to certain restrictions on transfer, including a requirement that the General Partner consent to any such transfer. There is no present market for the Interests, and no market is likely to develop in the future. Accordingly, Limited Partners may not be able to liquidate their investment in the event of an emergency or for any other reason, and Interests may not be readily acceptable as collateral for loans. Interests should be purchased only by prospective Investors who can bear the economic risk of their investment, who can afford to have their funds committed to an illiquid investment according to the withdrawal provisions in the Partnership Agreement and who, if necessary, can afford a complete loss of their investment. (*See "Restrictions on Transfers of Interests."*)

Lack of Insurance. The assets of the Partnership are not insured by any government or private insurer except to the extent portions may be deposited in bank accounts insured by the Federal Deposit Insurance Corporation or with brokers insured by the Securities Investor Protection Corporation and such deposits and securities are subject to such insurance coverage. Therefore, in the event of the insolvency of a depository or custodian, the Partnership may be unable to recover all of its funds or the value of its securities so deposited.

Side Letters. The General Partner may enter into agreements with certain Limited Partners that will result in different terms of an investment in the Partnership than the terms applicable to other Limited Partners. As a result of such agreements, certain Limited Partners may receive additional benefits which other Limited Partners will not receive (*e.g.*, additional information regarding the Partnership's portfolio, different withdrawal terms, lower Management Fee and/or Performance Allocations). The General Partner will not be required to notify the other Limited Partners of any such agreement or any of the rights and/or terms or provisions thereof, nor will the General Partner be required to offer such additional and/or different terms or rights to any other Limited Partner.

Regulations under Investment Company Act of 1940. The Partnership's operations are similar to an investment company as defined under the Investment Company Act, because the Partnership engages in the business of purchasing securities for investment. The Partnership is currently not required to register under the Investment Company Act due to an exemption for an entity which is beneficially owned by not more than 100 persons and which

does not intend to make any public offering of its securities. Accordingly, the provisions and extensive regulations of the Investment Company Act, which might otherwise govern the activities of the Partnership, will not be applicable.

Risks for Certain Benefit Plan Investors Subject to ERISA. Prospective investors that are benefit plan investors subject to the ERISA, and Department of Labor Regulations issued thereunder should read the section hereof entitled *"ERISA Considerations"* in its entirety for a discussion of certain risks related to an investment by benefit plan investors in the Partnership.

Revised Regulatory Interpretations Could Make Certain Strategies Obsolete. In addition to proposed and actual accounting changes, there have recently been certain well-publicized incidents of regulators unexpectedly taking positions which prohibited trading strategies which had been implemented in a variety of formats for many years. In the current unsettled regulatory environment, it is impossible to predict if future regulatory developments might adversely affect the Partnership.

Compliance, Litigation and Claims. The Partnership must comply with various legal requirements, including requirements imposed by the securities laws, tax laws and pension laws in various jurisdictions as well as compliance and reporting requirements. Should any of these laws change over the term of the Partnership, the legal requirements to which the Partnership and the Limited Partners may be subject could differ materially from current requirements. These compliance and reporting requirements may also prove expensive for the Partnership and time-consuming for the General Partner. The Partnership and General Partner, as independent legal entities, may also be subject to lawsuits or proceedings by government entities or private parties. Except in the event of a lawsuit or proceeding arising from the General Partner's willful misfeasance, bad faith or gross negligence in the performance of its duties, expenses or liabilities of the Partnership arising from any suit or proceeding shall be borne by the Partnership. Under certain circumstances, the Partnership may find it necessary to establish a reserve for contingent liabilities or withhold a portion of a Limited Partner's settlement proceeds at the time of withdrawal, in which case, the reserved portion would remain at the risk of the Partnership's activities.

Future Regulatory Change is Impossible to Predict. The securities markets are subject to comprehensive statutes, regulations and margin requirements. In addition, the Securities and Exchange Commission and the exchanges are authorized to take extraordinary actions in the event of a market emergency, including, for example, the retroactive implementation of speculative position limits or higher margin requirements, the establishment of daily price limits and the suspension of trading. The regulation of securities both inside and outside the United States is a rapidly changing area of law and is subject to modification by government and judicial action. The effect of any future regulatory change on the Partnership is impossible to predict, but could be substantial and adverse.

Importance of General Economic Conditions. Overall market, industry or economic conditions, which the General Partner cannot predict or control, will have a material effect on performance.

Risks Relating to Markets. The value of those securities in which the Partnership invests and that are traded on exchanges or over-the-counter and the risks associated therewith vary in response to events that affect such markets and that are beyond the control of the Partnership and the General Partner. Market disruptions such as those that occurred during October of 1987, on September 11, 2001 and during September of 2008 could have a material effect on general economic conditions and market liquidity which could result in substantial losses to the Partnership.

There is no guarantee that securities exchanges and markets can at all times provide continuously liquid markets in which the Partnership can close out its positions in those securities that the Partnership purchases that are publicly traded. The Partnership could experience delays and may be unable to sell securities purchased through a broker or clearing member that has become insolvent due to the deterioration of industry conditions in general. In that event, positions could also be closed out fully or partially without the Partnership's consent.

COVID-19 Pandemic May Have an Adverse Impact on the Performance of the Partnership. A respiratory illness caused by a novel strain of coronavirus (COVID-19) was identified in Wuhan, Hubei Province, China, in December 2019 and has since spread globally, including to every state in the United States. The outbreak of COVID-19 has severely impacted global economic activity and caused significant volatility and negative pressure in financial markets. The global impact of the outbreak has been rapidly evolving and many countries, including the United States, have reacted by instituting mandatory or voluntary quarantines, as well as the closure of schools and businesses and restrictions on travel. As a result, the COVID-19 pandemic is negatively impacting almost every industry directly or indirectly.

COVID-19 (or a future pandemic) could have material and adverse effects on the Partnership's operations, performance, financial condition, results of operations, and cash flows due to, among other factors, the Partnership's ability to access capital and illness of the management team or key employees of the General Partner or the

Partnership. The extent to which COVID-19 impacts the Partnership's operations will depend on future developments, which are highly uncertain and cannot be predicted with confidence, including the scope, severity, and duration of the outbreak, the actions taken to contain the outbreak or mitigate its impact, and the direct and indirect economic effects of the outbreak and containment measures, among others.

The COVID-19 pandemic and the measures taken to limit its spread are negatively impacting the global, national, and regional economies generally and many industries, directly or indirectly, and those impacts are likely to continue and may increase in severity, including potentially triggering a national or global recession or a prolonged period of negative or limited economic growth. Any such recession or period of negative or limited economic growth may have an adverse impact on the business, results of operations, financial condition, and liquidity of the Partnership.

**The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Partnership. Prospective Limited Partners should read the entire Memorandum and the Partnership Agreement and consult with their own advisors before deciding whether to invest in the Partnership. In addition, as the Partnership's investment program develops and changes over time, an investment in the Partnership may be subject to additional and different risk factors.**

**POTENTIAL CONFLICTS OF INTEREST**

In connection with the management of the Partnership, the General Partner may be deemed to have a fiduciary relationship with the Partnership and consequently the responsibility for dealing fairly with the Partnership. However, the General Partner, the Principals and/or their respective affiliates, shareholders, members, partners, managers, directors, officers and employees (each an "***Affiliate***" or collectively the "***Affiliated Persons***") may engage in activities that may conflict with the interests of the Limited Partners or the Partnership. The following discussion enumerates certain potential divergences and conflicts of interest.

**Other Activities**

The GP and their Affiliates will only devote so much time to the affairs of the Partnership as is reasonably required in the judgment of the GP. Affiliates will not be precluded from engaging directly or indirectly in any other business or other activity, including exercising investment manager and management responsibility and buying, selling or otherwise dealing with securities and other investments for their own accounts, for the accounts of family members, for the accounts of other funds and for the accounts of individual and institutional clients (collectively, "***Other Accounts***"). Such Other Accounts may have investment objectives or may implement investment strategies similar to those of the Partnership. Affiliates may also have investments in certain of the Other Accounts. Each Affiliate may give advice and take action in the performance of their duties to their Other Accounts that could differ from the timing and nature of action taken with respect to the Partnership. Affiliates will have no obligation to purchase or sell for the Partnership any investment that Affiliates purchase or sell, or recommend for purchase or sale, for their own accounts or for any of the Other Accounts. The Partnership will not have any rights of first refusal, co-investment or other rights in respect of the investments made by Affiliates for the Other Accounts, or in any fees, profits or other income earned or otherwise derived from them. If a determination is made that the Partnership and one or more Other Accounts should purchase or sell the same investments at the same time, Affiliates will allocate these purchases and sales as is considered equitable to each. No Limited Partner will, by reason of being a Limited Partner of the Partnership, have any right to participate in any manner in any profits or income earned or derived by or accruing to Affiliates from the conduct of any business or from any transaction in investments effected by Affiliates for any account other than that of the Partnership.

Affiliates will attempt to allocate investment opportunities that come to their attention on a fair and equitable basis among the Partnership and the Other Accounts for which participation in the respective opportunity is considered appropriate. In determining whether participating by an account is appropriate, Affiliates shall take into account, among other considerations: (a) whether the risk-return profile of the proposed investment is consistent with the objectives of the Partnership, which objectives may be considered (i) solely in light of the specific investment under consideration or (ii) in the context of the portfolio's overall holdings and available capital; (b) the potential for the proposed investment to create an imbalance in the portfolio of the Partnership; (c) liquidity requirements of the Partnership; (d) potential tax consequences; (e) legal or regulatory restrictions; (f) the need to re-size risk in the portfolio of the Partnership; and (g) whether the Partnership and/or Other Accounts have a substantial amount of investable cash (*e.g.*, during a "ramp-up" period). Notwithstanding the foregoing, there can be no assurance that an investment opportunity which comes to the attention of any of Affiliates will not be allocated to any Other Account, with the Partnership being unable to participate in such investment opportunity or participating only on a limited basis. In addition, there may be circumstances under which Affiliates will consider participation by Other Accounts in investment opportunities in which Affiliates do not intend to invest, or intend to invest only on a limited basis, on behalf of the Partnership. Because these considerations may differ for the Partnership and the Other Accounts in the context of any particular investment opportunity, investment activities of the Partnership and the Other Accounts may differ considerably from time to time.

As a result of the foregoing, Affiliates may have conflicts of interest in allocating their time and activity between the Partnership and the Other Accounts, in allocating investments among the Partnership and the Other Accounts and in effecting transactions for the Partnership and the Other Accounts, including ones in which Affiliates may have a greater financial interest.

**Transactions with Related or Affiliated Persons of the General Partner: Principal Portfolio Funds**

The Management Fee and the Carried Interest Distributions to the General Partner are intended to be the only direct compensation from the Partnership and its investments. However, the Partnership may engage in transactions with related or Affiliated Persons including investing, purchasing, and selling assets to, related or Affiliated Persons and/or

entities wholly owned, partially owned or otherwise controlled by related or Affiliated Persons, including the Principal Portfolio Funds, which are managed by the principals of the General Partner. While the Partnership will not be charged any fees or expenses at the Principal Portfolio Fund level in connection with investing in the Principal Portfolio Funds and the General Partner has an obligation to act in the best interests of the Partnership, such related or affiliated investments and transactions may create a material conflict of interest between the interests of the Partnership, on the one hand, and interests of such related or Affiliated Persons, on the other hand, which may incentivize the General Partner to act, or fail to act, in a manner more favorable to the related or Affiliated Person than it otherwise would in the absence of such affiliate or other relationship. All Limited Partners are advised to consult with their advisors prior to making an investment in the Partnership.

**No Separate Professional Advisors**

The Partnership and the GP are not represented by separate professional advisors. Without independent legal and other professional representation, investors may not receive legal and other advice regarding certain matters that might be in their interests but contrary to the interest of Affiliates. However, should a dispute arise between the Partnership and any Affiliates, or should there be a need in the future to negotiate and prepare contracts and agreements between the Partnership and any Affiliates, other than those existing or contemplated on the date of this Memorandum, the GP will cause the Partnership to retain separate counsel and, if necessary, other professionals for such matters.

**VALUATION OF INVESTMENTS**

The Net Asset Value of the Partnership will be determined as of such times as is required by the Partnership Agreement or as may be determined by the GP, but in any case no less than monthly. The value of assets held by the Partnership shall be denominated in U.S. dollars.

Each Partner's share of the Net Asset Value of the Partnership is determined by multiplying (i) the sum of the value of the Securities held by the Partnership plus any cash or other assets (including interest accrued but not yet received) minus all liabilities (including accrued expenses), by (ii) the Partner's Allocation Percentage.

The following general guidelines apply to the determination of the value of the Partnership's investments:

(a)    Securities which are listed on one or more United States or foreign securities exchanges or are traded on a recognized over-the-counter market (including the NASDAQ), or for which market quotations are available shall be valued at their last reported sales price on the date of determination on the primary exchange or market on which such Securities are traded or, if no sale occurred on the valuation date, the value for long positions shall be the "last bid" and the value for short positions shall be the "last ask" (or, if on such date securities markets were closed, then the last preceding business day on which they were open).

(b)    Securities in the form of options listed on a securities exchange will be valued at the last reported sales price on the date of determination on the primary exchange or market on which such Securities are traded or, if the last sales price does not fall between the "last bid" and "last ask" price for such options on such date, such options will be valued at the mean between "last bid" and "last ask" prices on the date of determination.

(c)    Futures instruments will be valued at the settlement price on the exchange on which that futures interest is traded on the day the value is being determined. However, if a futures interest could not have been liquidated on that day because of the operation of daily limits or other rules of the exchange or otherwise, the settlement price on the first subsequent day on which the futures interest could be liquidated will be the market value of that futures interest for that day.

For purposes of these guidelines, sales and bid and ask prices reported in newspapers of general circulation, or in electronic quotation systems or in standard financial periodicals or in the records of securities exchanges or other markets, any one or more of which may be selected by the General Partner, shall be accepted as evidence of the price of a Security.

A Security purchased, and awaiting payment against delivery, shall be included for valuation purposes as a Security held, and the cash account shall be adjusted by the deduction of the purchase price, including brokers' commissions or other expenses of the purchase. A Security sold but not delivered pending receipt of proceeds shall be valued at the net sales price.

Net Asset Value will include any unrealized profit or loss on open positions and any other credit or debit accruing to the Partnership but unpaid or not received by the Partnership. Interest earned on the Partnership's brokerage account, if any, will be accrued at least monthly. The amount of any distribution declared by the Partnership, and of any withdrawal proceeds due but not yet paid, will be treated as a liability from the day when the distribution is declared, or the related withdrawal is effective, as applicable, until it is paid.

The General Partner may make adjustments to the value of Securities to best reflect their fair market value. All matters concerning the valuation of Securities, the allocation of profits, gains, and losses among the Partners, and accounting procedures not specifically and expressly provided for by the terms of the Partnership Agreement, shall be determined by the General Partner and shall be final and conclusive as to all of the Partners.

As to the valuation of the Partnership's investment in a Portfolio Fund, the Partnership will utilize the value ascribed to its investment in such Portfolio Fund by the Portfolio Fund's manager, accountant or administrator, which in some cases may include one or all of the Principals. As specifically regarding Independent Portfolio Funds, valuations provided by such Independent Portfolio Fund's manager, accountant or administrator is not subject to independent review or investigation by the General Partner and Administrator, and the General Partner and

Administrator are entitled to rely on such valuations without independent verification. Certain investments of Portfolio Funds may not have a readily ascertainable market price and will be valued by the respective managers of the Portfolio Funds. The values ascribed by the managers of the Portfolio Funds to the investments of their funds are in accordance with the practices and policies of each such manager and Portfolio Fund, and such practices and policies may not be consistent.

---

## SERVICE PROVIDERS

---

**Broker**

In the sole discretion of the General Partner, the Partnership may utilize a broker (including, but not limited to Charles Schwab & Co., Inc. and Interactive Brokers LLC (the "***Brokers***")) who will clear the securities transactions for the Partnership. The Partnership is not committed to continue its brokerage relationship with any Broker(s) for any minimum period, and the General Partner may select other or additional brokers to act as a broker or prime broker for the Partnership. Subject to the considerations described above, the selection of a broker (including a prime broker) to execute transactions, provide financing and securities on loan, hold positions, cash and short balances and provide other services may be influenced by, among other things, the provision by the broker of the following: commitment of capital, access to company management, access to deal flow, capital introduction and marketing assistance.

**Auditor**

The GP, in its sole discretion, may select an auditor which will complete the year-end audit for the Partnership. The Partnership's books of account shall be audited as of the close of each fiscal year by Spicer Jeffries LLP (the "***Auditor***") or any other independent accounting firm, as designated by the GP. The GP will furnish annual reports containing audited financial statements to all Limited Partners within one hundred twenty (120) days, or as soon thereafter as is reasonably practicable, following the conclusion of each fiscal year, although the GP may elect to postpone the first audit of the Partnership's annual financial statements until the completion of the Partnership's first full fiscal year, in which case the initial audit will cover the applicable fiscal year as well as the partial "stub" year in which the Partnership commenced operation.

In addition, all Limited Partners will receive the information necessary to prepare federal and state income tax returns following the conclusion of such fiscal year as soon thereafter as is reasonably practical.

**Administrator**

NAV Consulting, Inc. (the "***Administrator***" or "***NAV***") has been engaged as the administrator of the Partnership pursuant to a service agreement entered into with the Partnership (the "***NAV Agreement***"). The Administrator is responsible for, among other things, calculating the Partnership's net asset value, performing certain other accounting, back-office, data processing, processing subscriptions, redemptions and transfer activities of Limited Partners in the Partnership, certain anti-money laundering functions and related administrative services.

The NAV Agreement provides that the Administrator shall not be liable to the Partnership, any Limited Partner or any other person in absence of finding of willful misconduct, gross negligence, or fraud on the part of NAV. Furthermore, the Partnership shall indemnify and hold harmless the Administrator, its affiliates, and their respective officers, directors, shareholders, employees, agents and representatives (collectively, the "***NAV Parties***") from and against any liability, damages, claims, loss, cost or expense, including, without limitation, reasonable legal fees and expenses (individually, "***Loss***" and collectively, "***Losses***") arising from, related to, or in connection with the services provided to the Partnership pursuant to the NAV Agreement, unless any such Losses are the direct result of the willful misconduct, gross negligence or fraud of NAV. In no event shall NAV have any liability to the Partnership, any Limited Partner or any other person or entity which seeks to recover alleged damages or losses in excess of the fees paid to NAV by the Partnership in the one year preceding the occurrence of any loss, nor shall NAV be liable for any indirect, incidental, consequential, collateral, exemplary or punitive damages, including lost profits, revenue or data, regardless of the form of the action or the theory of recovery, even if NAV has been advised of the possibility of such damages or such damages were foreseeable. Any claim brought against NAV in connection with the NAV Agreement will be barred unless it is initiated within one year of the earlier of the disclosure of the event which is the subject of such claim or the date that the party advancing such claim knew or could with due inquiry have known of such event.

NAV shall not be liable to the Partnership, any Limited Partner or any other person for the actions or omissions of any agent, contractor, consultant or other third party performing any portion of the services under the NAV Agreement absent a finding of gross negligence or fraud on the part of NAV in appointing such agent, contractor, consultant or other third party.

NAV shall not be liable to the Partnership, any Limited Partner or any other person for actions or omissions made in reliance on instructions from the Partnership or advice of legal counsel.

The services provided by NAV are purely administrative in nature. NAV has no responsibilities or obligations other than the services specifically listed in the NAV Agreement. No assumed or implied legal or fiduciary duties or services are accepted by or shall be asserted against NAV. NAV does not provide tax, legal or investment advice. NAV has no duty to communicate with Limited Partners other than as set forth in Exhibit A of the NAV Agreement. NAV does not have custody of Partnership's assets, it does not verify the existence of, nor does it perform any due diligence on the Partnership's underlying investments, including, investments in or via related or affiliated entities. In connection with the payment processing functions, NAV shall not be responsible for performance of the due diligence on payment recipients other than in connection with payments for Limited Partners' withdrawals from the Partnership, which are subject to anti-money laundering review functions of the services.

The NAV Agreement also provides that it is the obligation of the Partnership's management, and not of NAV, to review, monitor or otherwise ensure compliance by the Partnership with the investment policies, restrictions or guidelines applicable to it or any other term or condition of the Fund's offering documents and with laws and regulations applicable to its activities. Moreover, the Partnership's management's responsibility for the management of the Partnership, including without limitation, the valuation of the Partnership's assets and liabilities, the oversight of the services provided by NAV and the review of work product delivered by NAV shall not be affected by or limited by any of the services provided by NAV.

NAV is entitled to rely on any information, including valuation information, received by NAV from the Partnership, the Partnership's management or other parties, including without limitation, broker-dealers and data vendors, without independent verification, audit, review, inquiry, or performing other due diligence and NAV shall not be liable to the Partnership, any Limited Partner or any other persons for losses suffered as a result of NAV relying on incorrect information. NAV has no responsibility to review, independently value, verify, compare to other pricing sources or otherwise perform due diligence on the valuation information. NAV may accept such information as accurate and complete without independent verification. Furthermore, NAV shall not be liable to the Partnership, any Limited Partner or any other person for any loss incurred as a result of an error or inaccuracy from any pricing or valuation service or data service provider or delay, interruption in service or failure to perform of any pricing or valuation service or data service provider used by NAV.

Where the Partnership makes investments via related entities, to produce net asset value calculation, NAV will use the valuation information of such intermediate, related entities. The valuation information of the intermediate, related entities may be provided by the Partnership's manager or the manager of the intermediate, related entities. NAV is not responsible for performing any due diligence on any of the Partnership's investments, including, the intermediate, related entities and for verifying the existence of the end investments. The Partnership is responsible for the completeness of records, documents and information provided to NAV to perform services.

The information on investor statements and other reports produced by NAV shall not be considered an offer to sell or a solicitation of an offer to purchase any interest in the Partnership, nor may it be used to induce or recommend the purchase or holding of any interest in the Partnership.

The NAV Agreement bars non-parties from asserting third party beneficiary claims against NAV.

The Partnership pays NAV fees out of the Partnership's assets, generally based upon the size of the Partnership, in accordance with NAV's standard schedule for providing similar services, subject to a monthly minimum.

Either party may terminate the NAV Agreement on 180 days' prior written notice as well as on the occurrence of certain events.

Limited Partners may review the NAV Agreements by contacting the Partnership; provided, that NAV reserves the right not to disclose the fees payable thereunder.

NAV is not responsible for the preparation of this Memorandum or the activities of the Partnership and therefore accepts no responsibility for any information contained in any other section of this Memorandum.

**Legal Counsel**

Riveles Wahab LLP (the "**Attorney**") will represent the Partnership and the GP in connection with the organization of the Partnership, the offering of Interests and other ongoing matters. The Attorney has not been engaged to protect the interests of prospective Limited Partners or the Limited Partners. Prospective Limited Partners should consult with and rely upon their own counsel concerning an investment in the Partnership, including the tax consequences to Limited Partners of an investment in the Partnership. No independent counsel has been retained to represent the Limited Partners of the Partnership.

The Attorney's representation of the Partnership is limited to the organization of the Partnership, the offering of Interests and to certain other specific matters as to which the Attorney has been consulted by the Partnership and/or the GP. There may exist other matters which could have a bearing on the Partnership and/or the GP as to which the Attorney has not been consulted. In addition, the Attorney does not undertake to monitor the compliance of the GP and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does the Attorney monitor compliance with all applicable laws. In the course of advising the Partnership, there are times when the interests of the Limited Partners may differ from those of the GP and its affiliates. For example, issues may arise relating to trade errors, expenses to be charged to the Partnership, withdrawal rights of Limited Partners and other terms of the Partnership Agreement, such as those relating to amendments and indemnification. The Attorney does not represent the Limited Partners' interests in resolving such issues.

## BROKERAGE AND CUSTODY

The Partnership's accounts will be maintained with the Brokers. The General Partner has complete discretion regarding the selection of such brokers and the amount of brokerage commissions and fees paid to such brokers. Brokerage fees paid by the Partnership to brokers vary and may be greater than those typical for investment funds similar to the Partnership if the General Partner has determined that the execution and other services rendered by a particular broker merit greater than typical fees.

The General Partner makes investment decisions and arranges for the placement of buy and sell orders and the execution of portfolio transactions for the Partnership. In arranging for the execution of portfolio transactions on behalf of the Partnership, the General Partner seeks to obtain best execution at favorable prices on behalf of the Partnership. The General Partner has discretion to execute trades, select broker-dealers and negotiate commissions. In selecting broker-dealers, the General Partner seeks those broker-dealers who can provide best execution of transactions under the circumstances. The principal factors determining this selection are: (1) a broker's ability to execute the types of transactions occurring in client accounts; (2) the net prices for such transactions; and, (3) trading ideas generated by brokers. "Best execution" is not synonymous with lowest brokerage commission. Consequently, in a particular transaction the Partnership may pay a brokerage commission in excess of that which another broker might have charged for executing the same transaction.

The General Partner may generate "soft dollars" with respect to the Partnership's trades; if it does so, the General Partner intends to comply with the safe harbor of Section 28(e) of the Securities Exchange Act of 1934, as amended. Under "soft dollar" arrangements, the brokerage firms would provide or pay the costs of certain services, equipment or other items for the benefit of the Partnership, the General Partner, or one or more of their affiliates in consideration of the allocation to the firm of brokerage transactions (with resulting commission income) made on behalf of the Partnership on both an agency and net basis. Services that may be furnished or paid for by brokers or dealers may include, without limitation (in addition to the research products and services described below) special execution capabilities, clearance, settlement, net pricing, online pricing, block trading and block positioning capabilities, willingness to execute related or unrelated difficult transactions in the future, performance measurement data, consultations, financial strength and stability, efficiency of execution and error resolution, availability of stocks to borrow for short sales, custody, recordkeeping and similar services. Although these soft dollar arrangements may benefit the Partnership and the General Partner by reducing their respective expenses, the amount of the Management Fees payable to the General Partner will not be reduced. Because such services could be considered to benefit the General Partner and its affiliates, and the "soft dollars" used to acquire them are the assets of the Partnership, the General Partner could be considered to have a conflict of interest in allocating brokerage business on behalf of the Partnership. The General Partner believes, however, that to the extent it makes allocations of brokerage business and soft dollar arrangements, these would generally enhance the Partnership's ability to obtain research and optimal execution, as well as other benefits to the Partnership. Notwithstanding the foregoing, the Partnership will not necessarily benefit from all such soft dollar services. The General Partner and its affiliates and the Other Accounts they may advise may also derive substantial benefits from these services, particularly to the extent the General Partner uses soft dollars to pay for expenses it would otherwise be required to pay itself. Furthermore, because the extent of the products and services provided by these brokers will be based largely on the volume of commissions generated by the Partnership's trading activities, these soft dollar arrangements may create an incentive for the General Partner to increase the volume of the Partnership's trading activities.

Under Section 28(e) of the U.S. Securities Exchange Act of 1934, the General Partner's use of the Partnership's commission dollars to acquire "research" products and brokerage services is not a breach of the General Partner's fiduciary duty to the Partnership--even if the brokerage commissions paid are not the lowest available--as long as (among other requirements) the General Partner determines that the commissions are reasonable in relation to the value of the brokerage services and the "research" acquired. For these purposes, "research" means services or products used to provide lawful and appropriate assistance to the General Partner in making investment decisions for all of its clients. The types of "research" the General Partner may acquire include: research reports on or other information about particular companies or industries; economic surveys and analyses; recommendations as to specific securities; financial publications; portfolio evaluation services; financial database software and services; computerized news and pricing services; quotation equipment and other computer hardware for use in running software used in investment decision making; and other products or services that may enhance the General Partner's investment decision making. Research obtained by the use of "soft dollars" arising from the Partnership's portfolio transactions may be used by the General Partner or its affiliates in its other investment activities and may benefit the Other Accounts, and the Partnership therefore may not, in any particular instance, be

the direct or indirect beneficiary of the research provided. Where a product or service obtained with soft dollars provides assistance both within the safe harbor created by Section 28(e) and outside of the safe harbor, the Partnership will make a reasonable allocation of the cost that may be paid for with soft dollars and pay the remaining portion using the General Partner's own hard dollars. The "safe harbor" is not available where the transactions that compensate a broker-dealer for "research" services or products are effected on a principal basis, with a markup or markdown paid to the broker-dealer (e.g., in transactions with market makers).

The General Partner intends generally to consider the amount and nature of services provided by brokers as well as the extent to which such services are relied on, and will attempt to allocate a portion of the brokerage business of the Partnership and any such Other Accounts and entities on the basis of such considerations. The services received from brokers, however, may be used by the General Partner, its affiliates and principals in servicing some or all of such Other Accounts and entities, but not all such information may be used by the General Partner in connection with the Partnership. The General Partner believes that such an allocation of brokerage business will help the Partnership to obtain research and execution capabilities and provides other benefits to the Partnership.

If, in the General Partner's reasonable judgment, the aggregation of sale and purchase orders of securities for the Partnership with similar orders for the Other Accounts is reasonably likely to result in administrative convenience or an overall economic benefit to the Partnership based on an evaluation that the Partnership is benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions or a combination of these and other factors, the General Partner may place "bunched orders" with respect to such trades. A bunched order is a group of orders for more than one client entered as one order. Bunched orders will be allocated to client accounts in a systematic non-preferential manner. If the bunched order does not fill at one price, resulting in partial fills, allocations to client accounts will be made on an average pricing basis. Average pricing amounts to adding up all the buys or sells at their particular price levels, multiplied by the number of contracts at each particular price level, and dividing by the total number of contracts to determine an average price for the whole bunched order. This is standard industry practice and the Broker's back office will facilitate the process.

The General Partner is authorized to determine the brokers or dealers to be used for each securities transaction for the Partnership. Custody of the Partnership's investments will be maintained at one or more financial institutions or brokerage firms selected by the General Partner, under appropriate arrangements.

## QUALIFICATION OF INVESTORS

AN INVESTMENT IN THE PARTNERSHIP IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT. Interests in the Partnership are being offered under Rule 506(b) of Regulation D of the Securities Act and Section 3(c)(1) of the Investment Company Act for investment by up to 100 persons who are (i) "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act and (ii) "qualified clients" as defined in Rule 205-3 under the Advisers Act who have sufficient knowledge and experience in financial and business matters to make them capable of evaluating the merits and risks of an investment in the Partnership.

In order to satisfy the criteria for an "**accredited investor**," in the case of individuals, an investor must have either (i) an annual income of not less than $200,000 for each of the previous two years (or a combined income with such person's spouse or spousal equivalent[1] of not less than $300,000), and reasonably anticipate the same level of income for the current year, (ii) a net worth in excess of $1,000,000 (excluding the value of such person's primary residence), (iii) a person who holds, in good standing, one of the Series 7, Series 82, Series 65 securities license or such other qualifying professional certificate, designation or credential as set forth on SEC's website from time to time, or (iv) a "knowledgeable employee[2]" of the Partnership, as defined in Rule 3c-5(a)(4) under the Investment Company Act, as amended. Other types of accredited investors permitted to invest in the Partnership include (i) banks or savings and loan associations acting in an individual or fiduciary capacity, (ii) broker-dealers registered under the Securities Exchange Act of 1934, as amended, (iii) investment adviser registered pursuant to Section 203 of the Advisers Act, registered pursuant to the laws of a state or an investment adviser relying on the exemption from registering with the SEC under Section 203(l) or (m) of the Advisers Act; (iv) insurance companies, (v) any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of making the investment, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D, and (vi) a corporation, business trust, partnership or limited liability company not formed for the purpose of making the investment (x) which owns investments in excess of $5,000,000[3], or (y) in which all of the equity owners are accredited investors.

A "**qualified client**" is any person who comes within any of the following categories, at the time of such Limited Partner's admission to the Partnership:

- A natural person who, or a company that, immediately after entering into the contract, has at least one million and one hundred thousand dollars ($1,100,000) under the management of the GP and its affiliates;

- A natural person who, or a company that, the GP reasonably believes has a net worth (together, in the case of a natural person, with assets held jointly with a spouse) of more than two million and two hundred thousand dollars ($2,200,000) (excluding the value of such person's primary residence);

---

[1]"Spousal equivalent" means a cohabitant occupying a relationship generally equivalent to that of a spouse.

[2] A "knowledgeable employee" includes any natural person who is, among others: (1) an "executive officer" or person serving in a similar capacity of the private fund or an "affiliated management person" of a private fund relying on Section 3(c)(1) or 3(c)(7) of the Investment Company Act; or (2) an employee of such a private fund or affiliated management person (individually a "Covered Entity") who, in connection with his or her regular functions or duties, participates in the investment activities of a Covered Entity for at least 12 months.  An "executive officer" is defined to include the president; any vice president in charge of a principal business unit, division or function; any other officer who performs a policy-making function; or any other person who performs similar policy-making functions for a Covered Entity.

[3]        The term "investments" for this purpose generally means: (1) securities (as defined by Section 2(a)(1) of the Securities Act, other than securities of an issuer that controls, is controlled by, or is under common control with, the prospective investors that owns such securities, unless the issuer of such securities is: (i) an investment vehicle (as defined under Investment Company Act Rule 2a51-1(b)); (ii) a public company (as defined under Investment Company Act Rule 2a51-1(b)); or (iii) a company with shareholders' equity of not less than $50 million (determined in accordance with generally accepted accounting principles) as reflected on the company's most recent financial statements, provided that such financial statements present the information as of a date within 16 months preceding the date on which the prospective investor acquires the securities of a Section 3(c)(7) company; (2) real estate held for investment purposes; (3) commodity interests (as defined under Investment Company Act Rule 2a51-1(b)) held for investment purposes; (4) physical commodities (as defined under Investment Company Act Rule 2a51-1(b)) held for investment purposes; (5) to the extent not securities, financial contracts (as such term is defined in Investment Company Act Section 3(c)(2)(B)(ii) entered into for investment purposes; (6) in the case of a prospective investor that is a Section 3(c)(7) company, a company that would be an investment company but for the exclusion provided by Investment Company Act Section 3(c)(1), or a commodity pool, any amounts payable to such prospective investor pursuant to a firm agreement or similar binding commitment pursuant to which a person has agreed to acquire an interest in, or make capital contributions to, the prospective investor upon the demand of the prospective investor; and (7) cash and cash equivalents (including foreign currencies) held for investment purposes.

- A qualified purchaser as defined in Section 2(a)(51)(A) of the Investment Company Act;

- A natural person who is an executive officer, director, trustee, general partner or person serving in a similar capacity of the GP; or

- A natural person who is an employee of the GP (other than an employee performing solely clerical, secretarial or administrative functions with regard to the GP) who in connection with their regular functions or duties participates in the investment activities of the GP, *provided* that such employee has been performing such functions and duties for or on behalf of the GP or substantially similar functions or duties for or on behalf of another company for at least twelve (12) months.

The Partnership reserves the right to reject subscriptions in its sole discretion. Each purchaser will be required to represent that such purchaser's overall commitment to investments which are not readily marketable is not disproportionate to such purchaser's net worth, and that such purchaser's investment in the Partnership will not cause such overall commitment to become excessive; that such purchaser can sustain a complete loss of such purchaser's investment in the Partnership and has limited need for liquidity in such purchaser's investment in the Partnership; and that such purchaser has evaluated the risks of investing in the Partnership.

Limited Partners may not be able to liquidate their investment in the event of an emergency or for any other reason because there is not now any public market for the Interests and none is expected to develop.

The Partnership will not be registered as an investment company under the Investment Company Act of 1940, in reliance on Section 3(c)(1) thereof. As a Section 3(c)(1) fund, the Partnership may offer Interests in a private placement and may have no more than 100 beneficial owners. The Interests therefore may not be resold except in a transaction registered under the Securities Act and the laws of certain states or in a transaction exempt from such registration. (See "*Restrictions on Transfer of Interests*.")

Investors who reside in certain states may be required to meet standards different from or in addition to those described above. Investors will be required to represent in writing that they meet any such standards that may be applicable to them. The GP may, without the consent of the existing Limited Partners, admit new Partners to the Partnership. The GP may reject a subscription for an Interest for any reason in its sole and absolute discretion. If a subscription is rejected, the payment remitted by the Investor will be returned without interest.

Rule 506(d) of Regulation D of the Securities Act provides for disqualification of a Rule 506 offering if any of the principals of the GP or in the event 20% or more of the Partnership's interests is beneficially owned by a Limited Partner involved in a 'disqualifying event' in connection with the sale of securities, within the securities industry or with the SEC (a "**Bad Actor Event**"). A prospective investor subject to a Bad Actor Event within the previous 10 years may be denied admittance to the Partnership in the GP's sole discretion. An existing Limited Partner must inform the GP immediately upon being subject to a Bad Actor Event. The GP may remove such Limited Partner from the Partnership at its sole discretion. The following eight infractions, as provided under Rule 506(d)(i) – (viii), constitute Bad Actor Events:

1. Conviction, within ten years before the sale of the securities (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor: in connection with the purchase or sale of any security; involving the making of any false filing with the SEC; or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities.

2. Being subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before the sale of the securities, that, at the time of such sale, restrains or enjoins you from engaging or continuing to engage in any conduct or practice: in connection with the purchase or sale of any security; involving the making of any false filing with the SEC; or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities.

3. Being subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the Commodity Futures Trading Commission; or the National Credit Union Administration that, at the time of the sale of the securities, bars you from: association with an entity regulated by such commission, authority, agency or officer; engaging in the business of securities, insurance

or banking; or engaging in savings association or credit union activities; or constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before the sale of securities.

4.  Being subject to an order of the SEC entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (the "**Exchange Act**") or section 203(e) or 203(f) of the Investment Advisers Act of 1940 (the "**Advisers Act**") that, at the time of the sale of the securities: suspends or revokes your registration as a broker, dealer, municipal securities dealer, municipal securities dealer or investment adviser; places limitations on the activities, functions or operations of, or imposes civil money penalties on such person; or bars you from being associated with any entity or from participating in the offering of any penny stock.

5.  Being subject to any order of the SEC, entered within five years before the sale of the securities, that, at the time of such sale, orders you to cease and desist from committing or causing a future violation of: any scienter-based anti-fraud provision of the federal securities laws, including, but not limited to, Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 206(1) of the Advisers Act or any other rule or regulation thereunder, or Section 5 of the Securities Act.

6.  Being suspended or expelled from membership in, or suspended or barred from association with a member of, a securities self-regulatory organization (*e.g.,* a registered national securities exchange or a registered national or affiliated securities association) for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade.

7.  Having filed (as a registrant or issuer), or having been named as an underwriter in any registration statement or Regulation A offering statement filed with the SEC that, within five years before the sale of the securities, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of the sale of the securities, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued.

8.  Being subject to a United States Postal Service false representation order entered within five years before the sale of the securities, or, at the time of the sale of the securities, being subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

EACH PROSPECTIVE INVESTOR SHOULD CONSIDER WHETHER THE PURCHASE OF THE SECURITIES OFFERED HEREBY IS SUITABLE FOR HIM IN LIGHT OF HIS/HER INDIVIDUAL INVESTMENT OBJECTIVES.

**FEDERAL TAX ASPECTS**

The following material describes certain Federal income tax aspects of an investment in the Partnership. No consideration has been given to state and local income tax consequences. This summary provides only a general discussion and does not represent a complete analysis of all income tax consequences of an investment in the Partnership, many of which may depend on individual circumstances, such as the residence or domicile of a Limited Partner. Capitalized terms used herein and not otherwise defined will have the same meaning set forth in the Partnership Agreement.

The summary is based on the Internal Revenue Code of 1986, as amended (the "**Code**"), the regulations thereunder (the "**Regulations**") and judicial and administrative interpretations thereof, all as of the date of this Memorandum, taking into effect the TCJA. No assurance can be given that future legislation, Regulations, administrative pronouncements and/or court decisions will not significantly change applicable law and materially affect the conclusions expressed herein. Any such change, even though made after a Limited Partner has invested in the Partnership, could be applied retroactively. Moreover, the effects of any state, local or foreign tax law, or of federal tax law other than income tax law, are not addressed in these discussions and, therefore, must be evaluated independently by each prospective investor.

No ruling has been requested from the IRS or any other federal, state or local agency with respect to the matters discussed below; nor has the General Partner asked its counsel to render any legal opinions regarding any of the matters discussed below. This summary does not in any way either bind the IRS or the courts or constitute an assurance that the income tax consequences discussed herein will be accepted by the IRS, any other federal, state or local agency or the courts. The Partnership is not intended and should not be expected to provide any tax shelter.

THIS SUMMARY IS INCLUDED FOR GENERAL INFORMATION ONLY. NOTHING HEREIN IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY INVESTOR. EACH PROSPECTIVE LIMITED PARTNER IS URGED TO CONSULT SUCH LIMITED PARTNER'S PERSONAL TAX ADVISOR WITH RESPECT TO THE STATE AND FEDERAL INCOME TAX CONSEQUENCES OF HIS OR HER PARTICIPATION AS A LIMITED PARTNER IN THE PARTNERSHIP. DUE TO THE EVER-CHANGING NATURE OF TAX LAWS AND REGULATIONS, AND THE COMPLIANCE REQUIREMENTS ASSOCIATED THEREWITH, ANY DISCUSSION OF THE REGULATIONS AND THE CODE FOUND HEREIN IS SUBJECT TO CHANGE.

**Partnership Status**

The Federal income tax consequences to the Partnership and its Partners will depend primarily upon the characterization of the Partnership as a partnership for Federal income tax purposes rather than as a corporation. If the Partnership were treated as a corporation for Federal income tax purposes, all items of income, gain, loss, deduction, and credit would be those of the corporation and would not be passed through to the Partners, and distributions to Partners would be treated as dividends to the extent of current and accumulated earnings and profits. The General Partner has not requested, nor does it intend to request, a private letter ruling from the IRS that for Federal income tax purposes, the Partnership will be treated as a partnership and not as an association taxable as a corporation.

Treasury Regulations provide a default classification as a partnership for Federal tax purposes for any entity formed after 1996 as a limited partnership under state law. Such an entity may elect to be treated as a corporation for Federal tax purposes. The Partnership was formed as a Delaware limited partnership and does not intend to elect to be treated as a corporation for federal tax purposes. Accordingly, the Partnership will be classified as a partnership for federal tax purposes.

A partnership is not a taxable entity subject to Federal income tax. Accordingly, the Partnership will report its operations for each calendar year and annually will file a United States partnership return of income. Each individual Partner should report on his tax return his distributive share of the Partnership's income, loss, deductions, and credits, if any, for the taxable year of the Partnership ending within or with his taxable year. Each Limited Partner's distributive share of such items is determined in accordance with his allocable share of Net Profit and Net Loss as provided in the Partnership Agreement. As soon as reasonably practicable following the end of the taxable year of the Partnership, the Partnership will provide each Limited Partner with reports showing the items of income, gain, loss, deductions, or credits allocated to the Limited Partner for use in the preparation of the tax return. It should be noted

that a Limited Partner may recognize taxable income attributable to his Interest without receiving any cash distribution with which to pay the taxes thereon.

Publicly Traded Partnership Status. Under the Code, a "publicly traded partnership" generally is treated as a corporation. A partnership is a publicly traded partnership if interests therein (1) are traded on an established securities market (as defined under the applicable Regulations ("**PTP Regulations**")) or (2) are readily tradable on a secondary market (or the substantial equivalent thereof) ("readily tradable"). The Interests will not be listed for trading on an established securities market, and the Partnership will use its best efforts to ensure that its Interests will not be readily tradable.

The PTP Regulations include a "private placement safe harbor" under which partnership interests can avoid being treated as readily tradable. The PTP Regulations provide that this safe harbor applies if (1) the partnership interests were issued in a transaction or transactions not requiring registration under the Securities Act and (2) the partnership has no more than 100 partners.

For purposes of determining the number of partners, a person owning a partnership interest through a partnership, grantor trust or S corporation (a "flow-through entity") is counted as a partner only if substantially all the value of that person's interest in the flow-through entity is attributable to the underlying partnership and a principal purpose for using a tiered structure was to satisfy the 100-partner condition. Because the offering of Interests is not required to be registered under the Securities Act, if the Partnership has no more than 100 Limited Partners (as determined in accordance with the rules regarding "flow-through" entities noted above), the Partnership will meet this "private placement safe harbor" and thus should not be treated as a publicly traded partnership for federal tax purposes. The Partnership Agreement of the Partnership restricts the total number of Limited Partners to 100 (as determined in accordance with the rules regarding "flow-through" entities). Thus, the Partnership should qualify for the "private placement safe harbor."

**Taxation of Operations**

The tax consequences to investors of the Partnership's trading activities in securities are very complex. Prospective investors should consult with tax advisers who have substantial expertise with this aspect of the tax law.

Gains and Losses from Securities Transactions. Generally, the current maximum rate of tax for individuals on capital gains from assets held more than a year and on qualifying dividends is 20% and on ordinary income and short-term capital gains is 37%, reduced from 39.6% prior to enactment of the TCJA. Individuals are allowed to use capital losses to offset in full capital gains. To the extent that capital losses of an individual exceed capital gains in a taxable year, such excess capital losses are also allowed against a maximum of $3,000 of ordinary income. Any capital losses not used in a taxable year may be carried forward. The maximum federal rate of tax for corporations on ordinary income and long-term capital gains is 21%, reduced from 35% prior to the enactment of the TCJA. The TCJA repealed the corporate alternative minimum tax in 2018. Corporations are allowed to use capital losses to offset in full capital gains but are not allowed to offset ordinary income. Corporations generally may carry capital losses back 3 years and forward 5 years.

The Partnership expects to deal with its securities as a trader (generally, a person that buys and sells securities for its own account and conducts active turnover of positions) or investor (generally, a person that buys and sells securities for its own account for purposes of investment, *e.g.*, "buy and hold") and not as a dealer (generally, a person that buys from and sells securities to customers with a view to the gains from those transactions). Accordingly, except as discussed below (see "*Market Discount*") and absent an election under Section 475(f) of the Code (discussed below), the Partnership generally expects that gains and losses recognized on the sale of its securities will be capital gains and losses, which will be long-term or short-term depending, in general, on the length of time it held the securities and, in some cases, the nature of the transactions. There can be no assurance that the IRS will not determine that, for tax purposes, the Partnership is a dealer (or should for other reasons be comparably treated). In the event the IRS were to prevail on this issue, transactions which would otherwise have received capital gain or loss treatment may result in ordinary income or loss being recognized by a Limited Partner.

Gains from property held for more than one year generally will be eligible for favorable tax treatment. As of the date of this memorandum, the maximum Federal income tax rate applicable to a noncorporate taxpayer's net capital gain (the excess of net long-term capital gain over net short-term capital loss) recognized on the sale or exchange of capital assets held for more than one year is a maximum rate of 20%, depending on the investor's marginal tax bracket.

Gain or loss from the disposition of securities generally is taken into account for tax purposes only when realized. Capital losses in excess of capital gains may only be deducted up to $3,000 in any year. The Partnership

does not anticipate that an exclusion for "qualifying business income" under the TCJA will be available to the Partners. The net excess of capital losses above $3,000 may be carried forward indefinitely to offset future capital gains. However, a taxpayer that is engaged in a trade or business as a trader in securities (defined to include, among other instruments, corporate stock, bonds and other evidences of indebtedness, certain notional principal contracts and interests and derivative financial instruments in any of the foregoing or a currency, including any option, short position and similar financial instrument in such a security or currency) may elect under Section 475(f) of the Code to "mark to market" the securities it holds at the end of each taxable year (that is, to recognize gain or loss with respect to those securities as if the trader sold them for their fair market value on the last business day of the year). The Partnership does not intend to make this "mark to market" election, but may do so if deemed, in the General Partner's sole discretion, to be in the best interest of the Partnership. If it were to do so, the election would apply to the year in which it is made and all subsequent taxable years and to all securities held in connection with the trader's trade or business. A mark-to-market election cannot be revoked without the consent of the IRS. Any gain or loss recognized pursuant to the election would be treated as ordinary income or loss.

Medicare Tax. Starting in the 2013 tax year, individuals, estates and trusts are subject to a Medicare tax of 3.8% on "net investment income" (or undistributed "net investment income," in the case of estates and trusts) for each such taxable year, with such tax applying to the lesser of such income or the excess of such person's adjusted gross income (with certain adjustments) over a specified amount. The amount is $250,000 for married individuals filing jointly, $125,000 for married individuals filing separately, $200,000 for other individuals and the dollar amount at which the highest income tax bracket for estates and trusts begins. Net investment income includes net income from interest, dividends, annuities, royalties and rents and net gain attributable to the disposition of investment property. It is anticipated that net income and gain attributable to an investment in the Partnership will be included in an investor's "net investment income" subject to this Medicare tax.

Constructive Sales. If the Partnership has an "appreciated financial position" – generally, an interest (including an interest through an option or short sale) with respect to any stock, debt instrument (other than "straight debt") or partnership interest the fair market value of which exceeds its adjusted basis – and enters into a "constructive sale" of the position, it will be treated as having made an actual sale thereof, with the result that gain will be recognized at that time. A constructive sale generally consists of a short sale or an offsetting notional principal contract entered into by the Partnership or a related person with respect to the same or substantially identical property. In addition, if the appreciated financial position is itself such a short sale or such a contract, acquisition of the underlying property or substantially identical property will be deemed a constructive sale. In general, however, a transaction will not be considered a constructive sale if it is closed by the Partnership within 30 days after the end of the taxable year in which it was originally entered into and the Partnership holds the related appreciated financial position unhedged for 60 days after that closing (e.g., at no time during that 60-day period is the Partnership's risk of loss regarding that position reduced by reason of certain specified transactions with respect to substantially identical or related property, such as having an option to sell, being contractually obligated to sell, making a short sale or granting an option to buy substantially identical stock or securities).

Allocation. As of the close of each year, the capital gains and capital losses of the Partnership shall be allocated to the Partner's Capital Account so as to minimize, to the extent possible, any disparity between the "book" Capital Account and the "tax" Capital Account, consistent with the principles set forth in section 704 of the Code. To the extent permitted by the Treasury Regulations (or successor regulations) in effect under Code Sections 704(b) and 704(c), allocations of capital gain that have been realized up to the time a Capital Account was completely withdrawn may be allocated first to each Capital Account that was completely withdrawn during the applicable Fiscal Year to the extent that the "book" Capital Account as of the Withdrawal Date exceeds the "tax" Capital Account at that time, and allocations of capital loss that have been realized up to the time a Capital Account is completely withdrawn may be allocated first to each Capital Account that was completely withdrawn during the applicable Fiscal Year to the extent that the "tax" Capital Account as of the Withdrawal Date exceeded the "book" Capital Account of such Capital Account at that time. Notwithstanding anything herein to the contrary, capital gain or capital loss recognized with respect to Securities contributed to the Partnership, if any, shall be specifically allocated to the contributing Partner in the amount and manner required by Code Section 704(c) and the regulations thereunder, and, to the extent so allocated, shall be excluded from the computation of the Partnership's capital gain or capital loss, as applicable, for the relevant fiscal year. While this allocation method is commonly used by pooled investment vehicles such as the Partnership, the IRS has never provided a formal opinion that this method is consistent with Code Section 704(b).

Short Sales and Constructive Sales Treatment. The "short-sale" rules may apply to positions held by the Partnership so that what might otherwise be characterized as long-term capital gain or short-term capital loss would be characterized as, respectively, short-term capital gain or long-term capital loss. These rules may also terminate the running of the holding period of "substantially identical property" held by the Partnership.

Under the constructive sales provisions of Section 1259 of the Code, a taxpayer may be required to currently recognize gain with respect to certain appreciated financial positions held by such taxpayer if the taxpayer (or a related person) (i) enters into a short sale of the same or substantially identical property, (ii) enters into an offsetting notional principal contract with respect to the same or substantially identical property, or (iii) in the case of an appreciated financial position that is a short sale or a contract described in (ii) with respect to any property, acquires the same or substantially identical property underlying such short position or contract.

Straddles. If the Partnership incurs a loss upon the disposition of any position which is part of a "straddle" (*e.g.,* two or more offsetting positions), recognition of that loss for tax purposes will be deferred until the Partnership recognizes the gain in the offsetting position of the straddle. In general, investment positions will be treated as offsetting if there is a substantial diminution of the risk of loss from holding one position by reason of holding one or more other positions.

This rule would apply to all of the positions in a straddle which includes one or more Section 1256 contracts (discussed below) but which does not consist entirely of Section 1256 contracts (a "mixed straddle"). This rule does not apply to a straddle in which all of the positions are Section 1256 contracts. The Partnership may elect to have the Section 1256 contract components of a mixed straddle be treated as not subject to the mark-to-market rules. The Partnership can specifically identify particular positions as being components of a straddle, in which case a realized loss would be allowable only upon the liquidation of all of the components of the identified straddle. The Partnership's trading strategies may include the use of straddles, with or without making such identification.

Wash Sale Rules. "Wash sale" rules, which prevent the recognition of a loss from the sale of a security where the same security or a substantially identical security is (or has been) acquired within a prescribed time period, may apply where certain offsetting positions are entered into within the prescribed period.

Short Sales. The "short-sale" rules may apply to positions held by the Partnership so that what might otherwise be characterized as long-term capital gain or short-term capital loss would be characterized as, respectively, short-term capital gain or long-term capital loss. These rules may also terminate the running of the holding period of "substantially identical property" held by the Partnership.

Options. Certain listed non-equity options (such as those on a securities index) in which the Partnership invests may be subject to Section 1256 of the Code ("**Section 1256 contracts**"). Any Section 1256 contracts the Partnership holds at the end of each taxable year generally must be "marked-to-market" (that is, treated as having been sold at that time for their fair market value) for Federal income tax purposes, with the result that unrealized gains or losses will be treated as though they were realized. 60% of any net gain or loss recognized on these deemed sales, and 60% of any net realized gain or loss from any actual sales of Section 1256 contracts, will be treated as long-term capital gain or loss, and the balance will be treated as short-term capital gain or loss. The Partnership may elect not to have the foregoing rules apply to any "mixed straddle" (that is, a straddle, clearly identified by the Partnership in accordance with the Regulations, at least one (but not all) of the positions of which are Section 1256 contracts).

Investment in Non-U.S. Securities. Dividends and interest received by the Partnership with respect to non-U.S. Securities may give rise to withholding and other taxes imposed by non-U.S. countries, generally at rates from 10% to 40%. Tax conventions between certain countries and the U.S. may reduce or eliminate such taxes. With a limited number of exceptions, non-U.S. countries generally do not impose taxes on capital gains with respect to investments by nonresident investors. The tax treatment under the laws of non-U.S. countries of many of the investments that the Partnership holds is unclear. Such countries may assert that the Partnership owes additional taxes with respect to such transactions. In the event that such tax is actually paid, a Partner may be entitled, subject to certain limitations, to a credit or deduction on the Partner's federal income tax return for the Partner's proportionate share of the Partnership's non-U.S. tax liability. On the other hand, even though the Partnership may never actually pay such liability, the Partnership may be required to treat such uncertain tax positions as liabilities on its financial statements, which could cause a Partner's Capital Account to be reduced, thus reducing the amount that such Partner would receive on withdrawal from the Partnership. This paragraph is not a comprehensive discussion of non-U.S. tax consequences of investment in the Partnership.

Original Issue Discount. The Partnership may acquire certain debt instruments that are subject to the original issue discount ("**OID**") rules of Section 1272 of the Code. A debt instrument subject to such rules (which apply to most debt instruments) is treated as having OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. Generally, the stated redemption price of a debt instrument includes all amounts payable other than "qualified stated interest" (*e.g.,* payments that are unconditionally required to be paid at least annually at a single fixed rate over the term of the instrument). Thus, if and to the extent the Partnership acquires debt instruments bearing OID, the Partnership (and, therefore, its Limited Partners) would be required to include in

ordinary income OID, based on a constant yield method, before the receipt of cash attributable to such income, regardless of the Partnership's regular method of accounting. OID accrues daily in accordance with a constant yield method based on a compounding of interest. The OID allocable to any accrual period will be equal to the product of the adjusted issue price of the debt instrument as of the beginning of such period and the yield to maturity of the debt instrument. In the case of debt instruments acquired by the Partnership at their original issue, the adjusted issue price of the debt instrument as of the beginning of any accrual period will equal its issue price to the Partnership, increased by the amount of OID previously included in the gross income of the Partnership and decreased by the amount of any payments made to the Partnership on the debt instruments. If, on the other hand, the Partnership acquires debt instruments bearing OID subsequent to their original issuance, the Partnership will also be required to include OID in income, but the inclusion thereof may vary depending on the price paid by the Partnership for such debt instruments. If the Partnership purchases a debt instrument at less than its adjusted issue price, the Partnership will have market discount in addition to the remaining OID on such debt instrument (see "*Market Discount*"). If the price paid by the Partnership exceeds such adjusted issue price but is less than the stated redemption price at maturity, the Partnership will have acquisition premium equal to such excess and may offset OID accruals by the amortization of such acquisition premium. If the price paid by the Partnership for a debt instrument exceeds its stated redemption price at maturity, the Partnership may elect to amortize such excess under rules relating to acquisition premium.

       <u>Market Discount</u>. If the Partnership purchases, subsequent to its original issuance, a debt instrument for a price that is less than its adjusted issue price, the Partnership (and, therefore, its Limited Partners) may be subject to the rules relating to accrued market discount. Generally, any gain recognized by the Partnership upon a sale or other disposition of a debt instrument will be treated as ordinary income rather than capital gain to the extent of that portion of the market discount that accrued prior to such disposition. Market discount generally accrues on a straight-line basis over the remaining term of a debt instrument, but the holder can elect to compute accrued market discount based on the economic yield of the debt instrument. If the Partnership's purchase is debt-financed, the Partnership will not be entitled to deduct interest expense allocable to accrued market discount until it recognizes the corresponding income. However, the Partnership may elect to include the market discount in income as it accrues. If this election is made, any gain recognized on a disposition of the debt instrument would be entirely capital gain and the rules deferring the deduction of interest expense on related loans would not apply.

       <u>Short-term Acquisition Discount Obligations</u>. The Partnership may acquire debt obligations having short-term acquisition discount (generally, obligations have a term to maturity at issuance of no more than one year). Holders of short-term acquisition discount obligations that are financed (that is, the Partnership incurs interest-bearing expense to acquire or carry such obligations) must use the accrual method of accounting if the taxpayer does not otherwise use such method of accounting. As a practical matter, taxpayers holding short-term acquisition discount obligations that are financed endeavor to match the timing of income and expense; there is no assurance that the Partnership will achieve such objective.

       <u>Bond Premium</u>. If the Partnership purchases a debt instrument at a premium to its issue price, the Partnership may elect to deduct a prorated portion of such amount over par every year until the debt instrument matures. However, it is not necessary to amortize premium in the year the instrument is bought. The Partnership can begin doing so in any tax year. If the Partnership elects to amortize the premium for one bond, then it must also amortize the premium for all other similar bonds, both that year and going forward. If the Partnership decides to amortize the premium from a bond, it must reduce the cost basis of the position by an equivalent amount. Alternatively, the Partnership can elect to not amortize such deduction and simply declare a capital loss when the instrument is redeemed at maturity or is sold at a loss.

**Disallowance of Certain Itemized Deductions**

       The Partnership will be required each year to make the determination as to whether it will take the position for Federal income tax purposes that it is (i) a trader in securities or (ii) an investor in securities. This determination will be made separately each year based primarily on the level of the Partnership's securities activities during the particular year. Accordingly, the Partnership's status as a trader or an investor may vary from year to year and is difficult to predict in advance. If the Partnership is characterized as a trader, each partner who is an individual may deduct his share of the expenses of the Partnership (other than interest expense, but including the Management Fee) under Code Section 162 as a business expense. Alternatively, if the Partnership is characterized as an investor, the expenses of the Partnership (other than interest expense, but including the Management Fee) would constitute "miscellaneous itemized deductions," and as such, would be deductible by an individual only to the extent that is allowable after taking into effect amendments to the Code made by the TCJA. The TCJA substantially limits a Partner's utilization of itemized deductions; Partners are advised to consult their tax advisors with respect to the TCJA's effect on their particular case.

The Partnership may also take a more aggressive tax position than a Partner might. Should the IRS disallow any such position, Partners could be audited and required to pay back taxes, interest and perhaps penalties. Under the Code, neither interest nor any penalties incurred in such circumstances would be deductible. Further, the Code provides for centralized resolution of tax disputes where partnerships are involved. As a result, the resolution of tax disputes affecting Partners' returns may ultimately be controlled by the General Partner. Any audit activity at the Partnership level could also result in the audit of individual Partners' returns with respect to items unrelated to the Partnership's activities.

**Allocation of Income, Deductions, or Loss**

The Partnership Agreement provides that Net Profits shall be allocated to the Partners, including the General Partner, according to their Allocation Percentages. For each Fiscal Year of the Partnership, Net Loss shall be allocated to the Partners in accordance with their Allocation Percentages. Section 704(b) of the Code honors allocations of profits and losses as set forth in partnership agreements provided that such allocations have "substantial economic effect." The General Partner believes that the allocations provided for by the Partnership Agreement have substantial economic effect. However, if an allocation is determined not to have "substantial economic effect," a Partner's allocable share of the item or items involved must be determined on the basis of the Partner's Interest in the Partnership after taking into account all the facts and circumstances. No assurance can be given that the IRS will not challenge the allocation of income, gain, loss, deductions or credits contained in the Partnership Agreement, or in modifications to the Partnership Agreement. If such a challenge is made, no assurance can be given that a court will uphold the allocations so made.

**Tax Elections**

The Code generally provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death) provided that a partnership election has been made pursuant to Section 754. Under the Partnership Agreement, the General Partner, in its sole discretion, may cause the Partnership to make such an election. Any such election, once made, cannot be revoked without the IRS's consent. As a result of the complexity and added expense of the tax accounting required to implement such an election, the General Partner presently does not intend to make such election.

**Mandatory Basis Adjustments**

The Partnership is generally required to adjust its tax basis in its assets in respect of all Partners in cases of partnership distributions that result in a "substantial basis reduction" (*e.g.*, in excess of $250,000) in respect of the Partnership's property. The Partnership is also required to adjust its tax basis in its assets in respect of a transferee, in the case of a sale or exchange of an interest, or a transfer upon death, when there exists a "substantial built-in loss" (*e.g.*, in excess of $250,000) in respect of the Partnership property immediately after the transfer. For this reason, the Partnership will require (i) a Partner who receives a distribution from the Partnership in connection with a complete withdrawal, (ii) a transferee of an Interest (including a transferee in case of death) and (iii) any other Partner in appropriate circumstances to provide the Partnership with information regarding its adjusted tax basis in its Interest.

**Alternative Minimum Tax**

The extent, if any, to which the federal alternative minimum tax will be imposed on any Limited Partner, will depend on the Limited Partner's overall tax situation for the taxable year. Prospective investors should consult with their tax advisers regarding the alternative minimum tax consequences of an investment in the Partnership. The corporate alternative minimum tax was repealed by TCJA.

**General Rules Applicable to Tax-Exempt Organizations**

A tax-exempt organization generally is exempt from Federal income tax on its passive investment income, such as dividends, interest, and capital gains, whether realized by the organization directly or indirectly through a partnership in which it is a partner. (Tax-exempt organizations which are private foundations currently are subject to a 2% tax on their "net investment income.")

The general exemption from tax afforded to tax-exempt organizations does not apply to their "unrelated business taxable income" ("***UBTI***"). A type of UBTI is income or gain derived directly or through a partnership from "debt-financed property", which is any income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year. Gain from the sale or exchange of, and derived from, debt-financed property generally is taxable in the proportion in which the property is financed by "acquisition

indebtedness." The Partnership Agreement envisions the Partnership will incur indebtedness (through the purchase of securities on margin and otherwise). Therefore, tax-exempt organizations which are Partners will be subject to Federal income tax on such portion of their income from the Partnership that is considered to be UBTI.

There are special considerations which should be taken into account by certain beneficiaries of charitable remainder trusts that invest in the Partnership. Charitable remainder trusts should consult their own tax advisers concerning the tax consequences of such an investment on their beneficiaries. In particular, a charitable remainder trust will not be exempt from federal income tax under Code Section 664(c) for any year in which it has UBTI. Moreover, the charitable contribution deduction for a trust under Code Section 642(c) may be limited for any year in which the trust has UBTI.

## Option Transactions - Tax Consequences to Tax-Exempt Organizations

Code Section 512(b) excludes from UBTI (i) all gains or losses from the sale, exchange, or other disposition of capital assets, and (ii) all gains on the lapse or termination of options, written by a tax-exempt organization in connection with its investment activities, to buy or sell securities. The latter exclusion applies whether or not the organization owns the securities upon which the option is written, that is, whether or not the option is "covered."

Options written on a securities index are technically not options to buy or sell the underlying securities; however, the gain realized upon the exercise, lapse, or termination of securities index options is treated as gain derived from the sale of a capital asset under Sections 1234 or 1256 of the Code. Accordingly, pursuant to Section 512(b)(4) of the Code, such gain should not constitute UBTI.

The exclusion of option writing income from UBTI does not, by its terms, prevent the IRS from attempting to tax the option writing income as "debt-financed income," which, as noted above, is a type of UBTI. Section 512(b)(4) of the Code, in effect, provides that, notwithstanding the general exclusion of certain types of income such as interest, dividends, and capital gain from UBTI, if such income is "debt-financed," it is taxable as a type of UBTI. However, since no borrowing or "acquisition indebtedness" is incurred by the writer of an option, option writing income of the Partnership should not be taxable as debt-financed income. Nevertheless, a prospective Limited Partner subject to the rules of UBTI should consult its tax adviser concerning the foregoing matters.

## Passive Activity Losses

The Code restricts the deductibility of losses from a "passive activity" against certain income which is not derived from a passive activity. This restriction applies to individuals, estates or trusts, personal service corporations and certain closely-held corporations. Pursuant to Temp. Treas. Reg. §1.469-1T(e)(6)(i), however, the activity of trading personal property for the account of owners of interests in the activity is not a passive activity. Moreover, an example issued pursuant to such regulation expressly provides a partnership is not engaged in a passive activity if its activities consist of trading stocks, bonds, and other securities where the capital employed by the partnership consists of amounts contributed by the partners in exchange for their partnership interests and funds borrowed by the partnership. Therefore, to the extent the Partnership limits its activities to trading stocks, bonds, and other securities, the income or loss allocated to a Limited Partner will not constitute passive income or passive loss. Because the Partnership expects to limit its activities to trading stocks, bonds, and other securities, the income or loss allocated to a Limited Partner will constitute portfolio income, not passive income, and therefore Limited Partners will only be able to offset losses from their investment in the Partnership against portfolio income from other investments, not shelter passive losses from such Limited Partner's other investments.

## Distributions

A distribution by a partnership to a partner generally is not taxable to the partner except to the extent the distribution consists of cash (and, in certain circumstances, marketable securities) and exceeds the partner's adjusted basis of its interest in the partnership immediately before the distribution. A partner who receives a distribution of property other than cash may recognize gain if such partner contributed appreciated property (other than the property being distributed) to the partnership within seven years before the distribution. In addition, a partner who has contributed appreciated property to a partnership may recognize gain if such property is distributed to another partner within seven years after the property was contributed. Ordinarily, any such excess will be treated as gain from a sale or exchange of the partner's interest. However, the Partnership does not generally intend to make distributions to its Limited Partners.

## Sale of Interest

A Limited Partner receiving a cash liquidating distribution from the Partnership, in connection with a complete withdrawal from the Partnership generally will recognize capital gain or loss to the extent of the difference between the proceeds received by such Limited Partner and such Limited Partner's adjusted tax basis in its Interest. Such capital gain or loss will be short-term or long-term depending upon the Limited Partner's holding period for its interest in the Partnership. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Limited Partner's allocable share of the Partnership's "unrealized receivables" exceeds the Limited Partner's basis in such unrealized receivables, as determined pursuant to the Regulations. For these purposes, accrued but untaxed market discount, if any, on securities held by the Partnership will be treated as an unrealized receivable with respect to the withdrawing Limited Partner.

As discussed above, the Partnership Agreement provides that the General Partner may specially allocate items of Partnership capital gain or loss, including short-term capital gain or loss, to a withdrawing Limited Partner to the extent its liquidating distribution would otherwise exceed its adjusted tax basis in its Interest. Such a special allocation may result in the withdrawing Partner recognizing capital gain or loss, which may include short-term gain or loss, in the Partner's last taxable year in the Partnership, thereby reducing the amount of long-term capital gain or capital loss recognized during the tax year in which it receives its liquidating distribution upon withdrawal.

Except as provided below, distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's interest in the Partnership, generally will not result in the recognition of taxable income or loss to the Limited Partner, except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Partnership's unrealized receivables. Gain generally must be recognized where the distribution consists of marketable securities unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code Section 731(c). While there can be no assurance, it is anticipated that the Partnership will qualify as an "investment partnership." Thus, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose sole contributions to the Partnership consisted of cash, the non-recognition rule described above should apply.

**Audit of Tax Returns**

The IRS is applying greater scrutiny to a proper application of the tax laws to partnerships. An audit of the Partnership's information returns may precipitate an audit of the income tax returns of the Limited Partners. Any expense involved in an audit of a Limited Partner's return must be borne by the Limited Partner. If the IRS successfully asserts an adjustment of any item of income, gain, loss, deduction, or credit reported on a Partnership information return, corresponding adjustments will be made to the income tax returns of the Limited Partners. Further, any audit might result in the IRS making adjustments to items of non-Partnership income or loss. If a tax deficiency is determined, the taxpayer is liable for interest on the deficiency from the due date of the return and possible penalties.

In general, the tax treatment of items of partnership income, gain, loss, deduction, or credit is to be determined at the partnership level in a unified partnership proceeding, rather than in separate proceedings with the partners. Under partnership audit rules that generally take effect January 1, 2018, the "partnership representative" ("**REP**") (a function analogous to that of the tax matters partner ("**TMP**") under prior law), would represent the Partnership before the IRS and may enter into a settlement with the IRS as to the partnership tax issues, which generally will be binding on all the partners. The new audit rules require, generally, that the partners in the taxable year that the audit is resolved must bear the tax liability arising from the audit, rather than the partners in the year(s) that the audit relates to (the "historical partners"). Similarly, only one judicial proceeding contesting an IRS determination may be filed on behalf of a partnership and all partners. The REP may consent to an extension of the statute of limitations for all partners with respect to partnership items. The Partnership has designated the General Partner as the REP. Under the new partnership audit regime, the REP may make certain elections, which, if applicable, would (i) remove the Partnership from the coverage of the new rules or (2) require that the historical partners be liable for the tax arising from the audit. The REP has up to 45 days to make the second election after receipt of notice of conclusion of the audit.

**Tax Shelter Disclosure**

Certain rules require taxpayers to disclose -- on their Federal income tax returns and, under certain circumstances, separately to the Office of Tax Shelter Analysis -- their participation in "reportable transactions" and require "material advisors" to maintain investor lists with respect thereto. These rules apply to a broad range of transactions, including transactions that would not ordinarily be viewed as tax shelters, and to indirect participation in a reportable transaction (such as through a partnership). Prospective investors are urged to consult with their own tax advisers with respect to the regulations' effect on an investment in the Partnership.

**Non-U.S. Investors**

The discussion in this section is limited to the U.S. federal income tax consequences applicable to an investor that is not a U.S. person (for U.S. federal income tax purposes) and who, in addition, is neither (i) an individual present in the United States for 183 days or more in a taxable year nor (ii) an expatriate or former long-term resident of the United States (a "***Non-U.S. Investor***"). A person is generally not a U.S. person for U.S. federal income tax purposes so long as such person is not a citizen or resident of the United States; not a corporation or other entity created or organized in the United States or under the laws of the United States or any political subdivision thereof; not an estate, the income of which is subject to U.S. federal income taxation regardless of its source; and not a trust which (a) is subject to the primary supervision of a court within the United States with one or more United States persons having the authority to control all substantial decisions of the trust or (b) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person. This discussion does not deal with all tax considerations that may be relevant to specific investors in light of their particular circumstances, and does not address the tax consequences of persons who are not Non-U.S. Investors or of persons investing in the Partnership through a partnership or other pass-through entity for U.S. federal income tax purposes, or (with certain exceptions) the application of state, local or U.S. federal estate taxes to an investment in the Partnership.

U.S. Foreign Account Tax Compliance Act

The U.S. Foreign Account Tax Compliance Act ("***FATCA***") imposes certain withholding taxes on U.S. persons holding offshore accounts on designated payments to "foreign financial institutions" which do not provide information about their U.S. accounts to the IRS. The Partnership will require such information from potential Partners such that this rule is not anticipated to be applicable in the Partnership's case.

A non-U.S. Limited Partner will generally be required to provide the Partnership information which identifies its direct and indirect U.S. ownership. Any such information provided to the Partnership will be shared with the IRS. A non-U.S. Limited Partner that is a "foreign financial institution" within the meaning of Section 1471(d)(4) of the Code will generally be required to enter into an agreement with the IRS identifying certain direct and indirect U.S. account holders or equity holders. A non-U.S. Limited Partner who fails to provide such information to the Partnership or enter into such an agreement with the IRS, as applicable, would be subject to the 30% withholding tax with respect to its share of any such payments attributable to actual and deemed U.S. investments of the Partnership and the General Partner may take any action in relation to a Limited Partner's interests or redemption proceeds to ensure that such withholding is economically borne by the relevant Limited Partner whose failure to provide the necessary information gave rise to the withholding. Limited Partners should consult their own tax advisors regarding the possible implications of this legislation on their investments in the Partnership.

**Effectively Connected Income**

The Federal income tax treatment of a Non-U.S. Investor in the Partnership will depend on whether that investor is found, for Federal income tax purposes, to be effectively connected with the conduct of a trade or business in the United States as a result of its investment in the Partnership. Generally, a Limited Partner would be deemed to be engaged in a trade or business in the United States, and would be required to file a U.S. tax return (and possibly one or more state or local returns) if the Partnership is so engaged.

As long as the Partnership's principal activity is investing and/or trading in stocks, securities and commodities for its own account and is not a dealer in such items, a "safe harbor" would apply that would exempt Non-U.S. Investors owning interests in the Partnership from being treated as engaged in a United States trade or business as a result of the Partnership's stocks, securities and commodities trading activity, even if such activity otherwise constitutes a U.S. trade or business, provided that such Non-U.S. Investors are not dealers in stocks, securities or commodities. Accordingly, such Non-U.S. investors owning interests in the Partnership should be eligible for the safe harbor and would be exempt from Federal net taxation on the Partnership activities that fall within the safe harbor (other than for gains on certain securities reflecting interests in United States real property). However, withholding taxes, if any, would be imposed on a Non-U.S. investor's share of the Partnership's U.S. source gross income from dividends and certain interest income arising from safe harbor activities, and certain other income, unless an exception were applicable to reduce or eliminate such withholding. In addition, non-U.S. investors may be subject to withholding taxes on fixed, determinable annual or periodical income ("***FDAP Income***").

To the extent the Partnership engages in a United States trade or business, income and gain effectively connected with the conduct of that trade or business allocated to a Non-U.S. Investor would subject such person to Federal income tax on that income on a net basis at the same rates that are generally applicable to that particular type of investor which is a U.S. person. The Partnership is required to withhold U.S. income tax with respect to each Non-U.S. Investor's share of the Partnership's effectively connected income. The amount withheld is reportable as a tax credit on the U.S. income tax return that such Non-U.S. Investor is required to file. Moreover, effectively

connected earnings from the Partnership which are allocated to a Non-U.S. Investor and are not reinvested in a United States trade or business may be subject to a "branch profits tax."

**State and Local Taxation**

In addition to the Federal income tax considerations summarized above, prospective investors should consider potential state and local tax consequences of an investment in Interests. A Limited Partner's distributive share of the Partnership's taxable income or loss generally will be required to be included in determining the Limited Partner's taxable income for state and local tax purposes in the jurisdiction in which it is resident. However, state and local laws may differ from the Federal income tax law with respect to the treatment of specific items of income, gain, loss, and deduction. The TCJA substantially limits an individual Partner's ability to deduct state and local taxes; a Partner is advised to consult his or her tax advisor with respect to the effect of state and local taxation and tax compliance obligations in respect of an investment in the Partnership.

---

**ERISA CONSIDERATIONS**

---

THE FOLLOWING SUMMARY OF CERTAIN ASPECTS OF ERISA IS BASED UPON ERISA, JUDICIAL DECISIONS, DEPARTMENT OF LABOR REGULATIONS AND RULINGS IN EXISTENCE ON THE DATE HEREOF. THIS SUMMARY IS GENERAL IN NATURE AND DOES NOT ADDRESS EVERY ERISA ISSUE THAT MAY BE APPLICABLE TO THE PARTNERSHIP OR A PARTICULAR INVESTOR. ACCORDINGLY, EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL IN ORDER TO UNDERSTAND THE ERISA ISSUES AFFECTING THE PARTNERSHIP AND THE INVESTOR.

**General**

Persons who are fiduciaries with respect to a U.S. employee benefit plan or trust within the meaning of and subject to the provisions of ERISA (an "***ERISA Plan***"), an IRA or a Keogh plan subject solely to the provisions of the Code[4] (an "***Individual Retirement Fund***") should consider, among other things, the matters described below before determining whether to invest in the Partnership. ERISA imposes certain general and specific responsibilities on persons who are fiduciaries with respect to an ERISA Plan, including prudence, diversification, avoidance of prohibited transactions and compliance with other standards. In determining whether a particular investment is appropriate for an ERISA Plan, U.S. Department of Labor ("***DOL***") regulations provide that a fiduciary of an ERISA Plan must give appropriate consideration to, among other things, the role that the investment plays in the ERISA Plan's portfolio, taking into consideration whether the investment is designed reasonably to further the ERISA Plan's purposes, the risk and return factors of the potential investment, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the ERISA Plan, the projected return of the total portfolio relative to the ERISA Plan's funding objectives, and the limitation on the rights of Limited Partners to withdraw all or any part of their Interests or to transfer their Interests. Before investing the assets of an ERISA Plan in the Partnership, a fiduciary should determine whether such an investment is consistent with its fiduciary responsibilities and the foregoing regulations. For example, a fiduciary should consider whether an investment in the Partnership may be too illiquid or too speculative for a particular ERISA Plan and whether the assets of the ERISA Plan would be sufficiently diversified. If a fiduciary with respect to any such ERISA Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such ERISA Plan, the fiduciary may be held personally liable for losses incurred by the ERISA Plan as a result of such breach.

**Plan Assets Defined**

ERISA and applicable DOL regulations describe when the underlying assets of an entity in which benefit plan investors ("***Benefit Plan Investors***") invest are treated as "plan assets" for purposes of ERISA. Under ERISA, the term Benefit Plan Investors is defined to include an "employee benefit plan" that is subject to the provisions of Title I of ERISA, a "plan" that is subject to the prohibited transaction provisions of Section 4975 of the Code, and entities the assets of which are treated as "plan assets" by reason of investment therein by Benefit Plan Investors. Under ERISA, as a general rule, when an ERISA Plan invests assets in another entity, the ERISA Plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, when an ERISA Plan acquires an "equity interest" in an entity that is neither: (a) a "publicly offered security"; nor (b) a security issued by an investment fund registered under the Investment Company Act, then the ERISA Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that: (i) the entity is an "operating company"; or (ii) the equity participation in the entity by Benefit Plan Investors is limited. Under ERISA, the assets of an entity will not be treated as "plan assets" if Benefit Plan Investors hold less than 25% (or such higher percentage as may be specified in regulations promulgated by the DOL) of the value of each class of equity interests in the entity. Equity interests held by a person with discretionary authority or control with respect to the assets of the entity and equity interests held by a person who provides investment advice for a fee (direct or indirect) with respect to such assets or any affiliate of any such person (other than a Benefit Plan Investor) are not considered for purposes of determining whether the assets of an entity will be treated as "plan assets" for purposes of ERISA. The Benefit Plan Investor percentage of ownership test applies at the time of an acquisition by any person of the equity interests. In addition, an advisory opinion of the DOL takes the position that a redemption of an equity interest by an investor constitutes the acquisition of an equity interest by the remaining investors (through an increase in their percentage ownership of the remaining equity interests), thus triggering an application of the Benefit Plan Investor percentage of ownership test at the time of the redemption.

---

[4] References hereinafter made to ERISA include parallel references to the Code.

**Limitation on Investments by Benefit Plan Investors**

It is the current intent of the GP to monitor the investments in the Partnership to ensure that the aggregate investment by Benefit Plan Investors does not equal or exceed 25% of the value of any class of the Interests in the Partnership (or such higher percentage as may be specified in regulations promulgated by the DOL) so that assets of the Partnership will not be treated as "plan assets" under ERISA. Interests held by the GP and its affiliates are not considered for purposes of determining whether the assets of the Partnership will be treated as "plan assets" for the purpose of ERISA. If the assets of the Partnership were treated as "plan assets" of a Benefit Plan Investor, the GP would be a "fiduciary" (as defined in ERISA and the Code) with respect to each such Benefit Plan Investor and would be subject to the obligations and liabilities imposed on fiduciaries by ERISA. In such circumstances, the Partnership would be subject to various other requirements of ERISA and the Code. In particular, the Partnership would be subject to rules restricting transactions with "parties in interest" and prohibiting transactions involving conflicts of interest on the part of fiduciaries which might result in a violation of ERISA and the Code unless the Partnership obtained appropriate exemptions from the DOL allowing the Partnership to conduct its operations as described herein. The Partnership reserves the right to require the withdrawal of all or part of the Interest held by any Limited Partner, including, without limitation, to ensure compliance with the percentage limitation on investment in the Partnership by Benefit Plan Investors as set forth above.

**Representations by Plans**

An ERISA Plan proposing to invest in the Partnership will be required to represent that it is, and any fiduciaries responsible for the ERISA Plan's investments are, aware of and understand the Partnership's investment objectives, policies and strategies, and that the decision to invest plan assets in the Partnership was made with appropriate consideration of relevant investment factors with regard to the ERISA Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA. WHETHER OR NOT THE ASSETS OF THE PARTNERSHIP ARE TREATED AS "PLAN ASSETS" UNDER ERISA, AN INVESTMENT IN THE PARTNERSHIP BY AN ERISA PLAN IS SUBJECT TO ERISA. ACCORDINGLY, FIDUCIARIES OF ERISA PLANS SHOULD CONSULT WITH THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA OF AN INVESTMENT IN THE PARTNERSHIP.

**ERISA Plans and Individual Retirement Funds Having Prior Relationships with the GP or its Affiliates**

Certain prospective ERISA Plan and Individual Retirement Fund investors may currently maintain relationships with the GP or other entities that are affiliated with the GP. Each of such entities may be deemed to be a party in interest to and/or a fiduciary of any ERISA Plan or Individual Retirement Fund to which any of the GP or its affiliates provides investment management, investment advisory or other services. ERISA prohibits ERISA Plan assets to be used for the benefit of a party in interest and also prohibits an ERISA Plan fiduciary from using its position to cause the ERISA Plan to make an investment from which it or certain third parties in which such fiduciary has an interest would receive a fee or other consideration. Similar provisions are imposed by the Code with respect to Individual Retirement Funds. ERISA Plan and Individual Retirement Fund investors should consult with counsel to determine if participation in the Partnership is a transaction that is prohibited by ERISA or the Code. The provisions of ERISA are subject to extensive and continuing administrative and judicial interpretation and review. The discussion of ERISA contained herein is, of necessity, general and may be affected by future publication of regulations and rulings. Potential investors should consult with their legal advisors regarding the consequences under ERISA of the acquisition and ownership of Interests.

## RESTRICTIONS ON TRANSFER OF INTERESTS

The Interests offered hereby have not been registered under the Securities Act, in reliance upon the exemptions provided by the Securities Act and Regulation D thereunder, nor have the Interests been registered under the securities laws of any state in which they will be offered in reliance upon applicable exemptions in such states. Therefore, the Interests cannot be reoffered or resold unless they are subsequently registered under the Securities Act and any other applicable state securities laws or an exemption from registration is available under the Securities Act or such other laws. Pursuant to the terms of the Subscription Agreement, Limited Partners shall agree to pledge, transfer, convey or otherwise dispose of their Interests only in a transaction that is the subject of (i) an effective registration under the Securities Act and any applicable state securities laws or (ii) an opinion of counsel satisfactory to the Partnership to the effect that the registration of such transaction is not required. Accordingly, prospective investors in the Partnership must be willing to bear the economic risk of an investment in the Partnership for the period of time stipulated in the withdrawal provisions of the Partnership Agreement.

## ADDITIONAL INFORMATION

Prospective investors should understand that the discussions and summaries of documents in this Memorandum are not intended to be complete. Such discussions and summaries are subject to and are qualified in their entirety by reference to such documents. The Partnership will deliver to any prospective investor, upon request, a copy of any and all such documents. The GP will afford prospective investors and their purchaser representatives the opportunity to ask questions and receive answers concerning the terms and conditions of the Offering and to obtain any additional information which the Partnership possesses or can acquire without unreasonable effort or expense.

**PRIVACY NOTICE**

**Pentium Atlas Fund III, LP**

Current regulations require financial institutions (including investment funds) to provide their investors with an initial and annual privacy notice describing the institution's policies regarding the sharing of information about their investors. In connection with this requirement, we are providing this Privacy Notice to each of our investors.

We do not disclose nonpublic personal information about our investors or former investors to third parties other than as described below.

We collect information about you (such as name, address, social security number, assets and income) from our discussions with you, from documents that you may deliver to us (such as subscription documents) and in the course of providing services to you. In order to service your account and effect your transactions, we may provide your personal information to our affiliates and to firms that assist us in servicing your account and have a need for such information, such as the advisor, fund administrator, accountants or auditors. We do not otherwise provide information about you to outside firms, organizations or individuals except as required by law. Any party that receives this information will use it only for the services required and as allowed by applicable law or regulation, and is not permitted to share or use this information for any other purpose.

Pentium Invest, LLC
The General Partner of Pentium Atlas Fund III, LP
3200 Concord Cliff Ave
Henderson, NV 89044

# Exhibit C

PENTIUM
INVEST

# ATLAS FUND III

## PRESERVE & GROW WEALTH

DISCLAIMER

 DISCLAIMER Pentium Invest LLC (the "General Partner") is not registered as an investment adviser with the Securities and Exchange Commission or any state's securities commission. The limited partnership interests (the "Interests") in Pentium Atlas Fund III, LP (the "Fund") are offered under a separate private offering memorandum (the "Offering Memorandum"), have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), nor any state's securities laws, and are sold for investment only pursuant to an exemption from registration with the SEC and in compliance with any applicable state or other securities laws. Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws. Investors should be aware that they could be required to bear the financial risks of this investment for an indefinite period of time. This presentation is being furnished to you on a CONFIDENTIAL basis to provide preliminary summary information regarding an investment in the Fund managed by the General Partner and may not be used for any other purpose. Any reproduction or distribution of this presentation or accompanying materials, if any, in whole or in part, or the divulgence of any of its contents is prohibited. The information set forth herein does not purport to be complete and no obligation to update or otherwise revise such information is being assumed. It is meant to be read in conjunction with the Fund's Offering Memorandum prepared in connection herewith, and does not constitute an offer to sell, or a solicitation of an offer to buy, by anyone in any jurisdiction in which such an offer or solicitation is not authorized or in which the making of such an offer or solicitation would be unlawful. The information contained herein does not purport to contain all of the information that may be required to evaluate an investment in the Fund. The information herein is qualified in its entirety by reference to the Offering Memorandum, including, without limitation, the risk factors therein.

A prospective investor should only commit to an investment in the Fund if such prospective investor understands the nature of the investment and can bear the economic risk of such investment. THE FUND IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. The Fund may lack diversification, thereby increasing the risk of loss. The Fund's performance may be volatile. There can be no guarantee that the Fund's investment objectives will be achieved, and the investment results may vary substantially from year to year or even from month to month. AS A RESULT, AN INVESTOR COULD LOSE ALL OR A SUBSTANTIAL AMOUNT OF ITS INVESTMENT. In addition, the Fund's fees and expenses may offset its profits. There are restrictions on withdrawing and transferring interests from the Fund. In making an investment decision, you must rely on your own examination of the Fund and the terms of the Offering Memorandum and such other information provided by the General Partner to you and your tax, legal, accounting or other advisors. The information herein is not intended to provide, and should not be relied upon for, accounting, legal, or tax advice or investment recommendations. You should consult your tax, legal, accounting or other advisors about the matters discussed herein. The Fund's ability to achieve its investment objectives may be affected by a variety of risks not discussed herein. Please refer to the Offering Memorandum for additional information regarding risks and conflicts of interest.

No representations or warranties of any kind are made or intended, and none should be inferred, with respect to the economic return or the tax consequences from an investment in the Fund. No assurance can be given that existing laws will not be changed or interpreted adversely. Prospective investors are not to construe this presentation as legal or tax advice. Each investor should consult his or its own counsel and accountant for advice concerning the various legal, tax, ERISA and economic matters concerning his or its investment. No person other than the General Partner, and its Principals, has been authorized to make representations, or give any information, with respect to these membership interests, except the information contained herein, and any information or representation not expressly contained herein or otherwise supplied by the Principals in writing must not be relied upon as having been authorized by the General Partner or any of its members. Any further distribution or reproduction of these materials, in whole or in part, or the divulgence of any of its contents, is prohibited. An investment in the Fund has not been approved by any U.S. federal or state securities commission or any other governmental or regulatory authority. Furthermore, the foregoing authorities have not passed upon the accuracy, or determined the adequacy, of this document, the Offering Memorandum or limited partnership agreement associated with the Fund. Any representation to the contrary is unlawful.

Certain information contained in this document constitutes "forward-looking statements" which can be identified by use of forward-looking terminology such as "may," "will," "target," "should," "expect," "attempt," "anticipate," "project," "estimate," "intend," "seek," "continue," or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to the various risks and uncertainties, actual events or results in the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements. The General Partner is the source for all graph and charts, unless otherwise noted. This document may present past performance data regarding prior/other investments, funds, and/or trading accounts managed by the General Partner and/or the Principal(s). This is presented solely for explanatory purposes. The Fund may face risks not previously experienced or anticipated by the General Partner and/or Principals, and therefore, prospective investors should evaluate the Fund on its own merits. Furthermore, there is no guarantee the General Partner and/or Principal will be able to replicate the mandate, strategy, portfolio construction and risk management parameters reflected in their prior performance data. Market factors and unforeseen circumstances both internally and externally may result in a wide deviation from the returns reflected in the prior performance data, and there is no guarantee the General Partner and/or Principal will be able to avoid and/or remediate such internal and external factors.

PAST PERFORMANCE IS NOT INDICATIVE OR A GUARANTEE OF FUTURE RESULTS.
BACKTESTED/HYPOTHETICAL PERFORMANCE RETURNS

Some performance returns presented herein represent hypothetical returns meant to simulate how the Fund would have performed during this period had the strategy been implemented during that time. Backtested/simulated returns are hypothetical and do not reflect trading in actual accounts. Such returns are provided for informational purposes only to indicate historical performance had the strategy been implemented over the relevant time period. Backtested performance results have inherent limitations as to their relevance and use. One of the limitations of hypothetical performance results is that they are generally prepared with the benefit of hindsight. In addition, hypothetical trading does not involve financial risk, and no hypothetical trading record can completely account for the impact of financial risk in actual trading, such as the ability to withstand losses or to adhere to a particular trading program in spite of trading losses are material points which can also adversely affect actual trading results. There are numerous other factors related to the markets in general or to the implementation of any specific trading program which cannot be fully accounted for in the preparation of hypothetical performance results and all of which can adversely affect actual trading results. Any and all of these factors mean that no representation is being made that the Fund will achieve performance similar to that shown in simulated results, and in any case, past performance is no indicator of future performance



EXECUTIVE
SUMMARY

## TARGET FUND AUM

$100,000,000

## UNDERLYING

INDEX OPTIONS

## TARGET AVE RETURN

15-20% ANNUALLY



DAVID YEOW, PHARM.D
President, Co-Founder
Serial Entrepreneur, Investor, Option Trader

RYAN MILLER
Co-Founder
General Partner

KEVIN KWONG, ARM
Co-Founder, CIO
Strategy Expert

# The World is Changing



**GLOBAL CHALLENGES**

## High Inflation
- Broken traditional financial models
- (60/40 portfolio, 2022 worst year since 1930's)

## Overleveraged
- Record debts (Student loans, auto, credit card, mortgages)
- Banking crisis
- Debt ceiling

## Lack of Growth
- High interest rate
- Fastest rate hike ever
- Overpriced Assets
- Global economies struggle



Americans' credit card debt hits a record $1 trillion



Chart 6: Breadth in global stocks narrowest since 2003
MSCI ACWI Equal Weighted vs MSCI ACWI (price relative)

## Uncertainties
- Narrow breadth (market rally lifted by very concentrated few stocks, worst since 2003)
- Deepest inverted 2-10 treasuries yield curves in 40 years
- Real estate challenges
- Geopolitical risks
- Aug 2023 unemployment rate jumped to an 18-month high of 3.8%, from 3.5%



U.S. 10-Year Treasury Bond Total Returns By Year

# GLOBAL CHALLENGES

# The Looming Cliff





**Are you prepared for what is to come?**



# Track Record



| 2022 | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Fund | - | 0.12 | 4.23 | 3.37 | 2.17 | 3.44 | 4.66 | 7.26 | 0.45 | 3.07 | 2.26 | 0.46 | 36.26* |
| SP500 | - | -3.14 | 3.58 | -8.80 | 0.01 | -8.39 | 9.11 | -4.24 | -9.34 | 7.99 | 5.38 | -5.9 | -19.4 |

Audited 2022 Performance



**MISSION**
**& PHILOSOPHY**



**Pentium Atlas Fund III** has been designed to deliver robust investment performance through years of proven, **data-driven** systematic **uncorrelated** strategies. These strategies **consistently** capitalize on trading advantages while effectively **minimizing downside exposure**, providing superior risk-adjusted returns in a rapidly changing market environment.

Our vision is to become the trusted hedge fund partner, offering peace of mind to investors through a diversified range of strategies with distinct risk profiles. This approach ensures relatively consistent performance uncorrelated to the broader market.

- **Capital Preservation** - Resilient portfolio layered with multiple uncorrelated strategies while maintaining substantial **liquidity** and avoid overleveraging.
- **Drawdown Focused** - Repeatable systematic trades & position sizing focused on risk mitigation & **diversification**.
- **Tax Efficient** - Favorable 60/40 tax treatment on core trades' capital gains.



# Backtest

## Strategy Breakdown

| | Benchmark | Strategy-1 | Strategy-2 | Strategy-3 | Strategy-4 |
|---|---|---|---|---|---|
| CAGR | 13.1% | 6.75% | 9.47% | 11.3% | 13.85% |
| Sharpe | 0.8 | 1.93 | 1.78 | 1.36 | 1.04 |
| Max Drawdown | -33.72% | -4.07% | -3.62% | -7.14% | -13.06% |
| Sortino | 1.12 | 2.41 | 3.39 | 2.09 | 1.63 |

2013-2023 June 30 Period

## Combined Profile

| | Strategy | Benchmark |
|---|---|---|
| CAGR | **24.7%** | 13.1% |
| Sharpe | **2.09** | 0.8 |
| Max Drawdown | **-13.95%** | -33.72% |
| Sortino | **3.34** | 1.12 |

## Why Multi-Strategy?

- Diversification - Avoid dependence and over-leveraging one specific strategy
- Resiliency to market fluctuations
- Adjustable to market conditions or regime change
- Reduces overall volatility & drawdowns



STATS
&CORRELATIONS

# "Better performance, lower volatility

### Correlation Study of Strategies & Benchmark



| | Pentium Atlas | S&P 500 | Nasdaq Composite | Russell 2000 |
|---|---|---|---|---|
| **Risk/Return Ratios** | | | | |
| Annualized Sharpe Ratio (5%) | 1.89 | 0.47 | 0.64 | 0.23 |
| Annualized Sharpe Ratio (3M) | 1.92 | 0.52 | 0.67 | 0.26 |
| Annualized Sharpe Ratio (0%) | 2.19 | 0.82 | 0.93 | 0.47 |
| Gain to Loss Ratio | 1.80 | 0.85 | 0.99 | 0.92 |
| $ Profit to Loss Ratio | 10.77 | 1.84 | 1.97 | 1.45 |
| **Benchmark Analysis** | | | | |
| Beta | | 0.04 | 0.04 | -0.03 |
| Alpha | | 3.43% | 3.39% | 3.67% |



BACKTESTED/SIMULATED PERFORMANCE RETURNS ARE HYPOTHETICAL AND DO NOT REFLECT TRADING IN ACTUAL ACCOUNTS



**FUND SUMMARY**

## AUM

$100,000,000

## FEES

2% Management
20% Carried Interest

## MINIMUM INVESTMENT

Institution
$1,000,000

Accredited Individual
$200,000

## LIQUIDITY

1 Year Lock-Up

Monthly withdrawal with 60 Days' notice


**EARLY**
INVESTOR INCENTIVE

# Q4 2023 Investor incentive

| Investment Amount | Mangement fee/ Performance fee (%) |
|---|---|
| <$200,000 | 1.75/20 |
| $200,000-$999,999 | 1.75/17.5 |
| >$1,000,000 | 1.5/15 |
| >$5,000,000 | 1.25/12.5 |
| >$10,000,000 | 1/10 |



**SERVICE TEAMS**

Clearing Firm

**Interactive Brokers**
**Charles Schwab**

Administrator

**NAV Fund Administration Group**

Monthly Reporting

Bank

**Chase/ First Republic Bank**

Legal

**Rivals Wahab, LLP**

Accounting & Audit

**Spicer Jeffries, LLP**

Annual tax and audit



# Contact

Phone
+206 900 3161

Email
hedgefund@pentiumcapitalpartners.com

Address
3200 Concord Cliff Ave, Henderson, NV, 89044



# Magic of Compound Growth



